# In the United States Court of Federal Claims

Nos. 22-1380C, 22-1425C, 22-1436C, 22-1460C, 22-1462C, 22-1477C, 22-1492C, 22-1519C,
22-1549C, and 23-441C
Filed: May 3, 2023
Re-issued: June 2, 2023[1]
Amended: July 18, 2023[2]

|  |  |
|---|---|
| ──────────────────────────── | ) |
| ALLICENT TECHNOLOGY, LLC, et al., | ) |
|  | ) |
| *Plaintiffs*, | ) |
|  | ) |
| v. | ) |
|  | ) |
| THE UNITED STATES, | ) |
|  | ) |
| *Defendant*, | ) |
|  | ) |
| and | ) |
|  | ) |
| BRIGHTPOINT, LLC, et al. | ) |
|  | ) |
| *Defendant-Intervenors*. | ) |
| ──────────────────────────── | ) |

*W. Brad English*, Maynard, Cooper & Gale, P.C., Huntsville, AL, for Plaintiff Allicent Technology, LLC. *Emily J. Chancey* and *Mary Ann Hanke*, of counsel.

*Jon D. Levin*, Maynard, Cooper & Gale, P.C., Hunstville, AL, for Plaintiff Ekagra Partners, LLC. *Joshua B. Duvall* and *Nicholas P. Greer*, of counsel.

*Stephen P. Ramaley*, Miles & Stockbridge P.C., Washington, D.C., for Plaintiff CAN Softtech, Inc. *C. Peter Dungan* and *Roger V. Abbott*, of counsel.

*Alexander B. Ginsberg*, Fried, Frank, Harris, Shriver & Jacobson LLP, Washington, D.C., for Plaintiff Syneren Technologies Corp. *Michael J. Anstett* and *Katherine L. St. Romain*, of counsel.

---

[1] The Court initially filed this Opinion and Order under seal to allow the Parties to propose redactions. The Court has incorporated the proposed redactions and makes them with bracketed asterisks ("[ * * * ]") below.

[2] This Opinion and Order is amended with clarified language in ¶ 11(b) of the Conclusion. *See* ECF Nos. 275, 276.

*Adam K. Lasky*, Seyfarth Shaw LLP, Seattle, WA, for Plaintiff GenceTek, LLC. *Erica L. Bakies* and *Sarah F. Burgart*, *of counsel*.

*William M. Jack*, Kelley Drye & Warren LLP, Washington, D.C., for Plaintiff RarisRex, LLC. *Ken M. Kanzawa*, *of counsel*.

*Matthew P. Moriarty*, Schoonover & Moriarty LLC, Olathe, KS, for Plaintiff AttainX, Inc. *John M. Mattox, Ian P. Patterson*, and *Timothy Laughlin*, *of counsel*.

*Brandon Graves*, Centre Law & Consulting, LLC, Tysons, VA, for Plaintiff JCS Solutions, LLC. *Tyler J. Freiberger* and *Heather B. Mims*, *of counsel*.

*Shane J. McCall*, Koprince McCall Pottroff LLC, Lawrence, KS, for Plaintiff SaiTech, Inc. *Nicole D. Pottroff, John L. Holtz, Gregory P. Weber*, and *Stephanie L. Ellis*, *of counsel*.

*Miles K. Karson*, Trial Attorney, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Franklin E. White, Jr.*, Assistant Director, and *Alison S. Vicks, Brittney M. Welch*, and *Jason X. Hamilton*, Trial Attorneys, for the Defendant. *Ryan Lambrecht*, U.S. Department of Commerce, *of counsel*.

*William A. Shook*, The Law Offices of William A. Shook PLLC, Washington, D.C., for Defendant-Intervenor BrightPoint, LLC. *Steven Barentzen*, The Law Office of Steven Barentzen, *of counsel*.

*David Francis Dowd*, Potomac Law Group, PLLC, Washington, D.C., for Defendant-Intervenor Koniag Management Solutions, LLC.

*Elizabeth N. Jochum*, Blank Rome, LLP, Washington, D.C., for Defendant-Intervenor RIVA Solutions, Inc. *Samarth Barot*, *of counsel*.

*Alexander J. Brittin*, Brittin Law Group, PLLC, Washington, D.C., for Defendant-Intervenor Halvik Corp. *Mary Pat Buckenmeyer*, Dunlap Bennett & Ludwig PLLC, *of counsel*.

*Craig A. Holman*, Arnold & Porter Kaye Scholer LLP, Washington, D.C., for Defendant-Intervenor ProGov Partners LLC. *Julia Swafford*, *of counsel*.

*Kenneth A. Martin*, Martin Law Firm, McLean, VA, for Defendant-Intervenor VenTech SNAP JV.

*Kevin P. Mullen*, Morrison & Foerster LLP, Washington, D.C., for Defendant-Intervenor CW-LTS, LLC. *Krista A. Nunez*, *of counsel*.

James Y. Boland, Venable LLP, for Defendant-Intervenor SONA Networks, LLC. *Andrew W. Current*, *of counsel*.

*Damien C. Specht*, Morrison & Foerster LLP, Washington, D.C., for Defendant-Intervenor MetroIBR JV, LLC. *James A. Tucker* and *Alissandra D. Young*, *of counsel*.

*E. Sanderson Hoe*, Covington & Burling LLP, Washington, D.C., for Defendant-Intervenor T and T Consulting Services, Inc. *Andrew R. Guy*, *of counsel*.

## OPINION AND ORDER

**MEYERS, Judge**.

No procurement is perfect, nor do they need to be. These cases are no different. The consolidated post-award bid protests[3] raise numerous challenges to the Department of Commerce's award of 15 contracts for enterprise-wide IT support services. While plaintiffs raise similar challenges to Commerce's evaluation of their respective proposals, the factual distinctions between the parties' proposals, Commerce's evaluation of them, and the plaintiffs' arguments have necessitated the Court's separate review of each challenged evaluation.

There are, however, some big picture points that should help the reader understand the Court's rationale and distinctions it made between the plaintiffs' relatively similar claims. For example, most, if not all, plaintiffs complained that Commerce assessed significant weaknesses for failing to provide an approach or address various PWS requirements. Despite the Court's limited review of the Agency's evaluation, the Court does find the bare assertion that a plaintiff failed to provide an approach or address a requirement to be sufficient when the plaintiff points to the relevant page of its proposal that says something along the lines of "our approach is . . . ." Nor does the Court consider an evaluation that a party failed to provide an approach or address a required element of the RFP, typically in the Performance Work Statement ("PWS"), as meaning that the proposal lacked detail or was vague. When Commerce reached that conclusion, it did so explicitly.

But many times, Commerce did not simply conclude that a party failed to provide an approach or address an entire PWS section. In these cases, Commerce identified a specific subset of tasks within the evaluated PWS section and concluded that the offeror failed to provide an approach or address just those tasks. In such cases, the Court does not disturb those evaluations unless the plaintiff shows that it clearly did provide the approach and address the requirements the TET identified. In fact, if the Government argued that it was clear from the record that the offeror failed to address a specific requirement or subset of requirements within a PWS Section, the Court accepted that rationale and did not disturb those evaluations.

The remaining arguments were not so widespread and did not present so many close calls. Although the Agency has a duty to read a proposal in its entirety, it is not required to find and piece together a response to one PWS section in all the other sections of a proposal. And the RFP explicitly instructed offerors to include cross-references to other sections if needed to avoid duplication (in a sentence underlined in the RFP). Offerors also had to supply a compliance matrix that indexed the proposal and listed the specific pages that responded to the specific PWS Sections. If that were not enough, the RFP also instructed the offerors to comply with all its

---

[3] In addition to these nine consolidated protests, the four additional plaintiffs also protested this procurement but have since voluntarily dismissed their actions. *See* ECF Nos. 157, 215, 222, & 230. One of those four has filed a new protest that is also consolidated with these cases but will be decided in a subsequent opinion. *See* ECF No. 258.

instructions and that the failure to do so would be at the offeror's own risk.  And the record makes clear that the Agency did review proposals in their entirety and awarded multiple strengths for PWS Sections based on things offerors discussed in other sections of their proposals.  Taking all this together, plaintiffs bore a heavy burden to prevail on a challenge to an evaluation of a PWS Section based on parts of their proposals responding to different PWS Sections.

There are also many disparate treatment arguments spread throughout many proposals.  These arguments are very difficult to prevail on and often succeed only in highlighting and drawing significant attention to what the movant failed to do in its own proposal.  This case is no exception.

Similarly, several plaintiffs argued that the RFP did not require them to provide an approach to demonstrate their ability to perform the PWS work.  The RFP, however, required offerors to demonstrate their ability to perform the work and employ innovative methods to do so—i.e., provide their approaches to doing the work.  While the Agency did consider experience when evaluating an offeror's ability to perform the work, it was not sufficient.

Finally, several plaintiffs argued that Commerce either failed to enforce font and spacing requirements or disparately enforced them.  This issue came down to what the RFP allowed to be put into a table, which had different font and spacing requirements than narrative text did.  The RFP was also clear that it did not limit what could be in a table, so these arguments failed.  Nor did these plaintiffs prevail on what would constitute "excessive" use of tables because that is not something that the RFP limited.

In the end, the Court does not find many of the procurement decisions to have been arbitrary and capricious or an abuse of discretion.  But some were.  And they prejudiced four of the plaintiffs, Ekagra, CAN Softtech, Syneren, and JCS Solutions.  Therefore, the Court grants limited injunctive relief to those plaintiffs so that the Agency can re-evaluate their technical proposals as described herein.

## I.    Background

On November 12, 2021, the Department of Commerce issued Request for Proposal No. 1131L5-21-R-13OS-0006 (the "RFP") for the Commerce Acquisition for Transformational Technology Services ("CATTS"), seeking proposals to provide "enterprise-wide Information Technology services."  ECF No. 118 at AR 1418.[4]  These services fell into "6 main task areas: CIO Support, Digital Document and Records Management, Managed Service Outsourcing and Consulting, IT Operations and Maintenance, Information Technology Services Management, and Cyber Security."  *Id.*  The RFP was for a multi-award indefinite delivery, indefinite quantity ("IDIQ") contract with a one-year base period and four option periods for a total of 10 years.  *Id.*  The maximum amount of all orders combined was $1.5 billion.  *Id.*  Commerce intended to award between 15-20 contracts.  *Id.* at AR 1488.

---

[4] The Court cites to the conformed version of the RFP in the Administrative Record unless otherwise indicated.

The RFP included a PWS that provided the contractors' "general responsibilities" for the contract.  *Id.* at AR 1421 (RFP § C.3.2).  Each task order "will describe the required work to be performed . . . ."  *Id.* (RFP § C.3.1).  The RFP also included a PWS for Task Order 1, which Commerce intended to award at the same time as the IDIQ contracts.  *Id.* at AR 1483.  Although Commerce awarded 15 IDIQ contracts, it did not award Task Order 1.

### A.    The Procurement

1.    Phase 1

Commerce established a two-phase procurement.  In Phase 1 offerors had to provide proof of a Top-Secret Facilities Clearance, and provide a self-assessment.  ECF No. 118 at AR 1475.  Participation in the first phase was mandatory for participation in the second phase.  *Id.* At the end of Phase 1, Commerce would give an "advisory notification" that would "advise the Offeror of the Government's advisory recommendation to proceed or not to proceed with a Phase Two submission."  *Id.*  Commerce intended the advisory notification to minimize costs for those offerors that it found had little to no chance for award.  *Id.*  But the advisory notification was just that, offerors that got a negative notice could continue to submit a Phase 2 proposal if they chose.  *Id.*[5]

2.    Phase 2

For Phase 2, offerors submitted their proposals to perform the work under the CATTS RFP.  These proposals consisted of four or five volumes depending on whether the offeror chose to compete for Task Order 1, which was optional.  The first four volumes of the proposals related to the IDIQ Contracts and were the: (I) Business Proposal; (II) Technical Proposal; (III) Past Performance Proposal; and (IV) Price Proposal.  ECF No. 118 at AR 1477-1481. If offerors chose to compete for Task Order 1, that Technical Proposal was Volume V of their proposal.[6]  ECF No. 118 at AR 1473.

The evaluation considered three factors to determine which offers provided the best value to the Agency.  *Id.* at AR 1490.  Thus, Commerce could award a contract to an offeror that did not provide the lowest-priced or the highest-rated technical proposal.  *Id.*  The three factors for Phase 2 were Technical/Management Capability, Past Performance, and Price.  *Id.*  The RFP provided that Technical/Management Capability was more important than Past Performance.  *Id.*  When combined, the Technical/Management Capability and Past Performance were "approximately equal to price."  *Id.*

a)    *Technical Proposals*

---

[5] Even though the Agency classified offerors "Competitive" and "Non-Competitive" at the end of Phase 1, ECF No. 118 at AR 1489, 3001-20, this was not a competitive range determination because the Agency did not exclude any offeror from proceeding to Phase 2.  *See* 48 C.F.R. § 15.306(c).

[6] Because these protests focus on the evaluations of the IDIQ proposals, the Court does not delve into the requirements of the Business Proposal or the Task Order 1 Technical Proposal.

The "Technical Proposal[] consists of the offeror's proposal delineating its capabilities and how it intends to perform contract requirements. The Technical Proposal will be evaluated in accord with the criteria contained in Section M." *Id*. at AR 1478. In Section L, the RFP instructs the offerors "shall clearly address each of the technical evaluation criteria in Section M and, at a minimum, cover each element." *Id.* at AR 1479. Here, offerors had to address their capabilities to perform the work in the Performance Work Statement ("PWS") for the IDIQ contract. ECF No. 147-1 at AR 29545-85.

The PWS broke out various task areas and provided the work that an awardee would be expected to perform and provided that "[f]or a contractor to be qualified for a Task Area, the contractor must be capable of performing all services within that Task Area." *Id.* at AR 29552. And the RFP indicated that many of these tasks were required, using language like "the contractor shall . . ." or "the contractor is expected to . . . ." *Id.* at AR 29552 (PWS § 3.1.2), 29556 (PWS § 3.3.3). There were also "additional tasks" listed for some of the PWS work areas, but these were not things the offeror had to address, although offerors addressing them would "be viewed more favorably." ECF No. 118 at 976 (answer to Question 208). The RFP also instructed offerors that "[t]he Government considers statements that the prospective Offeror understands, can, or will comply with the specifications, or statements paraphrasing the requirements or parts thereof to be inadequate and unsatisfactory." *Id.* at AR 1474.

Under Section M, the RFP provides that the Agency would consider four elements of equal relative importance when evaluating the Technical/Management Capability Factor:

Offerors must:

a. Demonstrate the Offeror's ability to meet or exceed the Final CATTS PWS requirements and deliverables as contained in Attachment 1, and use proven, innovative methods to meet the Final CATTS PWS requirements, resolve complex issues, and provide continuous process improvement and implementation, all while maintaining and tracking high levels of customer satisfaction.

b. Demonstrate how the Offeror's approach will adapt to evolving technological innovations and the dynamic nature of the organization (impacted by changing regulations, laws, and executive directions) to improve service delivery and ensure ongoing organizational improvement.

c. Demonstrate the Offeror's ability and approach to manage and staff (to include retaining) key personnel and non-key personnel, to include teaming arrangements, to support each of the task areas with the appropriate clearance levels, education, and certifications to adequately meet the requirements of the Final CATTS PWS for future task orders.

6

d. Demonstrate the Offeror's understanding and approach to provide a smooth, undisrupted transition (phase in and out) to include:

> a. How the offeror will implement a proven, feasible and successful methodology for transitioning;
>
> b. How the offeror will identify and mitigate transition risks.

*Id.* at AR 1490-91.

### b)   Past Performance Proposals

Commerce's past performance evaluation sought to "evaluate the quality of the offeror's past performance based on its record of recent, relevant work with its current and former customers." *Id.* at AR 1491. The RFP required each offeror to submit past performance data for between three and six contracts that they completed or substantially performed within five years of proposal submission. ECF No. 118 at AR 1480.

In this evaluation, the Agency considered the timeliness of delivery or performance, responsiveness, quality of products or services, cost control, and compliance with subcontracting plans or goals (if applicable). *Id.* at AR 1491. The RFP reserved to the Agency the "discretion to determine the sources of past performance information used in the evaluation," which could come from the materials provided by offerors, information known to the Agency or other government or private entities, or databases of past performance. *Id.* That said, Commerce committed to consider all comments received regarding past performance. *Id.* at AR 1481.

To be "recent," the work had to be performed within five years of proposal submission. *Id.* at AR 1491. Commerce would consider performance "relevant" if "the performance involves work that is the same or similar in nature, size, and complexity to the services being procured under this solicitation." *Id.* Each reference had to be relevant to one or more task area and the combination of past performance references had to "demonstrate that the offeror has successfully performed all Task Areas in the Final CATTS PWS." *Id.* And the offerors had to explain why their past performance shows that they could perform all the contract requirements. *Id.* at AR 1480.

Finally, if an offeror lacked relevant past performance or had "indications of unsatisfactory performance in general," that offeror would get a "Neutral" rating. *Id.* at 1491-92. The RFP explains that a Neutral rating would not be an advantage nor a disadvantage, but Commerce would view strong recent and relevant past performance more favorably. *Id.* at 1492.

### c)   Price Proposals

The RFP does not dedicate much space to the price proposals. Basically, the RFP required offerors to complete a Price Schedule of hourly labor rates along with "a brief and concise description of the rationale for pricing proposed and of the methods used for estimating

prices including assumptions upon which the Price Proposal is based for task order 1 and any subsequent task orders." *Id.* at AR 1481.

As for the price evaluation, the RFP provides:

> Proposed prices will be evaluated but not scored. A price analysis will be conducted in accordance with FAR 15.305(a)(1) and as described at FAR 15.404-1(b) to determine that the proposed prices are complete, fair and reasonable in relation to the solicitation requirements. Proposed prices must be entirely compatible with the technical proposal and consistent with the pricing requirements listed in this solicitation.

> Proposed prices identified in Attachment 03 of the solicitation will be evaluated by multiplying the hourly labor price per respective year by the Government's estimated labor quantities required in each corresponding year -- years one (1) through ten (10). The totals for each labor category over the ten (10) years will then be added together to reach a single weighted price per offeror. The Government's estimated quantities will not be disclosed. Proposals must include ALL labor categories for ALL regions.

*Id.* at AR 1492.

**B.    Proposal Evaluation**

The Source Selection Plan provides the key ratings and their definitions. For the non-price factors—i.e., technical and past performance—Commerce would evaluate and document strengths and weaknesses using the following criteria:

> A Significant Strength relates to a benefit to the Government that appreciably increases the likelihood of successful contract performance and/or reduces the risk of unsuccessful contract performance.

> A Strength is defined as an aspect of the proposal that increases the likelihood of successful contract performance and/or reduces the risk of unsuccessful contract performance. A Strength must be tied to a benefit to the Government.

> A Weakness is defined as a flaw in the proposal that increases the risk of unsuccessful contract performance. Weaknesses must be tied to an impact or concern to meeting the requirements.

> A Significant Weakness is a flaw that appreciably increases the risk of unsuccessful contract performance. Significant Weaknesses must be tied to a significant impact or concern to meeting the

8

requirements.

A Deficiency is defined as a material failure of a proposal to meet a Government requirement or a combination of Significant Weaknesses in a proposal that increases the risk of unsuccessful performance to an unacceptable level.

A Risk is defined as an aspect of the proposal that may have an adverse impact on an element of performance such as schedule, cost, quality of products or services provided, etc.

ECF No. 118 at AR 1509-10.

1.    Technical evaluations

Commerce received 87 proposals.[7]  ECF No. 130 at AR 26514.  After five proposals failed compliance reviews and one offeror asked to withdraw from competition, the Technical Evaluation Team ("TET") evaluated 81 technical proposals.  *Id.*  For the technical evaluation, Commerce would rate each proposal using the following adjectival ratings:

| Rating | Definition |
| --- | --- |
| Excellent | Proposal significantly exceeds solicitation requirements, demonstrates an excellent understanding of and approach towards fulfilling the requirements and has salient features that offer significant advantages to the Government that are in addition to what is required.  Any Weakness(es) if identified are overwhelmingly offset by the cumulative effect of Strengths identified. Represents a very low risk of unsuccessful contract performance. |
| Good | Proposal exceeds solicitation requirements, demonstrates a good understanding of and approach towards fulfilling the requirements and has salient features that offer advantages to the Government that are in addition to what is required.  Any Weakness(es) if identified are offset by the cumulative effect of Strengths identified. Represents a low risk of unsuccessful contract performance. |
| Satisfactory | Proposal meets solicitation requirements and demonstrates an adequate understanding of and approach towards fulfilling the requirements.  Any Weakness(es) if identified are partially or mostly offset by the cumulative effect of Strengths. Represents a low to moderate risk of unsuccessful contract performance. |
| Marginal | Proposal minimally meets solicitation requirements.  Weaknesses and/or Significant Weaknesses identified are not offset by Strengths and/or |

---

[7] This does not include 2 Aces' proposal, which got lost in the mix after Commerce received it and Commerce subsequently evaluated.

| | | |
|---|---|---|
| | Significant Strengths identified.  Represents a moderate to high risk of unsuccessful contract performance. |
| Unsatisfactory | Proposal does not meet solicitation requirements and contains one or more Deficiencies and/or a combination of Significant Weaknesses that represents a material failure to meet requirements.  Represents a high or unacceptable risk of unsuccessful contract performance. |

ECF No. 118 at AR 1512.

Based on its evaluation, the TET concluded that 22 proposals met RFP requirements. These proposals were:

| Rating | Offerors |
|---|---|
| Excellent (2) | BrightPoint & CW-LTS. |
| Good (8) | dotIT, Enterprise Solutions & Management, Halvik, MetroIBR JV, NOVE-Dine, SONA Networks, T and T Consulting Services, & VentechSNAP JV. |
| Satisfactory (5) | Centuria, Koniag Management Services, ProGov Partners, Reston Consulting Group, & RIVA Solutions. |
| Marginal (7) | [ * * * ] |

ECF No. 130 at AR 26516.  Commerce rated the remaining 59 proposals, including those from all plaintiffs, as Unsatisfactory due to Deficiencies and/or a combination of Significant Weaknesses.  *Id.* at AR 26516-18.  A finding of Unsatisfactory meant that Commerce would not consider a proposal in the best value tradeoff because "[a] proposal receiving an 'Unsatisfactory' or 'Fail' rating in one or more factors shall be removed from further consideration for award or continued evaluation."  ECF No. 118 at AR 1489.  Commerce thus eliminated roughly 73% of the proposals on the technical evaluation.  The TET did not recommend awards.

2.    Past Performance Evaluation

The Past Performance Evaluation Team ("PPET") evaluation consisted of rating each offeror's Past Performance Proposal.  The review included confirming the work had been performed in the five years prior to proposal submission, determining each reference's relevance to the CATTS contract, and evaluating the quality of performance on each reference.  ECF No. 130 at AR 26319-20.

For the relevance rating, Commerce states that "[b]ased on the degree of similarity in nature, size and complexity with the solicitation task area requirements the references were

assigned relevancy findings of Approximately the Same, Very Similar, Somewhat Similar, Marginally Similar, or Limited to None across each task area." *Id.* at AR 26319.  The PPET prepared a table of its ratings for each reference from each offeror.  *Id.* at AR 26441-43.

For the quality of performance, the PPET reports from the Contractor Performance Assessment Reporting System ("CPARS"), and questionnaires that contacts filled out regarding past performance.  *Id.* at AR 26319-20.  The PPET created a table that summarizes the offeror's performance for each reference across multiple subject areas (*e.g.*, quality of service, management, regulatory compliance, etc.).  *Id.* at AR 26444-87.

Based on the analyses of the relevance and quality of references, Commerce assigned adjectival ratings based on the following definitions:

| Rating | Definition |
|---|---|
| Excellent | Offeror's relevant performance met contractual requirements and exceeded many to the customer's benefit.  Performance was accomplished with no to a few minor problems for which any required corrective actions taken were highly effective.  Past performance indicates a very low risk of unsuccessful performance to the Government. |
| Good | Offeror's relevant performance met contractual requirements and exceeds some to the Government's benefit.  Performance was accomplished with some minor problems for which corrective actions taken by the contractor were effective.  Past performance indicates a low risk of unsuccessful performance to the Government. |
| Satisfactory | Offeror's relevant performance met contractual requirements.  Performance was accomplished with some minor problems for which any required corrective actions taken were satisfactory.  Past performance indicates a moderate to low risk of unsuccessful performance to the Government. |
| Neutral | Relevant past performance information is not available, or the record of relevant past performance information is so sparse that no meaningful past performance rating can be reasonably assigned.  A neutral rating is neither a favorable nor unfavorable rating. |
| Marginal | Offeror's relevant performance did not meet all of the contractual requirements however met all critical requirements.  Performance was accomplished with serious problems for which any required corrective actions taken were marginally effective or not fully implemented.  Past performance indicates a moderate to high risk of unsuccessful performance to the Government. |
| Unsatisfactory | Offeror's relevant performance did not meet one or more critical contract requirements.  Performance was not successfully accomplished or a contract |

| | was terminated for default.  Past performance indicates a very high or unacceptable risk of unsuccessful performance to the Government. |

ECF No. 118 at AR 1514-15.  For each offeror, the PPET Report provides an adjectival rating, provides a summary table of each reference, and a short narrative explaining the rating.  ECF No. 130 at AR 26323-437.  Commerce found 14 proposals Excellent, 40 to be Good, 7 to be Satisfactory, and 20 to be Neutral.  *Id.* at AR 26438-40 (summary table of adjectival ratings). The PPET did not recommend awards.

3.   Price Evaluation

The Price Evaluation Team ("PET") calculated each offeror's evaluated price by multiplying labor rates by estimated level of effort for each year.  Commerce determined the estimated level of effort based on the Independent Government Cost Estimate ("IGCE").  ECF No. 130 at AR 26885.  Commerce estimated the level of effort for each labor category for each year.  *Id.*  Commerce then divided the estimated work for each category by 15 to generate an estimated level of effort to account for 15-20 awardees performing the work.  *Id.*  Finally, Commerce weighted different labor categories based on how much Commerce anticipated utilizing each labor category.  Commerce then multiplied the weighted level of effort (hours) by the corresponding labor rates.  *Id.* at AR 26886.  Commerce then added together the labor categories for each year to reach a yearly price, and these yearly prices added together for a total price.  *Id.*

The evaluated prices ranged from $[ * * * ] to $[ * * * ], and the average price was $[ * * * ].  *Id.*  The IGCE was $[ * * * ].  *Id.* at AR 26888.  Approximately [ * * * ]% of the prices were between $[ * * * ] and $[ * * * ], and roughly [ * * * ]% were between $[ * * * ] through $[ * * * ].  *Id.*  The total prices, average price, and IGCE are summarized below:

[ * * * ]

*Id.* at AR 26890; *see also id.* at AR 26886-88 (table of total evaluated prices).  The PET Report also includes the analysis for each offeror's proposal, which includes a determination of fair and reasonable pricing.[8]  *Id.* at AR 26891-971.  The PET did not recommend awards.

**C.   Best Value Tradeoff Award Decision**

The Source Selection Authority ("SSA") reviewed the TET, PPET, and PET Reports and concurred with the findings of each.  *Id.* at AR 28246.  For each proposal, the SSA summarized the TET, PPET, and PET Reports, evaluated the proposal, and made a tradeoff analysis.  *Id.* at AR 28246-373.  The SSA then considered the 22 awardable proposals—those that the TET rated Marginal or better—and which of them represented the best value to the Government.  *Id.* at AR

---

[8] Commerce found that all but one proposal not relevant here contained fair and reasonable pricing.  ECF No. 130 at AR 26971-78 (summary table).

28373-75.  The SSA determined that each offeror whose proposal rated Marginal or better on the technical evaluation received a contract.

## II.     Standard of Review

This Court has jurisdiction over bid protests pursuant to the Tucker Act, which requires the Court to review the Government's action under the standards of the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(1) & (4); *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under the APA, the Court determines whether the Government's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *Banknote*, 365 F.3d at 1350 (citation omitted).  In other words, "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Id.* at 1351 (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  "When a challenge is brought on the first ground, the courts have recognized that contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process."  *Impresa*, 238 F.3d at 1332 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  "Accordingly, the test for reviewing courts is to determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,'" *id.* (quoting *Latecoere*, 19 F.3d at 1356), "and the 'disappointed bidder bears a heavy burden of showing that the award decision had no rational basis,'" *id.* (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)).  "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'"  *Id.* (quoting *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

If an error is found in the procurement, the APA further instructs that "due account shall be taken of the rule of prejudicial error."  5 U.S.C. § 706; *see also Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (citations omitted) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.").  The bid protester was prejudiced if "there was a substantial chance it would have received the contract award but for the" challenged action.  *Glenn Defense Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005)).  To what extent a showing of prejudice is necessary, however, depends on the procurement error.  Specifically, "when an irrational or arbitrary and capricious agency action has occurred, prejudice is presumed, but when a violation of statute or regulation has occurred, there must be a separate showing of prejudice."  *Caddell Constr. Co. v. United States*, 125 Fed. Cl. 30, 50 (2016) (citing generally *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir.2009)); *Banknote*, 365 F.3d at 1351; *see also, e.g., Textron, Inc. v. United States*, 74 Fed. Cl. 277, 329 (2006) ("This prejudice analysis, however, should be reached only when the protestor has shown violation of an applicable procurement regulation.  If the court finds that the Government has acted arbitrarily and capriciously, the analysis stops at that finding."), *appeal dismissed sub nom. Textron, Inc. v. Ocean Tech. Servs., Inc.*, 222 F. App'x 996 (Fed. Cir. 2007), *and dismissed per stipulation*, 223 F. App'x 974 (Fed. Cir. 2007).

Lastly, this bid protest is before the Court pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), which provides for judgment on the administrative record. *See* RCFC 52.1. Judgment on the administrative record under RCFC 52.1 "is properly understood as intending to provide for an expedited trial on the record." *Bannum*, 404 F.3d at 1356. The rule requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record." *Id.* at 1354.

## III.   Standing

Congress granted this Court jurisdiction over an "action by an interested party objecting . . . to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). To establish standing in a bid protest, plaintiffs must establish that they are interested parties under Section 1491(b)(1). In this post-award protest, an interested party is an actual offeror "whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001). Because this is a standing question, the Court must address it before turning to the merits. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.").

While it is undisputed that every plaintiff is an actual offeror, two intervenors move to dismiss some or all the plaintiffs on standing grounds because, according to the intervenors, the plaintiffs (or some subset of them) are not interested parties. CW-LTS moves to dismiss all the complaints because "the number of Deficiencies and/or Significant Weaknesses assigned to many of the Plaintiffs' proposals" makes establishing standing "an insurmountable burden." ECF No. 200 at 3. Thus, "[t]he number of Deficiencies and/or Significant Weaknesses assessed to each Plaintiff's proposal alone warrant the Court's dismissal of their Complaints." *Id.* at 3. This argument, however, fails because it confuses the prejudice required to establish standing with the prejudice required to prevail on the merits.[9]

In a bid protest, the Court makes two prejudice determinations. *Ascendant Servs., LLC v. United States*, 160 Fed. Cl. 275, 287 (2022) ("In order to be successful in a bid protest, a protestor must establish prejudice twice."). First, the Court must determine whether a plaintiff's allegations, if true, establish a substantial likelihood of award but for the error. To meet this burden, a plaintiff "must allege *facts* — not mere conclusory assertions of law — demonstrating prejudice." *Ekagra Partners, LLC v. United States*, 163 Fed. Cl. 189, 203 (2022) (quoting *Vanquish Worldwide, LLC v. United States*, 163 Fed. Cl. 57, 69 (Nov. 10, 2022) (additional citations omitted)). Second, the Court must evaluate prejudice on the merits. Here, the plaintiff must prove that the Government erred and that the error was prejudicial. *Id.* In other words,

---

[9] The remaining intervenors and Government contend that plaintiffs fail to establish prejudice on the merits but do not challenge standing on these grounds. The Government does, however, make limited standing and/or merits prejudice challenges to specific claims about past performance, Weaknesses, and price that it argues cannot be prejudicial because of the Significant Weaknesses and/or Deficiencies that a plaintiff has. The Court will address these at the opening of each section below where the Government makes one of those arguments.

"[t]his second prejudice determination employs the same standards as the prejudice determination for purposes of standing, discussed above.  The difference between the two is that the prejudice determination for purposes of standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true."  *L-3 Commc'ns Corp. v. United States*, 99 Fed. Cl. 283, 289 (2011).

CW-LTS does not argue that any plaintiff failed to allege facts sufficient to establish prejudice; rather, it argues that no plaintiff can establish prejudice because of the number of Significant Weaknesses and/or Deficiencies the Agency assigned to each.  But the question of whether a plaintiff can establish prejudice is a merits question.  The standing question goes to the allegations in the complaint, which CW-LTS ignores.  And the Court has reviewed each plaintiff's Complaint and confirmed that they have alleged facts that challenge each Significant Weakness or Deficiency that Commerce assigned their proposals.  Assuming these allegations are true, as the Court must for the standing analysis, each plaintiff has alleged sufficient facts to challenge their Significant Weaknesses and/or Deficiencies.  And if they prevail on these, their Strengths, Past Performance, and Price evaluations show a substantial chance of award and, therefore, establish standing.

And the one case CW-LTS relies upon to support its argument does not help CW-LTS's cause.  In *Seaborn Health Care, Inc. v. United States*, Judge Wheeler found that "none of Seaborn's allegations, either individually or in combination, would place Seaborn in line for award."  101 Fed. Cl. 42, 49 (2011).  But in *Seaborn*, the plaintiff's proposal was among the lower-rated proposals and would have had to leapfrog six other offerors whose evaluations Seaborn did not contest.  And Seaborn would have had to increase its own evaluation significantly—its "approach to the scope of work" needed to go from "Marginally acceptable" to "Exceptional," its "quality control plan" had to go from "Average" to "Exceptional," and its past performance from "fair" to "very good."  *Id*. at 49.  It was the failure to allege sufficient facts to establish entitlement to these changes that doomed Seaborn's complaint, not the number of issues with its evaluation.  Here, the Agency issued many Significant Weaknesses and Deficiencies for the same purported failure—failing to provide an approach—that, if set aside (for example on the basis that the proposals have sections for each PWS work section that lead off with something along the lines of "our approach is . . ."), would remove most of the assigned Significant Weaknesses and Deficiencies.  In other words, the allegations here "either individually or in combination" would, if proven, establish a substantial chance of award.

ProGov makes a more targeted argument, challenging the standing of four of the nine plaintiffs—Allicent, A-Tek,[10] RarisRex, and Ekagra—arguing they cannot establish standing because they were found unawardable due to their technical evaluations.  ECF No. 195-1 at 6-8.  Thus, ProGov argues that "*unless* the Court finds the Agency determination unreasonable," these plaintiffs lack standing.  *Id*. at 6 (citing *COMINT v. United States*, 700 F.3d 1377, 1384 (Fed. Cir. 2012)) (emphasis added).  But that is *unquestionably* a merits question, not a standing one.  The Court may well find the Agency determination unreasonable on the merits, but there is nothing deficient about the pleadings that address each evaluation rating that made plaintiffs

---

[10] Because A-Tek voluntarily dismissed its case after ProGov's motion, the Court does not address A-Tek's standing.  ECF Nos. 214-15.

unawardable and, if proven, demonstrate a substantial chance of award.  In fact, if Allicent, Ekagra, and RarisRex prove the allegations in their complaints and the challenged Significant Weaknesses and/or Deficiencies are removed, each of these plaintiffs would have [ * * * ].  ECF No. 130 at AR 26890.  Clearly these plaintiffs adequately allege facts sufficient to establish a substantial chance of award if they prevail on proving the allegations in their complaints.

ProGov's argument regarding intervening, higher-rated offerors fares no better.  ECF No. 195-1 at 8-9.  While intervening offerors could preclude standing, they do not here because if these plaintiffs prevail on the merits, they will have technical ratings on par or better than awardees, coupled with similar past performance and pricing, would put them in the zone of active consideration.  *See Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 366 (2009) (holding that absent procurement errors, plaintiff "was 'within the zone of active consideration' and that suffices to demonstrate prejudice") (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983))).

The Court denies CW-LTS's and ProGov's motions to dismiss properly target merits prejudice rather than standing.

## IV.     Allicent Technology, LLC (No. 22-1380)[11]

Commerce assigned Allicent's technical proposal 1 Significant Strength, 9 Strengths, 1 Significant Weakness, and 5 Deficiencies.  As a result of the Deficiencies, it found Allicent's technical proposal Unsatisfactory, which eliminated Allicent from consideration for award. Allicent challenges these ratings and its past performance rating.  Allicent challenges the merit of the negative technical ratings and its past performance evaluation.

### A.     Commerce's assessment of a Significant Weakness for PWS Section 3.4.8 was not arbitrary and capricious.[12]

Commerce assigned Allicent a Significant Weakness for PWS Section 3.4.8.  PWS Section 3.4.8 calls for a contractor to provide various cloud services, including "infrastructure services (e.g., Exchange and Email, SharePoint, . . . Public Key Infrastructure (PKI), etc.)."  ECF No. 118 at AR 1238-39.  Commerce assigned the Significant Weakness because it found Allicent "did not demonstrate capability to operate and maintain PKI systems."  ECF No. 130 at AR 26594.

The first question is whether the RFP required offerors to address PKI specifically. Allicent contends that the RFP did not require offerors to demonstrate capability with PKI because "PKI was just one example in a non-exhaustive list of possible services that the

---

[11] The Court addresses the protests in the order in which they were filed.

[12] Because the parties generally addressed Weaknesses, then Significant Weaknesses, and then Deficiencies, the Court does so as well.

contractor *may* have to provide."  ECF No. 232 at 10 (emphasis added).[13]  Although the RFP uses the words "will include but are not limited to," Allicent claims that only the words preceding the "e.g." parenthetical (which ends in "etc.") are required services, and the parenthetical merely provides an illustrative, non-exhaustive list that includes "PKI."  *Id.*  But the Solicitation provided that each offeror would be evaluated, in part, based on ability to "[d]emonstrate [its] ability to meet or exceed the Final CATTS PWS requirements . . . ."  ECF No. 118 at AR 1490.  And the plain text of PWS Section 3.4.8 provides that "[t]hese services *will include* but are not limited to . . . infrastructure services (e.g., . . . Public Key Infrastructure (PKI), etc.)."  ECF No. 147-1 at AR 29560 (emphasis added).  Given that "infrastructure services" is a broad term, the parenthetical narrows it to specific items that offerors should expect to perform.  Indeed, the same language—"will include but are not limited to"—was used elsewhere in the RFP and Allicent understood what it meant.  ECF No. 203 at 34.  And "[f]or a contractor to be qualified for a Task Area, the contractor must be capable of performing *all* services within that Task Area."  ECF No. 147-1 at AR 29552 (emphasis added).

Several parties argued that Allicent's arguments fail because HSPD-12 requires PKI implementation and Allicent should have known it would be required.  *E.g.*, ECF No. 200 at 6-7.  Similarly, the Government also contends that "PKI operations is an industry standard based on federally mandated encryption requirements" and so "[i]t is inconceivable that an entity of Allicent's experience would believe that demonstrating proficiency with a universal requirement in federal IT services is optional, particularly given the PWS's specific requirement."  ECF No. 254 at 14.  But Allicent disputes that PKI is "federally-mandated" pursuant to HSPD-12 because HSPD-12 does not "'mandate compliance with Public Key Infrastructure,' as CW-LTS has represented[,]" but instead "set[s] the groundwork for agencies to prioritize secure and reliable forms of identification, which later developed into a standard for implementing, among other things, digital certificate infrastructure for federal employees and their contractors."  *Id.* at 12 (citations omitted).  Whatever the merit of these arguments, the RFP language is clear enough and required Allicent to demonstrate its ability to meet or exceed the requirement to provide "infrastructure services," which included PKI services.

Allicent next argues that the Agency's evaluation was arbitrary and capricious because PKI is a security measure and Allicent mentioned PKI in its approach to cybersecurity in a different task area.  ECF No. 168 at 16.  Although Allicent did not explicitly use the term "PKI" in its approach to PWS Section 3.4.8, Allicent "described its ability to leverage its knowledge of key services like [ * * * ] which is just one tool in the PKI toolbox in its cybersecurity approach."  *Id.* (citing ECF No. 118 at AR 3872).  But this language is in a different section of Allicent's proposal and there is no cross-reference in the response to Section 3.4.8 to this language.  While the Agency was free to look at other places, it was not required to search out responsive information in the proposal.  *CACI, Inc.*, 158 Fed. Cl. at 19 (2021) ("Agencies must indeed review the whole proposal, but they are not compelled to comb the record for information that an offeror does not otherwise adequately present through a well-written proposal.").  Again, the RFP instructed offerors to cross-reference other sections if they provided information in other sections of the proposal. ECF No. 118 at AR 1472 ("<u>Cross-references should be utilized to</u>

---

[13] To the extent Allicent is claiming the language is unclear, that argument is waived.  *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).

preclude unnecessary duplication of data between sections.") (emphasis in original).  And the RFP put offerors on notice that failure to do so could result in negative evaluations.  Specifically, the RFP provides that "Offerors shall examine and follow all instructions.  Failure to do so will be at the Offeror's own risk."  ECF No. 118 at AR 1474 (RFP § L.2).  Nor can the Court conclude that it is arbitrary and capricious for the Agency to find that a discussion of "one tool in the PKI toolbox" is insufficient to demonstrate a capability to support PKI as a whole.

Allicent also challenges the evaluation because it argues that several awardees merely parroted back the words "PKI" and were not given a Significant Weakness, thereby demonstrating the Agency "converted its evaluation into a word search, instead of substantively reviewing offerors' approaches . . . ."  ECF No. 168 at 12, 16.  The Government counters that "Allicent's claim that the agency improperly deviated from the evaluation criteria in favor of a mere keyword search is speculation unsupported by any record evidence."  ECF No. 203 at 33.  But what is a sufficient discussion of PKI is for the Agency to determine, not the Court.  And, as discussed below, the Agency found several awardees to have sufficiently addressed the requirement without using the term PKI, which means the Agency could not have been doing a keyword search.

Finally, Allicent raises a disparate treatment argument because MetroIBR,[14] RIVA, and T&T Consulting all failed to mention the term PKI yet were not given Significant Weaknesses.  ECF No. 168 at 17.  To establish disparate treatment, Allicent must show that its proposal and the other proposals are "substantively indistinguishable".  ECF No. 254 at 16 (citing *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020)).  The Government acknowledges that although RIVA and T&T omitted the term "PKI," unlike Allicent, they both address PKI components and requirements in other manners.  *Id.;* ECF No. 203 at 14-15.

In reviewing RIVA's and T&T's proposals, the Court cannot conclude that the Agency's evaluations show disparate treatment.  RIVA states in its proposal that it would use [ * * * ].  ECF No. 128 at AR 20767.  T&T's proposal states "that it would 'ensure [ * * * ],' and ensure [ * * * ], and also [would] [ * * * ]."  ECF No. 254 at 15 (citing ECF No. 129 at AR 23144, 23156).  The Court cannot find it irrational for the Agency to conclude that these proposals satisfied the PKI requirement.  And it is not disparate treatment for the Agency to evaluate different proposals differently.

The Agency's assessment of a Significant Weakness for PWS Section 3.4.8 was not arbitrary and capricious; it was supported by the record.  And Allicent has failed to demonstrate disparate treatment with respect to the Agency's evaluations of RIVA's and T&T's proposals.  Therefore, the Court denies Allicent's challenge to the Significant Weakness for PWS Section 3.4.8.

## B.    Deficiencies

---

[14] Although Allicent raised MetroIBR in its MJAR, the Government responded to it and Allicent did not discuss MetroIBR in its reply.  Therefore, the Court does not consider MetroIBR in this decision.  *E.g.*, *Golden IT, LLC v. United States*, 157 Fed. Cl. 680, 695-96 (2022) (collecting cases).

Because the SSP defines a technical rating of Unsatisfactory to include any single deficiency, Allicent must prevail on its challenges to each Deficiency that Commerce assigned to its proposal.

       1.    <u>Commerce's assessment of a Deficiency for PWS Section 3.4.20 was not arbitrary and capricious.</u>

Commerce assigned Allicent's proposal four Deficiencies for PWS Sections 3.4.2, 3.4.4, 3.4.10, and 3.4.20. The entirety of the evaluation was:

> The Offeror did not demonstrate its ability to meet or exceed the requirements of PWS Task Area 4, Sections **3.4.2, 3.4.4, 3.4.10, and 3.4.20**. The Offeror failed to address these requirements or provide an approach to demonstrate capability. The requirements of PWS Sections **3.4.2, 3.4.4, 3.4.10, and 3.4.20** are key components of Task Area 4, IT Operations and Maintenance. Therefore, the Offeror's failure to demonstrate its approach and its full understanding of the requirements in these PWS areas creates an unacceptable risk of unsuccessful performance.

ECF No. 130 at AR 26594 (emphasis in original). The Government insists that it is clear from the record why Allicent got the assigned Deficiencies. ECF No. 203 at 31-32. The Court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc*., 419 U.S. 281, 285-86 (1974) (citing *Colorado Interstate Gas Co*. v. *FPC*, 324 U.S. 581, 595 (1945)). But this Court will not scour the record to "supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). Nor is the Government free to assert a rationale that the Agency did not propound in the record. *Id*. And without a rationale that is consistent with the record, the Court is unable to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

According to the Government, Commerce assigned the Deficiency for PWS Section 3.4.2 because Allicent's proposal purportedly lacked detail. ECF No. 203 at 29-30. But that is not the reason Commerce gave for the Deficiency. The Agency clearly concluded that "[t]he Offeror *failed to address* these requirements *or provide an approach* to demonstrate capability." ECF No. 130 at AR 26594 (emphasis added). That is not a conclusion that Allicent's proposal lacked detail. And when the Agency concluded that a proposal lacked detail, it said so. *E.g.,* ECF No. 130 at AR 26631 ("Offeror does not explain what their 'cradle to grave' approach entails . . . . "); ECF No. 130 at AR 26551 ("Offeror failed to provide any details of [its] 11-step approach, thus failing to demonstrate a capability to perform these requirements."); ECF No. 130 at AR 26678 ("However, the above statements are vague . . . ."). Therefore, the Court cannot accept a contrary argument in this litigation.

The Government also argues in its reply that Allicent failed to address PWS Section 3.4.20, which justifies the Deficiency on that ground. ECF No. 254 at 9. PWS Section 3.4.20

calls for "knowledge wall and video display integration, operations, and maintenance." ECF No. 147-1 at AR 29565. This work would include things like "engineering, installing, and programming video display systems"; conducting testing; and "maintaining and operating a wide variety of video display equipment, to include video feed devices, channel and layout controls, audio, video, and display components"; and similar services *Id*. In its response and reply, Allicent countered that it addressed these requirements in a section of its proposal that combined its responses to PWS Sections 3.4.13, 3.4.18, 3.4.19, and 3.4.20, which Allicent considers to be related. ECF No. 232 at 8 (citing ECF No. 119 at AR 3862). PWS Sections 3.4.13, 3.4.18, and 2.4.19 address "collaboration services"; "voice installation, operations, and maintenance"; and "video and  video teleconferencing installation, operations, and maintenance" respectively. ECF No. 147-1 at 29562, 29564-65. Thus, the question is whether Allicent's proposal clearly addresses PWS Section 3.4.20's requirements.

Here the Court is mindful that "the role of the court is 'not to substitute its judgment for that of the agency,' but rather to determine whether the agency had a rational basis for its decision." *Vanguard Recovery Assistance v. United States*, 101 Fed. Cl. 765, 784-85 (2011) (internal citation and quotation marks omitted). There is nothing on the face of Allicent's proposal that responds to PWS Section 3.4.20 other than the inclusion of that section number in the header of the one-page section of Allicent's proposal responding to these four PWS Sections. *See* ECF No. 119 at AR 3862. Allicent devotes the first half of the page to voice services but does not explicitly address knowledge wall requirements. *Id*. The bottom half of the page has a header "Video & Video Teleconferencing Installation, Operations & Maintenance," which is also the title of PWS Section 3.4.19. *Id*.; *see also* ECF No. 147-1 at AR 29564. This section of the proposal refers explicitly to video teleconferencing support, but not to the knowledge wall requirements. While it *may* be that some of the proposal services address PWS Section 3.4.20 requirements, they do not clearly do so. And they do not do so clearly enough for the Court to conclude that the Agency lacked a rational basis when it concluded that Allicent did not respond to the PWS Section 3.4.20 requirements. Therefore, the Deficiency for PWS Section 3.4.20 is not arbitrary and capricious, and the Court will not disturb it.

## C.     Prejudice

As explained above, Allicent must show prejudicial error to prevail. To do so, Allicent "must show that there was a substantial chance it would have received the contract but for the government's error in the bid process." *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1380 (Fed. Cir. 2009) (citing *Bannum, Inc. v. United States*, 404, F.3d 1346, 1358  (Fed. Cir. 2005)). Given that the Deficiency Commerce assigned to Allicent's proposal for PWS Section 3.4.20 was rationally assessed, Allicent cannot establish prejudice. The SSP provides that Commerce would use an adjectival rating system that defines an Unsatisfactory technical rating as one where the "Proposal does not meet solicitation requirements and contains one or more Deficiencies and/or a combination of Significant Weaknesses that represents a material failure to meet requirements. Represents a high or unacceptable risk of unsuccessful contract performance." ECF No. 118 at AR 1512. Thus, a single Deficiency results in a technical proposal being Unsatisfactory. And "[a] proposal receiving and 'Unsatisfactory' or 'Fail' rating in one or more factors *shall be removed from further consideration* for award or continued evaluation." ECF No. 118 at AR 1489 (RFP § M.2.2(d)(5)) (emphasis added). As a result, no matter how erroneous any other part of the Agency's evaluation of Allicent may be, the fact that

a Deficiency survives the Court's review means that the Agency "shall" remove Allicent's proposal from further consideration.

Because Allicent cannot establish prejudice, the Court denies Allicent's MJAR and grants the Government's and Defendant-Intervenors' Cross-MJARs.

## V.   Ekagra Partners, LLC (No. 22-1425)

Commerce assessed Ekagra's technical proposal 1 Significant Strength, 5 Strengths, 3 Weaknesses, and 21 Significant Weaknesses.  As a result, Ekagra's technical proposal was rated Unsatisfactory, which eliminated Ekagra from consideration for award.  Ekagra challenges the merit of the negative technical ratings.

### A.   Weaknesses

#### 1.   Commerce rationally assigned the Weakness for PWS Section 3.1.2.

PWS Section 3.2.1 establishes that "[t]he contractor shall provide technical writing and documentation support.  Technical writing services and documentation support include, but are not limited to . . . maintaining change control for all documents."  ECF No. 147-1 at AR 29552-53.  The Evaluation claims Ekagra "did not provide an approach to demonstrate capability to support this requirement . . . ."  ECF No. 130 at AR 26676.  Ekagra explained in its proposal that its "multi-staged approach to Technical Writing and Document Management includes requirements gathering, planning, drafting, peer review, editing, and proofreading."  ECF No. 122 at AR 11154.  But the Agency, "based on its technical expertise and judgment, determined that 'drafting peer review, editing, and proofreading,' was ***not*** the equivalent of providing a detailed technical approach to performing the work necessary for 'change control,' and that Ekagra's failure would 'result[] in an inefficient documentation process.'"  ECF No. 203 at 43 (citing ECF No. 130 at AR 288804) (emphasis in original).

Ekagra does not dispute that it "did not specifically use the words 'change control,' [but] it did state that it employs a Document Management approach that includes 'drafting, peer review, editing and proofreading.'" ECF No. 231 at 3 (citing ECF No. 122 at AR 11154).  While Ekagra may believe that "[t]hat is the very essence of change control," ECF No. 231 at 3; *see also* ECF No. 173 at 22 ("Ekagra's document management involves all aspects of the rigorous change control process, including those services sought by the Agency"), the Court does not find that to necessarily be true.  It is clear that "maintaining change control for all documents" is one of several requirements prescribed under PWS Section 3.1.2.  *See* ECF No. 147-1 at AR 29552-53.  But it is not clear that "drafting, peer review, editing and proofreading" satisfies the requirement to manage "change control" because change control connotes so form of version and revision control, not merely the "peer review, editing, and proofreading" of documents.  Therefore, Ekagra's challenge to the Agency's assigning a Weakness to its proposal for PWS Section 3.1.2 fails.

#### 2.   Commerce rationally assigned the Weakness for PWS Section 3.1.5.

PWS Section 3.1.5 requires the contractor "to provide the capabilities necessary to define, track, and control licenses procured under the contract and those licenses provided by the

government for the full period of performance of the contract."  ECF No. 147-1 at AR 29553.
Further, the solicitation clarifies that "[t]his capability should be on-line and remote[ly]
accessible through standard features (e.g., browser) to provide government situational awareness
and ensure compliance with applicable license terms and conditions."  *Id.*  The TET concluded
that Ekagra "stated they would, 'provide a License Utilization Report for CATTS stakeholders,'
but did not demonstrate that this reporting capability would be on-line and remotely accessible."
ECF No. 130 at AR 26676.

Ekagra counters that the Agency's rationale is contradicted by the record because
"[r]eporting usage 'across multiple cloud and development environments,' both alone and when
combined with reporting tools that are used to report data from the cloud necessarily means they
are online and remotely accessible."  ECF No. 173 at 22 (citing ECF No. 122 at AR 1115).
Accordingly, Ekagra claims its "proposal included features that met this PWS requirement,
including tracking being online, remotely[,]" and therefore the "assignment of a Weakness here
is arbitrary and irrational."  ECF No. 231 at 4.  While Ekagra maintains the approach set forth in
its proposal "necessarily" indicates that its reporting capability would be online and remotely
accessibly, the Agency did not exceed its discretion in coming to the opposite conclusion.  This
is because reporting across multiple environments only requires the reader to conclude that a
report would cover software in those various environments.  But it does not necessarily mean or
imply that one would be able to access such a report online and remotely accessible through a
browser.  It was, therefore, not arbitrary or capricious for the Agency to conclude that Ekagra
failed to demonstrate that its proposed reporting would be available online.  *See* ECF No. 122 at
AR 11156.  Therefore, Ekagra's challenge to the Agency's evaluation of its proposal for PWS
3.1.5 fails.

### 3.    Commerce's assessment of a Weakness for PWS Section 3.4.13 was arbitrary and capricious.

PWS Section 3.4.13 requires the contractor "to provide unified communications support
as part of its network and communication services . . . includ[ing], but [] not limited to,
integrating real-time communications services like instant messaging, telepresence, IP telephony,
video conferencing, data access and sharing with non-real time communication services such as
unified messaging (voicemail, email, SMS)."  ECF No. 147-1 at AR 29562.  In its evaluation, the
Agency determined Ekagra's proposal "did not provide an approach to demonstrate capability to
support these requirements (Offeror's Technical Volume, p. 25), which will leave end-users
without the ability to access multiple methods to communicate effectively and ensure near or
real-time responses to support Department missions."  ECF No. 130 at AR 26677.  Further, the
Government reasons that "Ekagra' s proposal merely lists 'Feature[s] of Our Approach,' absent
any detail whatsoever as to the actual execution of these purported 'features.'"  ECF No. 203 at
44 (citing ECF No. 122 at AR 11174).

Ekagra asserts "[t]his weakness is incorrect on its face."  ECF No. 173 at 23.  In support,
Ekagra highlights sections of its proposal that addresses how it "would carry out accomplishing
this requirement . . .  [and,] [s]hort of listing step by step instructions explaining and detailing its
plan to address this PWS Section, Ekagra successfully explained its approach and demonstrated
its capability to do so based on what it wrote in its proposal."  ECF No. 231 at 4.  Such
"solution[s] for these services[,]" which the Agency found lacking, included:

22

[ * * * ]

ECF No. 173 at 23 (citing ECF No. 122 at AR 11174).

Although the Court acknowledges that Ekagra's discussion of PWS Section 3.4.13 is, perhaps, brief, the Court cannot agree that Ekagra failed to provide an approach or address requirements. Ekagra's proposal does lay out an approach and identifies "Features of our Approach" specific to PWS Section 3.4.13. ECF No. 122 at AR 11174. Nor does the Government argue that there were specific elements PWS Section 3.4.13 that Ekagra did not respond to. Although the Court would consider an evaluation that Ekagra failed to provide an approach to a PWS Section sufficient if Ekagra failed to address all required work, the Court will not check the proposal on its own to search for missing requirements because this Court will not scour the record to "supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

If the Agency intended to evaluate the proposal as insufficiently detailed, as the Government now argues, it could have done so. Indeed, the Agency did, in fact, find many proposals insufficiently detailed and said so. *See, e.g.,* ECF No. 130 at AR 26631 ("Offeror does not explain what their 'cradle to grave' approach entails . . . . "); ECF No. 130 at AR 26551 ("Offeror failed to provide any details of [its] 11-step approach, thus failing to demonstrate a capability to perform these requirements."). And the TET found another part of Ekagra's own proposal vague. ECF No. 130 at AR 26678 ("However, the above statements are vague . . . ."). Given the clarity with which the Agency found proposals insufficiently detailed, the Court does not read an evaluation stating that Ekagra failed to provide an approach as saying the approach lacked sufficient detail. "[A] court cannot effectively review whether a procuring agency has properly exercised its discretion if the procuring agency does not adequately explain the rationale for its relevancy assessment." *Mgmt. & Training Corp. v. United States*, 161 Fed. Cl. 578, 597 (2002). And, without a rationale that is consistent with the record, the Court is unable to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park, Inc.*, 401 U.S. at 416.

The Weaknesses assigned to Ekagra's proposal for PWS Section 3.4.13 was arbitrary and capricious.

## B. Significant Weaknesses

1. Commerce's assessment of Significant Weaknesses for PWS Sections 3.4.2, 3.4.4, 3.4.5, 3.4.12, 3.4.14, 3.4.15, 3.4.17, 3.4.18, 3.4.19, and 3.4.20 was arbitrary and capricious.

PWS Section 4 focuses on "IT Operations and Maintenance" and contains 21 subsections focusing on specific types of support services. ECF No. 147-1 at AR 29557-66. The TET found many faults with Ekagra's proposal, assessing many Significant Weaknesses, including ten Significant Weaknesses joined into a single bullet point stating:

The PWS requires the Offeror to provide an approach to demonstrate capability to support PWS Task Areas **3.4.2, 3.4.4, 3.4.5, 3.4.12, 3.4.14, 3.4.15, 3.4.17, 3.4.18, 3.4.19, and 3.4.20**.

> The Offeror's proposal states they will support the requirements, but does not demonstrate capability to meet or exceed requirements, and it does not provide an approach as to how the Offeror will perform successfully (Offeror's Technical Volume, p. 20-27).

ECF No. 130 at AR 26677 (emphasis in original).  The remainder of the evaluation explains why the flaws constitute a Significant Weakness.  *Id*.

Ekagra first argues that "the Agency only documented 12 of the 21 purported [significant] weaknesses.  The Agency's assignment of phantom weaknesses 13 through 21 is irrational because it is undocumented."  ECF No. 173 at 23 (citing *Lab. Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 653 (2014)).  Specifically, Ekagra takes issue with the "laundry list of PWS sections where the Agency found that Ekagra 'states they will support the requirements but does not demonstrate capability to meet or exceed requirements, and it does not provide an approach as to how the Offeror will perform successfully.'"  ECF No 173 at 23 (citing ECF No. 130 at AR 26677).  This, Ekagra argues, provides "no way of knowing if the first bullet point under Significant Weakness is for one weakness or ten . . . [and] there are no other differentiating factors that would lead one to reasonably find this single bullet point actually represents ten Significant Weaknesses."  ECF No. 231 at 5.

The record is clear, however, that the TET assigned a separate Significant Weakness for each of the PWS Sections listed in the TET Report.  The TET Report's summary of Ekagra's proposal makes clear that the TET assigned 21 Significant Weaknesses to Ekagra's proposal. ECF No. 130 at AR 26675.  The question is how to count these Significant Weaknesses.  Ekagra counts the number of bullet-point paragraphs in the Significant Weakness section of the TET Report (the way the Court initially read the report), and there are only 12 separate paragraphs. Thus, Ekagra does not believe there is any documentation of the 9 "phantom" Significant Weaknesses.  When one counts the number of PWS Sections identified in the Significant Weakness section, however, there are 21.  *Id*. at AR 26677-81.  This is clearly how the Agency counted the Significant Weaknesses and the Court does as well.

On the merits of the evaluation Ekagra complains that "[t]he Agency did not identify any aspect of Ekagra's 65-page proposal that failed to 'meet or exceed requirements'" and did not explain how Ekagra failed to "'provide an approach as to how [Ekagra] will perform successfully.'  Rather, it just found that these were 'key components of Task Area 4, IT Operations and Maintenance' and concluded that something Ekagra wrote in its 65-page proposal failed to meet them."  ECF No. 173 at 24 (quoting ECF No. 130 at AR 26677).  Ekagra then points to the sections of its proposal that respond to each of PWS Sections 3.4.2, 3.4.4, 3.4.5, 3.4.12, 3.4.14, 3.4.15, 3.4.17, 3.4.18, 3.4.19, and 3.4.20.  ECF No. 173 at 24-26 (citing ECF No. 122 at AR 11171-75).  In its proposal, Ekagra does address its approach to Task Area 4—PWS Sections 3.4.1-21—at pages 18-27 of its proposal, ECF No. 122 at AR 11167-76.  In these pages, Ekagra discusses its approach and includes tables discussing the "Features of our Approach" and "Benefits" of those approaches to the specific PWS Work.

The Government, however, contends that these discussions of Ekagra's approach failed to satisfy the RFP.  According to the Government, Ekagra was "required to 'clearly address each

of the technical evaluation criteria in Section M, and at a minimum cover each element' as well as '[p]rovide a detailed technical approach to performing the work in the Final CATTS PWS.'" ECF No. 203 at 45-46 (citing ECF No. 118 at AR 1479-80). And, after evaluating Ekagra's proposal, the Agency "determined that Ekagra merely 'states that it will support the requirements,' but contrary to the solicitation's requirement, 'does not demonstrate capability to meet or exceed requirements, and it does not provide an approach as to how the Offeror will perform successfully.'" ECF No. 203 at 46 (citing ECF 130 at AR 28805). This, the Government asserts, was within the Agency's discretion. *Id.* "Moreover, the [A]gency provided a concise statement that there was a significant gap between Ekagra's purported capabilities and an articulation of the actual means to execute them—as required by the solicitation—which satisfies the agency's burden to provide some rationale for its decision." ECF No. 203 at 46-47.

It is well settled "that an agency must explain its action with sufficient clarity to permit 'effective judicial review . . . .'" *Timken U.S. Corp v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (quoting *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973)); *see also In re Sang Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("The agency must present a full and reasoned explanation of its decision [such that] . . . [t]he reviewing court is thus enabled to perform a meaningful review . . . ."). While "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency[,]" the agency nevertheless "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Simply stating that Ekagra failed to provide an approach when the proposal plainly discusses its approach, does not comport with the record. While the Court does not require a "line-by-line" breakdown, if there are some requirements of the PWS that Ekagra failed to address, then either the Agency or the Government would need to specify which ones. Otherwise, the only way the Court can read the TET's analysis is that Ekagra provided no approach at all, which is contradicted by the record.

While the Court acknowledges that Ekagra's discussion of the PWS Sections that got Significant Weaknesses is, perhaps, brief, the Court cannot agree that Ekagra failed to provide an approach. Nor does the Government argue that there were specific elements of any one of these PWS Sections that Ekagra did not respond to. Although the Court would consider an evaluation that Ekagra failed to provide an approach to a PWS Section sufficient if the offeror failed to address all required work, the Court will not check the proposals on its own to search for missing requirements because this Court will not scour the record to "supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

If the Agency intended to evaluate the proposal as insufficiently detailed, as the Government now argues, it could have done so. Indeed, the Agency did, in fact, find many proposals insufficiently detailed and said so. *See, e.g.,* ECF No. 130 at AR 26631 ("Offeror does not explain what their 'cradle to grave' approach entails . . . "); ECF No. 130 at AR 26551 ("Offeror failed to provide any details of [its] 11-step approach, thus failing to demonstrate a capability to perform these requirements."). And the TET found another part of Ekagra's own proposal vague. ECF No. 130 at AR 26678 ("However, the above statements are vague . . . ."). Given the clarity with which the Agency found proposals insufficiently detailed, the Court does

not read an evaluation stating that Ekagra failed to provide an approach as saying the approach lacked sufficient detail. "[A] court cannot effectively review whether a procuring agency has properly exercised its discretion if the procuring agency does not adequately explain the rationale for its relevancy assessment." *Mgmt. & Training Corp.*, 161 Fed. Cl. at 597. And, without a rationale that is consistent with the record, the Court is unable to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park, Inc.*, 401 U.S. at 416.

The Significant Weaknesses assigned to Ekagra's proposal for PWS Sections 3.4.2, 3.4.4, 3.4.5, 3.4.12, 3.4.14, 3.4.15, 3.4.17, 3.4.18, 3.4.19, and 3.4.20 were arbitrary and capricious.

2. <u>Commerce rationally assigned the Significant Weakness for PWS Section 3.3.1.</u>

PWS Section 3.3.1 requires the contractor to provide "logistical support and inventory management functions . . . includ[ing], but [] not limited to, the equipment, spares, and licensing inventory management; shipping and receiving; ordering, tracking, shipping, and expediting purchases; and warehousing, storage, and staging." ECF No. 147-1 at AR 29555. Additionally, the PWS directs the contractor to "develop and implement the techniques, processes, and procedures to maintain a 'just-in-time' inventory methodology to ensure customer fulfillment while reducing warehousing cost of storage . . . [and] perform analysis and recommend updates, enhancements, or replacements to extend the life or improve reliability of the equipment." *Id*. According to the Evaluation, Ekagra's "proposal states they will assess the current environment, provide a roadmap and solutions[,] . . . [but] did not provide an approach to demonstrate capability to perform successfully." ECF No. 130 at AR 26677. Therefore, the Agency found that Ekagra's failure to "address[] these requirements will leave DOC without the required support to ensure proper operations and maintenance of hardware and software, and having the right inventory on hand at the right time, which has a substantial negative impact on the availability of equipment to complete mission critical work." *Id*.

In response, Ekagra argues that it "very much provided an approach to address these requirements from the Solicitation. [Specifically,] Table 7 of Ekagra's proposal focuses on certain approaches to meet these needs and also includes how each approach will benefit the Agency." ECF No. 173 at 26 (citing ECF No. 122 at AR 11164). The Government counters by claiming that Ekagra's proposal "provides only a conclusory delineation of 'Solution Strengths' and their respective 'Benefits to [the agency].'" ECF No. 203 at 48 (citing ECF No. 122 at AR 11164). "The remainder of the proposal's paragraph failed to provide sufficient detail to demonstrate to the agency Ekagra's ability to meet or exceed the PWS requirements—a prevalent theme to the proposal." *Id.*

Reviewing Ekagra's proposal, it does, as the Agency found, state that Ekagra's "approach to this management and delivery is to assess the current environment and roadmap a realistic transition to our solution support without excessive over-engineering or disruption to customer delivery and reduce the warehousing cost of storage." ECF No. 122 at AR 11163-64. In addition to this, Ekagra's proposal lists several "solution strengths of approach" that it presumably intends to implement. Although these "solution strengths" list various models and standardized processes that Ekagra has in place, they do not provide any explanation of what

26

they are.  For example, Ekagra's proposal states it has "standardized repeatable processes and tools to collaborate with IPTs to achieve key objectives."  *Id*. at 11164.  But there is no explanation of what those processes are.  Similarly, the proposal references several "models," *e.g.*, [ * * * ], but does not explain what those models are.  *Id*.  Without more, the Court cannot conclude that the Agency's assessment of the Significant Weakness for PWS Section 3.3.1 was arbitrary and capricious.

Therefore, the Court denies Ekagra's challenge to this Significant Weakness.

### 3.   Commerce rationally assigned the Significant Weakness for PWS Section 3.3.3.

PWS Section 3.3.3 requires the contractor to "provide education and training services.  Services provide the principles and techniques of instructional design methodology to develop and deliver training materials and programs as well as provide customized education and training to CIO customers in varied venues and locations."  ECF No. 147-1 at AR 29556.  The TET's evaluation states that Ekagra "states they will use, [sic] 'an instructional design methodology to develop and deliver standardized and customized training materials,' but did not provide an approach or demonstrate capability to support the requirements . . . ."  ECF No. 130 at AR 26677-78.  Thus, the TET recognized the proposal's reference to "an instructional design methodology," but clearly found that reference insufficient to satisfy the requirement.

Ekagra argues that it "explained how it would create training materials, explained how it would deploy these materials to ensure proper training and then provided a recent example to demonstrate its capability[,]" thereby establishing its approach to satisfy the PWS requirements.  ECF No. 173 at 27.  "The Agency seemed to want something more, but that 'more' was simply not required."  *Id*.  But Ekagra's proposal does not explain what its "instructional design methodology" is or provide any detail as to how that methodology would be employed in this contract.  *See* ECF No. 122 at AR 11165.  The Court does not find it arbitrary and capricious for the Agency to conclude that simply stating there is a methodology without explaining it is insufficient.  As the Government puts it, "the [A]gency did want more; specifically, detail as to how Ekagra would actually provide the education and training requirements, not just vague proclamations.  Ekagra . . . failed to demonstrate a means to do what it claimed."  ECF No. 203 at 49.

The Government's argument finds support in the RFP.  For example, RFP § L.2 instructs offerors that "[t]he Government considers statements that the prospective Offeror understands, can, or will comply with the specifications, or statements paraphrasing the requirements or parts thereof to be inadequate and unsatisfactory.  The Government further considers the mere reiteration of the requirement or standard reference material to also be inadequate and unsatisfactory."  ECF No. 118 at AR 1474.  And the RFP instructs offerors that the Agency wanted a "detailed technical approach," *id*. at AR 1479, further supporting the Government's argument that merely stating a methodology exists without more would not be acceptable.  Finally, Section M.2.3(a)a provides that the Agency will evaluate the Offeror's ability to meet or exceed the Final CATTS PWS requirements.  ECF No. 118 at AR 1490.  Taken together, these provisions required offerors to do more than merely state a methodology existed.  They confirm that an explanation of that methodology would be required.

Therefore, the Court denies Ekagra's challenge to this Significant Weakness.

4.     Commerce rationally assigned the Significant Weakness for PWS Section 3.3.4.

PWS Section 3.3.4 requires the contractor to provide "IT infrastructure installation, necessary IT equipment and software for the solution, and decommissioning services for the participating IT organization and customer locations throughout the world."  ECF No. 147-1 at AR 29556.  The Agency recognized that Ekagra's proposal "provides past experience and states they will, 'assign a project manager' and 'have these special project resources (cloud-as-a-service, infrastructure-as-a-service, telecom-as-a-service, etc.) that have standardized processes and checklists to ramp up, plan (as-is versus to-be architectures), implement, and operationalize a service . . . .'"  ECF No. 130 at AR 26678.  But, according to the TET Report, these "statements are vague and do not provide an approach that demonstrates capability to support the requirements."  *Id.*

Ekagra challenges this assessment, agruing that it did, in fact, propose an approach, which "leans on [its] past experiences doing similar work and utilizes its proprietary resources to support these requirements.  Ekagra also stated that transitioning and decommissioning are included in these categories."  ECF No. 173 at 27 (citing ECF No. 122 at AR 11166) ("Ekagra's proposed approach included use of project managers and their 'special project resources' that 'have standardized processes and checklists to ramp up, plan, implement, and operationalize a service.'").  But a challenger must offer more than "naked claims" of disagreement to overcome "the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious."  *Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 244 (2011) (quoting *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 384 (2003)).  The question is not whether Ekagra or the Government is correct; rather, it is "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion . . . .'"  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001) (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).

The Agency did not simply state that the Offeror failed to provide an approach to meet the Solicitation requirements.  The TET recognized Ekagra's past performance and that it would "assign a project manager" and that Ekagra "ha[d] these special project resources (cloud-as-a-service, infrastructure-as-a-service, telecom-as-a-service, etc.) that have standardized processes and checklists to ramp up, plan (as-is versus to-be architectures), implement, and operationalize a service."  ECF No. 130 at AR 26677 (citations omitted).  But the TET concluded that Ekagra's proposed approach to PWS Section 3.3.4 was unacceptably "vague" and lacked sufficient detail to satisfy the Agency's requirements.  ECF No. 130 at AR 26678.  As the Court explained above regarding the evaluation of PWS Section 3.3.3, it was not arbitrary and capricious for the Agency to conclude that stating "standardized processes" exist without more to be insufficient.  Nor was it irrational for the TET to conclude that Ekagra's proposal was "vague" because Ekagra did not explain what the standardized processes were that it intended to employ on this contract.  The Court will not disturb the TET's evaluation of PWS Section 3.3.4 because "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations

of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).

Therefore, the Court denies Ekagra's challenge to this Significant Weakness.

> 5. Commerce's assessment of a Significant Weakness for PWS Section 3.4.6 was arbitrary and capricious.

PWS Section 3.4.6 requires the contractor "to provide server administration and management for virtual and physical servers. Services focus on building, documenting, operating, maintaining, and sustaining enterprise, regional, and local physical and virtual servers supporting mission and business applications and systems, as well as the underlying shared application and infrastructure services." ECF No. 147-1 at AR 29559. The Agency determined that Ekagra's proposal "states they will provide the required support, but does not provide an approach to demonstrate capability to support the requirements." ECF No. 130 at AR 26678-79. Further, the TET Report explained "not demonstrating capability to support these requirements is a significant weakness that will leave the Department without the required support to ensure proper operations and maintenance substantially increases server downtime and outages, which negatively impacts mission critical work." *Id.*

Ekagra argues that "[t]he Agency assigned an extremely generic and non-specific weakness" for PWS Section 3.4.6, which, [w]ithout some information as to how Ekagra failed to meet the requirement, . . . is irrational." ECF No. 173 at 28 ("[T]he Agency relied on the bullets [in the PWS] as though they formed a factual basis for [its] finding. But they do not . . . ."). Further, Ekagra complains that the Agency's determination that it "failed to provide an approach" is arbitrary because its proposal clearly sets forth an approach in Section 5.3.2.1. *Id.*; s*ee* ECF No. 122 at AR 11171 (discussing "Features of our Approach" for PWS Section 3.4.6).

While "[t]he [A]gency is not required to give a line-by-line breakdown of the failure for each required service within the PWS," ECF No. 203 at 50, it must give a rationale that is consistent with the record. *Overton Park, Inc.*, 401 U.S. at 416 ("To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."). PWS Section 3.4.6 sets forth a non-exhaustive, albeit extensive, list of required services with respect to server administration and management.

Although the Court acknowledges that Ekagra's discussion of PWS Section 3.4.6 is, perhaps, brief, the Court cannot agree that Ekagra failed to provide an approach. Ekagra's proposal does lay out an approach and identifies "Features of our Approach" specific to PWS Section 3.4.6. ECF No. 122 at AR 11171-72. Nor does the Government argue that there were specific elements PWS Section 3.4.6 that Ekagra did not respond to. Although the Court would consider an evaluation that Ekagra failed to provide an approach to a PWS Section sufficient if Ekagra failed to address all required work, the Court will not check the proposal on its own to search for missing requirements because this Court will not scour the record to "supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

If the Agency intended to evaluate the proposal as insufficiently detailed, as the Government now argues, it could have done so. Indeed, the Agency did, in fact, find many proposals insufficiently detailed and said so. *See, e.g.,* ECF No. 130 at AR 26631 ("Offeror does not explain what their 'cradle to grave' approach entails . . . ."); ECF No. 130 at AR 26551 ("Offeror failed to provide any details of [its] 11-step approach, thus failing to demonstrate a capability to perform these requirements."). And the TET found another part of Ekagra's own proposal vague. ECF No. 130 at AR 26678 ("However, the above statements are vague . . . ."). Given the clarity with which the Agency found proposals insufficiently detailed, the Court does not read an evaluation stating that Ekagra failed to provide an approach as saying the approach lacked sufficient detail. "[A] court cannot effectively review whether a procuring agency has properly exercised its discretion if the procuring agency does not adequately explain the rationale for its relevancy assessment." *Mgmt. & Training Corp.*, 161 Fed. Cl. at 597. And, without a rationale that is consistent with the record, the Court is unable to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park, Inc.*, 401 U.S. at 416.

The Significant Weakness assigned to Ekagra's proposal for PWS Section 3.4.6 was arbitrary and capricious.

> 6.     Commerce's assessment of a Significant Weakness for PWS Section 3.4.7 is arbitrary and capricious.

PWS Section 3.4.7 requires the contractor "to support the provisioning of storage services across all virtual and physical environments, to include but not limited to, administration and management support, backup, disaster recovery, emergency response, and Continuity of Operations (COOP)." ECF No. 147-1 at AR 29560. In providing such support, the contractor must "fully document all instances of storage within the enterprise construct in compliance with government regulations and guidelines" and "provide data protection and management solutions, scalable from workgroup to enterprise, ensure continuity of operations, and efficient use of storage across the enterprise. This includes both the management of storage, as well as back-up and recovery functions." ECF No. 147-1 at AR 29560. According to the TET, "Ekagra states they will provide the required support, but does not provide an approach to demonstrate capability to support the requirements (Offeror's Technical Volume, p. 23). The Offeror not addressing these requirements is a significant weakness . . . ." ECF No. 130 at AR 26679.

Ekagra argues that the Agency's determination that it "did not meet **any** of these Solicitation requirements" is arbitrary because such finding is contradicted by the record. ECF No. 173 at 29 (emphasis in original). Specifically, Ekagra claims that its proposed approach "stated it would retain and manage data 'in accordance with government regulations and guidelines' as well as establish intelligent automation." *Id.* (citing ECF No. 122 at AR 11172). This, Ekagra contends, highlights its "commitment to properly handling data in line with the Solicitation's requirements as well as its intentions to provide data protection." *Id.* Further, contrary to the TET Report's finding, Ekagra asserts that it did address the requirements in the PWS. *See* ECF No. 122 at AR 11172. The Government argues that the Agency "used less universal and hyperbolic terms, instead noting that despite Ekagra's stated intent to provide support, it had once more failed to demonstrate a capability to do so." ECF No. 203 at 50 (citing

ECF No. 130 at AR 26679).  But the evaluation states that Ekagra failed to provide an approach or address requirements.  ECF No. 130 at AR 26679.

It is well settled "that an agency must explain its action with sufficient clarity to permit 'effective judicial review . . . .'"  *Timken*, 421 F.3d at 1355 (quoting *Camp*, 411 U.S. at 142-43); *see also In re Sang Su Lee*, 277 F.3d at 1342 ("The agency must present a full and reasoned explanation of its decision [such that] . . . [t]he reviewing court is thus enabled to perform a meaningful review . . . .").  Indeed, while "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency[,]" the agency nevertheless "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168).  And the Agency's decision is arbitrary and capricious when its proffered "explanation for its decision that runs counter to the evidence before [it]."  *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 519 (2011) (citations omitted).  Thus, simply stating that Ekagra failed to provide an approach, without explanation, when Ekagra points to its approach in its proposal, does not comport with the record.  *See, e.g.*, ECF No 122 at AR 11172 (discussing the "Features of our Approach" regarding PWS Section 3.4.7).  The only way the Court can read the TET's analysis is that Ekagra provided no approach at all, which is contradicted by the record.  Again, the TET does not say the approach is insufficient or vague, lacking detail, or fails to address certain requirements.  Instead, the TET's evaluation concludes that the approach does not exist.  That does not comport with the record.

This Court is similarly unpersuaded by the Government's claim—which it raises repeatedly throughout its motion—that "Ekagra's argument boils down to nothing more than proclaiming that its proposal met the requirement, and that the agency was arbitrary to say otherwise."  ECF No. 203 at 50.  Again, the problem here is that the TET's *stated* evaluation that Ekagra failed to provide an approach or address PWS Section 3.4.7's requirements does not comport with the record.  If the Agency thought that the proposed approach was insufficient, insofar as it lacked the requisite level of detail, this rationale is certainly within the broad scope of the Agency's discretion.  But it cannot merely conclude that the approach does not exist or that Ekagra failed to address requirements when the proposal clearly provides otherwise.  Again, the Agency provided such rationales in multiple instances throughout the TET Report.  *See, e.g.,* ECF No. 130 at AR 26631 ("Offeror does not explain what their 'cradle to grave' approach entails . . . ."); ECF No. 130 at AR 26551 ("Offeror failed to provide any details of [its] 11-step approach, thus failing to demonstrate a capability to perform these requirements.").  And the TET found another part of Ekagra's own proposal vague.  ECF No. 130 at AR 26678 ("However, the above statements are vague . . . .").  Given the clarity with which the Agency found proposals insufficiently detailed, the Court does not read an evaluation stating that Ekagra failed to provide an approach as saying the approach lacked sufficient detail.  "[A] court cannot effectively review whether a procuring agency has properly exercised its discretion if the procuring agency does not adequately explain the rationale for its relevancy assessment."  *Mgmt. & Training Corp.*, 161 Fed. Cl. at 597.  And, without a rationale that is consistent with the record, the Court is unable to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Overton Park, Inc.*, 401 U.S. at 416.

The Significant Weakness assigned to Ekagra's proposal for PWS Section 3.4.7 was arbitrary and capricious.

  7. <u>Commerce rationally assigned the Significant Weakness for PWS Section 3.4.8.</u>

PWS Section 3.4.8 requires the contractor "to provide Cloud PaaS capabilities to customers seeking to deploy into a native cloud infrastructure. The contractor is expected to manage and control the underlying native cloud infrastructure including network, servers, virtualization and containerization platforms, operating systems, storage, and platform software and services." ECF No. 147-1 at AR 29560.  Here too, the TET concluded that "[t]he Offeror did not provide an approach to demonstrate capability to support these requirements (Offeror's Technical Volume, p. 23)." ECF No. 130 at AR 26679.

Ekagra contends that its "proposal included a detailed plan to meet this requirement," and, in support, highlights the approach it set forth in response to the solicitation.  ECF No. 173 at 29; *see* ECF No. 122 at AR 11172 (describing Ekagra's [ * * * ]).  Further, Ekagra argues "PKI was listed only as an example of the types of security the Agency needed—not a stand-alone requirement Ekagra had to address."  ECF No. 173 at 29-30 (citing ECF No. 118 at AR 1238-39).

But as discussed above, the RFP did require offerors to address PKI.  The RFP provided that each offeror would be evaluated, in part, based on ability to "[d]emonstrate [its] ability to meet or exceed the Final CATTS PWS requirements . . . ."  ECF No. 118 at AR 1490.  And the plain text of PWS Section 3.4.8 provides that "[t]hese services *will include* but are not limited to . . . infrastructure services (e.g., . . . Public Key Infrastructure (PKI), etc.)."  ECF No. 147-1 at AR 29560 (emphasis added).  Given that "infrastructure services" is a broad term, the parenthetical narrows it to specific items that offerors should expect to perform.

Whatever the merits of the rest of the dispute about the assignment of this Significant Weakness, the failure to address PKI suffices to justify the Significant Weakness.  While it would have been better for the TET to call out the failure to address PKI in its evaluation as it did with other proposals, the Court can discern the Agency's rationale when a proposal fails to address requirements within a PWS Section. *Bowman Transp.*, 419 U.S. at 285-86 ("[A Court] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.").  Therefore, the Agency had a rational basis for assigning this Significant Weakness and the Court will not disturb it.

  8. <u>Commerce's assessment of a Significant Weakness for PWS Section 3.4.9 was arbitrary and capricious.</u>

PWS Section 3.4.9 requires the contractor to "provide services to establish enterprise operations, event monitoring and management, performance monitoring, and analysis services." ECF No. 147-1 at AR 29561.  According to the TET, Ekagra "did not provide an approach to demonstrate capability to support these requirements.  The Offeror not addressing these requirements is a Significant Weakness . . . ."  ECF No. 130 at AR 26679-80 (internal citation omitted).  Ekagra argues its "proposal included a thorough approach that addressed these

requirements using the [ * * * ] which [ * * * ]."  ECF No. 173 at 30 (citing ECF No. 122 at AR 11172-73).  This, Ekagra explains, describes an approach to provide "corrective action as well as detection and prevention of potential issues[,]" as required by the solicitation.  *Id*.  Ekagra contends that it therefore "met the Solicitation's requirements [and] the Agency's assignment of a Significant Weakness here is unfounded."  *Id.*

The Government is correct that disagreement, "no matter how vigorous, fall[s] far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process . . . ."  *Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 243 (2011).  But Ekagra is not "merely disagree[ing] with the agency's evaluation, which is supported by a rational basis in the record and cannot be second-guessed by the Court under the deferential standard of review."  *See* ECF No. 254 at 25.  Rather, it is explaining that, contrary to the Agency's evaluation, it did, in fact, address these requirements and provide an "approach" for PWS requirements where the TET Report indicates such details are absent.  For instance, "Ekagra's MJAR highlighted portions of its proposal that addressed this PWS Section to which the Government countered with '[t]he agency, with all of its technical expertise, disagrees.'"  ECF No. 231 at 12 (citing ECF No. 203 at 52); *see also* ECF No. 122 at AR 11172-73 (addressing PWS Section 3.4.9 requirements and providing an approach).

Although the Court acknowledges that Ekagra's discussion of PWS Section 3.4.9 is, perhaps, brief, the Court cannot agree that Ekagra failed to provide an approach or address requirements.  Ekagra's proposal does lay out an approach and identifies "Features of our Approach" specific to PWS Section 3.4.9.  ECF No. 122 at AR 11172-73.  Nor does the Government argue that there were specific elements PWS Section 3.4.9 that Ekagra did not respond to.  Although the Court would consider an evaluation that Ekagra failed to provide an approach to a PWS Section sufficient if Ekagra failed to address all required work, the Court will not check the proposal on its own to search for missing requirements because this Court will not scour the record to "supply a reasoned basis for the agency's action that the agency itself has not given."  *State Farm Mut. Auto. Ins. Co*., 463 U.S. at 43.

If the Agency intended to evaluate the proposal as insufficiently detailed, as the Government now argues, it could have done so.  Indeed, the Agency did, in fact, find many proposals insufficiently detailed and said so.  *See, e.g.,* ECF No. 130 at AR 26631 ("Offeror does not explain what their 'cradle to grave' approach entails . . . . ");  ECF No. 130 at AR 26551 ("Offeror failed to provide any details of [its] 11-step approach, thus failing to demonstrate a capability to perform these requirements.").  And the TET found another part of Ekagra's own proposal vague.  ECF No. 130 at AR 26678 ("However, the above statements are vague . . . .").  Given the clarity with which the Agency found proposals insufficiently detailed, the Court does not read an evaluation stating that Ekagra failed to provide an approach as saying the approach lacked sufficient detail.  "[A] court cannot effectively review whether a procuring agency has properly exercised its discretion if the procuring agency does not adequately explain the rationale for its relevancy assessment."  *Mgmt. & Training Corp.*, 161 Fed. Cl. at 597.  And, without a rationale that is consistent with the record, the Court is unable to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Overton Park, Inc.*, 401 U.S. at 416.

The Significant Weakness assigned to Ekagra's proposal for PWS Section 3.4.9 was arbitrary and capricious.

        9.     <u>Commerce's assessment of a Significant Weakness for PWS Section 3.4.10 was arbitrary and capricious.</u>

PWS Section 3.4.10 requires the contractor "to provide enterprise infrastructure maintenance and repair support."  ECF No. 147-1 at AR 29561.  According to the TET, Ekagra "did not provide an approach to demonstrate capability to support these requirements.  The Offeror not addressing these requirements is a significant weakness . . . ."  ECF No. 130 at AR 26680.  Ekagra argues it "provided an approach that addressed these requirements that the Agency either did not consider or ignored."  ECF No. 173 at 31 (citing ECF No. 122 at AR 11173).  And Ekagra emphasizes its "approach includes 'lifecycle management' which addresses 'inventory, license management and disposal' as well as 'coordinating repair' for warranty and out of warranty work."  ECF No. 173 at 31.  In response, the Government admonishes Ekagra for "proclaim[ing] its approach 'addressed all of [the] requirements,' but offer[ing] nothing to rebut the agency's determination except another sparse Table of Features and Benefits which fails to provide any detail."  ECF No. 203 at 53 (citing ECF No. 122 at AR 11172; ECF No. 173 at 31; ECF No. 130 at AR 26680).

Although the Court acknowledges that Ekagra's discussion of PWS Section 3.4.10 is, perhaps, brief, the Court cannot agree that Ekagra failed to provide an approach or address requirements.  Ekagra's proposal does lay out an approach and identifies "Features of our Approach" specific to PWS Section 3.4.10.  ECF No. 122 at AR 11173.  Nor does the Government argue that there were specific elements PWS Section 3.4.10 that Ekagra did not respond to.  Although the Court would consider an evaluation that Ekagra failed to provide an approach to a PWS Section sufficient if Ekagra failed to address all required work, the Court will not check the proposal on its own to search for missing requirements because this Court will not scour the record to "supply a reasoned basis for the agency's action that the agency itself has not given."  *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

If the Agency intended to evaluate the proposal as insufficiently detailed, as the Government now argues, it could have done so.  Indeed, the Agency did, in fact, find many proposals insufficiently detailed and said so.  *See, e.g.,* ECF No. 130 at AR 26631 ("Offeror does not explain what their 'cradle to grave' approach entails . . . . ");  ECF No. 130 at AR 26551 ("Offeror failed to provide any details of [its] 11-step approach, thus failing to demonstrate a capability to perform these requirements.").  And the TET found another part of Ekagra's own proposal vague.  ECF No. 130 at AR 26678 ("However, the above statements are vague . . . .").  Given the clarity with which the Agency found proposals insufficiently detailed, the Court does not read an evaluation stating that Ekagra failed to provide an approach as saying the approach lacked sufficient detail.  "[A] court cannot effectively review whether a procuring agency has properly exercised its discretion if the procuring agency does not adequately explain the rationale for its relevancy assessment."  *Mgmt. & Training Corp.*, 161 Fed. Cl. at 597.  And, without a rationale that is consistent with the record, the Court is unable to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Overton Park, Inc.*, 401 U.S. at 416.

The Significant Weakness assigned to Ekagra's proposal for PWS Section 3.4.10 was arbitrary and capricious.

>   10.   Commerce's assessment of a Significant Weakness for PWS Section 3.4.16 was arbitrary and capricious.

PWS Section 3.4.16 requires the contractor "to provide network operations, event monitoring and management, performance monitoring, and analysis services."  ECF No. 147-1 at AR 29563.  According to the TET, Ekagra "stated [ * * * ]."  ECF No. 130 at AR 26681 (citing ECF No. 122 at AR 11175).  The TET then concluded that Ekagra "did not provide an approach to demonstrate capability to support these requirements.  The Offeror not addressing these requirements . . . ."  ECF No. 130 at AR 26680-81.

Again, Ekagra argues that it "addressed these Solicitation requirements and the Agency's finding that [it] failed to [do so] is unreasonable and irrational."  ECF No. 173 at 31 (citing ECF No. 122 at AR 11175).  Specifically, Ekagra's proposal includes an approach to provide "24/7 eyes-on-glass with a continuous proactive view of all network systems, core services, and network infrastructure."  ECF No. 122 at AR 11175.  "Additionally, Ekagra included Table 20 which [] detailed its intention to use [ * * * ].  Ekagra further included an approach to Major Incident Management, directly in line with the Solicitation's requirements."  ECF No. 173 at 31 (citing ECF No. 122 at AR 11175).  The Government's response is, once again, that, "[o]nce more, the agency found [] Ekagra's lack of context insufficient, and Ekagra's subjective disagreement does not render the agency's decision arbitrary."  ECF No. 203 at 53.

Although the Court acknowledges that Ekagra's discussion of PWS Section 3.4.16 is, perhaps, brief, the Court cannot agree that Ekagra failed to provide an approach or address requirements.  Ekagra's proposal does lay out an approach and identifies "Features of our Approach" specific to PWS Section 3.4.16.  ECF No. 122 at AR 11175.  Nor does the Government argue that there were specific elements PWS Section 3.4.16 that Ekagra did not respond to.  Although the Court would consider an evaluation that Ekagra failed to provide an approach to a PWS Section sufficient if Ekagra failed to address all required work, the Court will not check the proposal on its own to search for missing requirements because this Court will not scour the record to "supply a reasoned basis for the agency's action that the agency itself has not given."  *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.  It is also not clear whether the TET considered the cross-reference that Ekagra included in its proposal when it stated that its response to PWS Section 3.4.16 "builds on section 5.3.2.2," which is where Ekagra addressed Enterprise Operations and Monitoring—PWS Section 3.4.9.  ECF No. 122 at AR 11175.

If the Agency intended to evaluate the proposal as insufficiently detailed, as the Government now argues, it could have done so.  Indeed, the Agency did, in fact, find many proposals insufficiently detailed and said so.  *See, e.g.,* ECF No. 130 at AR 26631 ("Offeror does not explain what their 'cradle to grave' approach entails . . . .");  ECF No. 130 at AR 26551 ("Offeror failed to provide any details of [its] 11-step approach, thus failing to demonstrate a capability to perform these requirements.").  And the TET found another part of Ekagra's own proposal vague.  ECF No. 130 at AR 26678 ("However, the above statements are vague . . . .").  Given the clarity with which the Agency found proposals insufficiently detailed, the Court does not read an evaluation stating that Ekagra failed to provide an approach as saying the approach

lacked sufficient detail.  "[A] court cannot effectively review whether a procuring agency has properly exercised its discretion if the procuring agency does not adequately explain the rationale for its relevancy assessment." *Mgmt. & Training Corp.*, 161 Fed. Cl. at 597.  And, without a rationale that is consistent with the record, the Court is unable to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park, Inc.*, 401 U.S. at 416

The Significant Weakness assigned to Ekagra's proposal for PWS Section 3.4.16 was arbitrary and capricious.

11.   Commerce rationally assigned the Significant Weakness for PWS Section 3.6.1.

PWS Section 3.6.1 requires the contractor "to provide diverse Cybersecurity and Information Assurance (IA) services that enforce, comply with, and support the Federal Information Security Management Act (FISMA) cybersecurity and IA security directives, Department of Homeland Security (DHS), DOC, and NIST policies and procedures."  ECF No. 147-1 at AR 29574.  Among the work are "policy development"; "security architecture development"; and "security engineering."  *Id.*  According to the TET, Ekagra "did not provide an approach to demonstrate capability to support requirements for policy development, security architecture development, and security engineering."  ECF No. 130 at AR 26681.

Ekagra contends that the Agency's determination "is contradicted by the first sentence of Ekagra's proposal: '[w]e provide expertise in numerous technical, functional, and managerial services to secure system operations that enforce and comply with all Federal Information Security Management Act (FISMA) Cybersecurity and IA security directives, plus DHS, DOC, and NIST policies and procedures.'"  ECF No. 173 at 32 (citing ECF No. 122 at AR 11203).  Ekagra further asserts that its "proposal addresses the Solicitation's requirements" and it "proposed an approach that addresses policy development (Table 47) and security engineering." *Id.* (citing ECF No. 122 at AR 11203-11204).  But "in the technical opinion of the agency," the TET found that Ekagra's proposal failed to "demonstrate [] that it has Federal legal requirement compliance expertise.  Again, [according to the Government,] subjective disagreement is not the same as demonstrating a lack of a logical rationale for an agency decision, and Ekagra offers no evidence to that effect."  ECF No. 203 at 53-54.

This evaluation is not that Ekagra failed to provide an approach to any of the requirements, but only to the three that the TET specifically identified.  Again, the Court is mindful that "the role of the court is 'not to substitute its judgment for that of the agency,' but rather to determine whether the agency had a rational basis for its decision." *Vanguard Recovery Assistance v. United States*, 101 Fed. Cl. 765, 784-85 (2011) (internal citation and quotation marks omitted).  There is nothing on the face of Ekagra's proposal that clearly contradicts the Agency's conclusions.  While Ekagra's proposal points to its experience complying with various federal cybersecurity policies, ECF No. 122 at AR 11203, it does not clearly address policy development.  And while Ekagra insists that Table 47 includes its approach to policy development and security engineering, it does not unequivocally do so.  Therefore, the Court cannot find the Agency's evaluation arbitrary and capricious because this dispute boils down to a

mere disagreement about the sufficiency of Ekagra's proposal.  *Tech Sys., Inc.*, 98 Fed. Cl. at 244.

Perhaps recognizing that its proposal did not address policy development, Ekagra argues disparate treatment with respect to three awardees: [ * * * ].  ECF No. 173 at 32-33.  Specifically, Ekagra argues that these awardees similarly failed to address [ * * * ] in their proposals, but nevertheless received higher ratings.  ECF No. 173 at 32 (citing ECF No. 128 at AR 20498-500; ECF No. 121 at AR 10281-82; ECF No. 130 at AR 24953-55).  Ekagra contends that "[t]he Agency's evaluation appears to be a mechanical one where instead of considering the full approach, its evaluators instead looked at whether offerors proposed the specific terms from the Solicitation . . . . [However,] despite failing to also say these 'magic words,' these three awardees did not receive a fault, unlike Ekagra."  ECF No. 231 at 14.  According to the Government, "Ekagra fails to allege, let alone establish, that what it proposed for PWS 3.6.1. was 'substantively indistinguishable' from what any other offeror proposed . . . ."  ECF No. 203 at 54.  And its claim "that other offerors were not downgraded for their apparent failure to [ * * * ] is a far cry from alleging that it was inappropriately assigned a significant weakness for a 'substantively indistinguishable' offer."  *Id*.  Further, the Government contends that "Ekagra merely opines that since those offeror's failed to mention 'policy' under PWS 3.6.1, they should be similarly penalized."  *Id*.

But a cursory review of the record shows that [ * * * ] do, in fact, provide approaches to [ * * * ] in their proposals.  *See* ECF No. 128 at AR 20468-69 [ * * * ]; ECF No. 121 at AR 10241-42 [ * * * ]; ECF No. 130 at AR 24954 [ * * * ].  Ekagra does not direct this Court to evidence in the record to support its claim that its proposal was "substantially indistinguishable," and this Court will not engage in further comparative evaluation on its behalf.  "Indeed, having the Court pass judgment regarding the relative merits of proposals that are not substantively indistinguishable 'would give a court free reign to second-guess the agency's discretionary determinations underlying its technical ratings' and '[t]his is not the court's role.'"  *Tech. Innovation All., LLC v. United States*, 149 Fed. Cl. 105, 132 (2020) (citing *Office Design Grp.*, 951 F.3d at 1373).  Ekagra has not met its high burden to demonstrate disparate treatment with respect to PWS Section 3.6.1.

Because the Agency adequately explained its conclusion and Ekagra failed to establish disparate treatment, Ekagra's challenge to the Significant Weakness for PWS Section 3.6.1 fails.

## C.    Prejudice

To establish prejudice, Ekagra "is not required to show that but for the alleged error, [it] would have been awarded the contract."  *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (citations omitted).  But "a showing of a mere possibility that the protester would have received the contract but for the error is inadequate to show prejudice . . . .  The proper standard lies between these polarities."  *Id*.  Therefore, "the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract."  *Id*.

Ekagra prevailed on its challenges to 15 of the 21 Significant Weaknesses and 1 of the three Weaknesses assessed to its technical proposal. Ekagra is left with an Excellent past performance rating, ECF No. 130 at 28311; an evaluated price of $65,099,922.21, which is the 17th lowest price, *id*. at 28315; and 1 Significant Strength, 5 Strengths, 2 Weaknesses, and 6 Significant Weaknesses. That puts Ekagra in the zone of consideration, which is all that is required to establish prejudice. *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983).

Further, Commerce eliminated Ekagra from consideration based on the combination of Significant Weaknesses in its proposal. Under the SSP, a proposal is Unsatisfactory if it contains a single Deficiency or "a combination of Significant Weaknesses that represents a material failure to meet requirements. Represents a high or unacceptable risk of unsuccessful contract performance." ECF No. 118 at 1512. But there are no criteria in the RFP (or SSP) that dictate when a combination of Significant Weaknesses is an unacceptable risk. This Court is certainly not able to determine whether, assuming a plaintiff prevails on some but not all its challenges to Significant Weaknesses, the remaining Significant Weaknesses still constitute a "high or unacceptable risk of unsuccessful contract performance." *Id*. Nor can this Court determine whether Ekagra's Significant Strength and Strengths offset the remaining Significant Weaknesses. Those are unquestionably for the Agency to decide. During oral argument, the Government agreed, stating "if any of the significant weaknesses are knocked out, then it needs to go back to the Agency for reevaluation based on the criteria established by this Court and consideration of the other factors . . . ." ECF No. 263 at 66:21-25. Because Ekagra has succeeded in its challenge to 15 of the Significant Weaknesses, it has established prejudicial error.

For these reasons, the Court grants-in-part and denies-in-part Ekagra's MJAR and grants-in-part and denies-in-part the Government's and Defendant-Intevenors' Cross-MJARs.

## VI.   CAN Softtech, Inc. (No. 22-1436)

Commerce assessed CAN Softtech's ("CSI") technical proposal 10 Strengths, 4 Weaknesses, and 8 Significant Weaknesses. Based on the combination of Weaknesses and Significant Weaknesses, Commerce found CSI's proposal Unsatisfactory, which eliminated it from consideration. CSI challenges the merit of the negative technical evaluations.

### A.   Weaknesses

CSI's evaluation is unique among the plaintiffs in that the TET considered CSI's Weaknesses and Significant Weaknesses to find CSI's proposal Unsatisfactory. According to the TET Report, "[t]he *combination of weaknesses and significant weaknesses* identified in Task Area 4 represent a material failure to meet requirements. The risk of unsuccessful performance is unacceptable." ECF No. 130 at AR 26628 (emphasis added).[15]

---

[15] The SSP defines an Unsatisfactory technical rating as applying to a proposal that "contains one or more Deficiencies and/or combination of Significant Weaknesses that represents a material failure to meet requirements." ECF No. 118 at AR 1512. Weaknesses appear in the definitions

          1.      <u>Commerce rationally assigned the Weakness for PWS Section 3.4.2.</u>

PWS Section 3.4.2 requires the contractor to "provide customer desk-side support services for end-users and customer work center environments."  ECF No. 147-1 at AR 29558.  While PWS Section 3.4.2 includes numerous requirements, the TET called out that "the PWS requires the Offeror to provide support for Installing, Moving, Adding, or Changing (IMAC) hardware; locally resolving systems account and access management issues; tailoring directory service entries, organizational mailboxes, distribution lists, etc., to meet customer requirements."  ECF No. 130 at AR 26630 (citation omitted).  According to the TET, CSI "did not provide an approach to demonstrate capability to support the requirements."  ECF No. 130 at AR 26630.  Thus, the Agency did not simply state that the Offeror failed to provide an approach to meet the PWS requirements.  Rather, the Agency clearly stated that the Offeror did not address a specific subset of the requirements of PWS Section 3.4.2 and, in doing so, sufficiently explained its rationale for assigning a Weakness.

CSI challenges this assessment because it claims the TET Report improperly quoted certain requirements in PWS Section 3.4.2—"the supply of IMAC services is covered by PWS Section 3.4.10 Enterprise Infrastructure Maintenance and Repair and not in PWS Section 3.4.2."  ECF No. 174-1 at 13.  But this argument is without merit.  PWS Section 3.4.2 includes a requirement to support "equipment install, move, add, and change requests . . . ."  ECF No. 147-1 at AR 29558.  The fact that PWS Section 3.4.10 also requires IMAC services for *enterprise* hardware, ECF No. 147-1 at AR 29561, does nothing to limit PWS Section 3.4.2's requirement to provide IMAC services for *desktop* hardware.  CSI does not clearly address PWS Section 3.4.2's ICAM requirement.  Nor does it argue that its proposal addresses this requirement.  And the Government's argument that that "CSI mentions some services but fails to address others, including equipment installation and movement and directory services, mailboxes, and distribution lists" finds support in the record.  ECF No. 203 at 69 (citing ECF No. 120 at AR 6659-60).  Indeed, there is no discussion of support for directory services, mailboxes, or distribution lists.  ECF No. 120 at AR 6659-60.

Again, the Agency did not simply state that the Offeror failed to provide an approach to meet the Solicitation requirements.  Rather, the Agency clearly stated that the Offeror did not address certain requirements of PWS Section 3.4.2 and, in doing so, sufficiently explained its rationale for assigning this Weakness.

Therefore, the Agency's assessing CSI a Weakness for PWS Section 3.4.2 rational and will not be disturbed.

          2.      <u>Commerce rationally assigned the Weakness for PWS Section 3.4.3.</u>

PWS Section 3.4.3 requires the contractor to "provide server and workstation baseline creation, standardization, deployment, and patch management services."  ECF No. 147-1 at AR 29558.  According to the TET, CSI "did not provide the required approach to demonstrate capability."  ECF No. 130 at AR 26630-31.  Here, too, CSI argues that "[i]n assessing this

---

of Excellent, Good, Satisfactory, and Marginal, ratings but not Unsatisfactory.  *Id*.  It is not clear why the Agency considered the Weaknesses to find CSI's proposal Unsatisfactory.

weakness, the Agency specifically points to only one purported omission . . . . This requirement was one of the nine aforementioned bullet points that are included under PWS Section 3.4.3, and takes up only two lines." ECF No. 174-1 at 27. Thus, CSI contends that the image creation requirement was an unstated evaluation criterion. *Id.* at 29. But, "[f]or a contractor to be qualified for a Task Area, the contractor must be capable of performing all services within that Task Area." ECF No. 147-1 at AR 29552.

CSI next argues that it did, in fact, include an approach to baseline image creation in its proposal. *See* ECF No. 120 at AR 6660 ("Our approach includes . . . ."). Specifically, CSI's proposal states that it "automate[s] server and workstation baseline creation, standardization, deployment, and patch management services to include, but not be limited to, establishing master image server and workstation baselines for standard Windows, Mac, Linux, and UNIX server configurations." *Id.* But, as the Government explains, CSI's approach proposes satisfying this PWS requirement through the *automation* of server and workstation baseline creation, which the TET found insufficient. *See* ECF No. 120 at 6660.

The TET clearly stated its rationale for assigning this Weakness in the contemporaneous evaluation, and directly linked such explanation to failures in CSI's proposal. Section M.2.3(a)a indicates that the Agency will evaluate the Offeror's ability to meet or exceed the Final CATTS PWS requirements—all of them. ECF 118 at AR 1490. And it is well within the Agency's discretion to determine that a proposal that merely proposes to automate the generation of baseline image creation, without more, is insufficient to satisfy the requirement to provide an approach to "establishing master image server and workstation baselines for standard Windows, Mac, Linux, and UNIX server configurations." ECF No. 147-1 at AR 29558. Here, "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss*, 77 F.3d at 449. This Court will not second-guess the Agency's technical evaluation based on mere disagreement. Accordingly, the Agency clearly set forth its rationale for assessing this Weakness in the contemporaneous evaluation. Therefore, the Agency's evaluation is not arbitrary or capricious and must be sustained.

3.   Commerce rationally assigned the Weakness for PWS Section 3.4.4.

PWS Section 3.4.4 requires the contractor to "support installed hardware and software maintained to the availability levels defined in the individual Task Orders." ECF No. 147-1 at AR 29558. It lists a number of specific requirements, including "hardware and software recapitalization," "ensuring all equipment . . . meets Original Equipment Manufacturer (OEM) standards, government specific technical requirements, and established operational functions necessary to support the user." *Id.* The TET Report identifies these requirements and concludes that CSI "failed to provide an approach to demonstrate capability to support the requirements (Offeror's Technical Volume, p. 21). The Offeror's failure to demonstrate capability to support these requirements is a weakness that will increase costs to the Department due to inefficient utilization of hardware and software." ECF No. 130 at AR 26631. Thus, the TET did not find that CSI failed to provide an approach to any of the PWS Section 3.4.4 requirements, only the ones its specifically listed in its evaluation.

40

CSI disagrees.  According to CSI, its "approaches to electronic device disposal (e.g., covering sanitization of devices) and asset management process" is in its proposal.  ECF No. 174-1 at 14; *see* ECF No. 120 at AR 6661 ("Team CANSI's Approach to Enterprise Systems Maintenance and Repair – PWS 3.4.4").  While that may address part of the "hardware and software recapitalization" requirement, it is not clear that it addresses all of it.  *See* ECF No. 203 at 69 (arguing that CSI addressed some but not all of the requirements).  Nor does CSI's proposal address how it would ensure that all equipment meets OEM standards.  Therefore, the Court finds the TET's rationale sufficient and supported by the record.  *Bowman Transp.*, 419 U.S. at 285-86 (stating the Court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" ) (citing *Colorado Interstate Gas Co*., 324 U.S. at 595).

Therefore, the Court will not disturb the Weakness assigned to PWS Section 3.4.4.

4.    Commerce rationally assigned the Weakness for PWS Section 3.4.12.

PWS Section 3.4.12 requires the contractor "to provide support for planning, execution and management of enterprise data backup, emergency response, and disaster recovery (DR), and continuity of operations (COOP) operations and support."  ECF No. 147-1 at AR 29562.  According to the TET, CSI "did not provide an approach to demonstrate capability to support the requirements."  ECF No. 130 at AR 26631.  CSI argues that "[g]iven the stringent page limit, CSI provided an adequate approach to the Enterprise Data Backup, Disaster Recovery (DR) and Continuity of Operations (COOP) Program Operations and Support."  ECF No. 174-1 at 21.  And, because "CSI provided a detailed approach with specific tasks, tools and methods, and outcomes, it was incumbent on the Agency to fairly consider that approach – not to rush through the evaluation and claim without evidence that CSI somehow failed to submit an approach at all."  *Id.*; *see* ECF No. 120 at AR 6664 ("Team CANSI Approach to Enterprise Data Backups, Disaster Recovery (DR), and Continuity of Operations (COOP) Program Operations and Support – PWS 3.4.12").

To the extent CSI claims that the solicitation's page limit and formatting requirements hindered its ability to provide an adequate response—this Court disagrees.  Indeed, because CSI failed to raise this challenge before the closure of the solicitation period and issuance of the award, it is necessarily waived.  It is well settled that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."  *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).  This reasoning "applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so."  *COMINT Systems Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012).  Therefore, CSI's claim that the terms of the solicitation limited its ability to provide an "adequate" response is unpersuasive.

The Government asserts in its cross-motion that "CSI's response to this section shows that it did not offer test scenarios to verify continued capabilities."  ECF No. 203 at 70 (citing ECF No. 120 at AR 6664-65).  Specifically, the Government argues that the record indicates "[t]he TET reviewed CSI's response for PWS 3.4.12 and explained that what CSI offered would leave Commerce 'without test exercises to verify that DR and COOP capabilities will meet

requirements.'" *Id.* (citing ECF No. 130 at AR 26631).  Here, the Government does not provide a post hoc explanation to compensate for a conclusory Agency determination.  As explained above, when the less-than-clear rationale can easily be found in the record, *e.g.*, failing to address required elements, the Court assess that rationale.

CSI finally argues that the Strength it got for developing prototypes and proof of concepts in an innovation lab contradicts this Weakness.  ECF No. 174 at 35 (citing ECF No. 130 at AR 26628).  But this amounts to mere disagreement with the evaluation that does not provide a basis to challenge the evaluation.  In any event, this Court cannot discern whether the proposed prototyping constitutes "creating and executing *recurring* enterprise data backup, DR, and COOP scenarios *to test and verify continued capabilities*" as the PWS requires.  ECF No. 147-1 at AR 29562.  In common parlance, prototyping and proof of concept generally do not refer to ongoing operations of a system.  Indeed, the TET awarded the strength to CSI for its proposal "to develop various prototyping and proof of concepts through their innovation lab to allow stakeholders to test and review the prototypes prior to implementing emerging technologies into the environment."  ECF No. 130 at AR 26628.  That certainly appears to be something different than the ongoing operations and testing of existing systems.  Therefore, there was nothing about the Strength for prototyping that undermined the validity of the Weakness for failing to address ongoing testing to ensure "continued capabilities."

Because the Agency rationally assessed the Weakness to PWS Section 3.4.12, the Court does not disturb it.

### B.     Significant Weaknesses

#### 1.     Commerce rationally assigned the Significant Weakness for PWS Section 3.3.4.

PWS Section 3.3.4 requires the contractor to provide "IT infrastructure installation, necessary IT equipment and software for the solution, and decommissioning services for the participating IT organization and customer locations throughout the world."  ECF No. 147-1 at AR 29556.  According to the TET, CSI "does not explain what their 'cradle grave' approach entails or provide any other approach to demonstrate capability to perform the requirements successfully."  ECF No. 130 at AR 26631.  CSI contends that it established "a detailed 'cradle to grave approach,' and [Commerce] has provided nothing in the record to suggest otherwise other than its conclusory statement that CSI somehow did not 'explain' itself."  ECF No. 174-1 at 11.  In support, CSI directs this Court to the "simple language" in its proposal, where it claims to set forth a detailed "cradle to grave" methodology with "readily apparent" meaning.  ECF No. 174-1 at 11-12.  Specifically, CSI explains that it "will engage in infrastructure capacity planning—a specific approach at the beginning of the IT lifecycle[,]" (i.e., the "cradle stage").  ECF No. 174-1 at 11-12 (citing ECF No. 121 at AR 6657-7758).  And "at the middle of the 'cradle to grave' stage, CSI committed to 'install, modify, clean, and repair computer hardware' as well as 'develop and deliver a variety of training courses for end-users . . . .'"  ECF No. 174-1 at 12 (citing ECF No. 121 at AR 6657-7758).

Here the Government's response is simple, "the TET report—the contemporaneous documentation of the technical team's evaluation—shows that the TET clearly reviewed CSI's

response to PWS Section 3.3.4 and explained that the approach offered was unsatisfactory." ECF No. 254 at 32 (citing ECF No. 130 at AR 26631). Specifically, the Agency determined "that CSI's proposal to use a 'holistic "cradle to grave" approach to streamline the installation and termination of IT cable/fiber, data center racks, fiber frames, servers, storage or networking equipment' was unexplained as to what it entailed to meet all of the PWS requirements." *Id.* at 32-33. Indeed, the contemporaneous documentation clearly provides that CSI "does not explain what their 'cradle to grave' approach entails or provide any other approach to demonstrate capability to perform the requirements successfully." ECF No. 130 at AR 26631. Accordingly, the TET found that CSI's failure to sufficiently explain its "cradle to grave" led to its assignment of the Significant Weakness.

This response is not a post hoc explanation for a conclusory Agency determination. Rather, the TET clearly stated its rationale for assigning this Significant Weakness in the contemporaneous evaluation, and directly linked such explanation to failures in CSI's proposal. Section M.2.3(a)a indicates that the Agency will evaluate the Offeror's ability to meet or exceed the Final CATTS PWS requirements—all of them. ECF 118 at AR 1490. And it is well within the Agency's discretion to determine whether the Offeror's proposal is sufficiently detailed to pass muster, so long as that determination is not arbitrary or capricious. Indeed, "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss*, 77 F.3d at 449. This Court will not second-guess the Agency's technical evaluation based on mere disagreement and declines the Offeror's invitation to wade into a technical assessment of whether its proposal was clear enough. That is a matter for the Agency. Accordingly, the Agency clearly set forth its rationale for assessing this Significant Weakness in the contemporaneous evaluation. Therefore, the Agency's evaluation was rational and the Court will not disturb it.

### 2. Commerce's assessment of a Significant Weakness for PWS Section 3.4.7 was arbitrary and capricious.

PWS Section 3.4.7 requires the contractor "to support the provisioning of storage services across all virtual and physical environments, to include but not limited to, administration and management support, backup, disaster recovery, emergency response, and Continuity of Operations (COOP)." ECF No. 147-1 at AR 29560. According to the TET, CSI "failed to provide an approach to demonstrate capability to support these requirements." ECF No. 130 at AR 26631-32. CSI, however, believes its proposal "provides a detailed approach to this requirement . . . ." ECF No. 174-1 at 16. And CSI argues that it is arbitrary for the Agency to claim that CSI "failed to provide an approach" when such approach is clearly set forth in its proposal. *Id.*

A review of CSI's proposal makes clear that there is an approach spelled out. Indeed, CSI's proposal for PWS Section 3.4.7 begins "[o]ur approach begins with a strong understanding of DOC storage and management needs, in-depth review review of current processes and procedures, and application of industry best practices like ITIL, ISO and CMMI to our storage services. We then automate the provisioning of storage services . . . ." ECF No. 120 at AR 6662. Before the Court, the Government argues in its Cross-MJAR that "CSI's proposal for PWS 3.4.7 is vague and high-level, with CSI promising to 'automate the provisioning of storage

services[,]' and 'incorporate proactive data analysis[,]' but failing to address, *e.g.*, scalability or troubleshooting support."  ECF No. 203 at 61 (citing ECF No. 120 at AR 6662).  And because the Agency "explained that CSI's response for PWS 3.4.7 would leave Commerce without the 'required support to ensure proper scalable, maintained, secure, operational and efficient storage response,' and with 'insufficient storage data storage capacity . . .' [t]he TET clearly offered more than a statement that CSI failed to offer any approach."  *Id.* (citing ECF No. 130 at AR 26631).  But that is not what the TET said.  The TET said only that CSI "failed to provide an approach to demonstrate capability to support these requirements."  ECF No. 130 at AR 26631. The remainder of the assessment is why this failure is a Significant Weakness, not an explanation of what is missing from CSI's proposal.

Nor can the Court agree that the Agency found CSI's proposal "vague and high-level." ECF No. 203 at 61.  If the Agency intended to evaluate the proposal as insufficiently detailed, as the Government now argues, it could have done so.  Indeed, the Agency did, in fact, find many proposals insufficiently detailed and said so.  *See, e.g.,* ECF No. 130 at AR 26631 ("Offeror does not explain what their 'cradle to grave' approach entails . . . ."); ECF No. 130 at AR 26551 ("Offeror failed to provide any details of [its] 11-step approach, thus failing to demonstrate a capability to perform these requirements."); ECF No. 130 at AR 26678 ("However, the above statements are vague . . . .").  Given the clarity with which the Agency found proposals insufficiently detailed, the Court does not read an evaluation stating that CSI failed to provide an approach as stating the approach was vague or lacked sufficient detail.  "[A] court cannot effectively review whether a procuring agency has properly exercised its discretion if the procuring agency does not adequately explain the rationale for its relevancy assessment."  *Mgmt. & Training Corp.*, 161 Fed. Cl. at 597.  And, without a rationale that is consistent with the record, the Court is unable to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Overton Park, Inc.*, 401 U.S. at 416.

It is true that the Court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp.*, 419 U.S. at 285-86 (citing *Colorado Interstate Gas Co*., 324 U.S. at 595).  "However, a court cannot effectively review whether a procuring agency has properly exercised its discretion if the procuring agency does not adequately explain the rationale for its relevancy assessment."  *Mgmt. & Training Corp.*, 161 Fed. Cl. at 597.  And, without a rationale that is consistent with the record, the Court is unable to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Overton Park, Inc.*, 401 U.S. at 416. This Court will not scour the record to "supply a reasoned basis for the agency's action that the agency itself has not given."  *State Farm Mut. Auto. Ins. Co*., 463 U.S. at 43.

The Significant Weakness assigned to CSI's proposal for PWS Section 3.4.7 was arbitrary and capricious.

        3.     <u>Commerce's assessment of Significant Weaknesses for PWS Sections 3.4.8, 3.4.10, 3.4.18, and 3.4.20 was arbitrary and capricious.</u>

Commerce grouped four Significant Weaknesses into one bullet point in its evaluation, which states that "[t]he PWS requires the Offeror to provide an approach to demonstrate

capability to support PWS Task Areas 3.4.8, 3.4.10, 3.4.18 and 3.4.20.  The Offeror's proposal states that they will support the requirements, but it does not demonstrate capability to meet or exceed requirements, and it does not provide an approach as to how the Offeror will perform successfully."  ECF No. 130 at AR 26632.

CSI argues that "the Agency's failure to provide 'a satisfactory explanation' is exemplified by its lumping together of four separate significant weaknesses into a single bullet point.  The Agency did not even attempt to address each significant weakness individually but offered only a conclusory one-sentence statement for all of them . . . ."  ECF No. 237 at 5.  But as discussed in response to Ekagra's similar argument, it is not necessarily irrational for the Agency to group multiple Significant Weaknesses together if the rationale is the same for all.  That does not mean the evaluation is sufficiently documented, only that the Court does not find the grouping of Significant Weaknesses to be arbitrary and capricious on its own.

Turning to the substance of the evaluation, the Agency clearly concluded that CSI failed to provide an approach.  But a cursory review of CSI's proposal shows that it did provide an approach to these PWS Sections.  *See* ECF No. 120 at AR 6662-63 (PWS Section 3.4.8), AR 6663-64 (PWS Section 3.4.10), AR 6667 (PWS Section 3.4.18), AR 6668 (PWS Section 3.4.20).  Indeed, these sections of CSI's proposal discuss various aspects of its "approach."  This was insufficient, the Government argues, because:

- CSI's response to PWS Section 3.4.8 consists of various generalities and promises that hit on certain key words, such as servers, storage, and containers, but at base does little more than claim to support the requirements . . . .

- CSI's response to PWS Section 3.4.10 . . . consisted of vague and generalized language . . . . [T]he TET's conclusion that CSI merely stated it would support the requirements but overall "lack[ed] full understanding of the requirements" for PWS Section 3.4.10 is reasonably discernible from the record, not arbitrary and capricious, and should, therefore, be sustained . . . .

- CSI's response to PWS 3.4.18 stays at a high level . . . . Given the vague language of CSI's proposal—*e.g.*, its promise that it will "bring our industry-leading design, consult, installation, testing, operations, and maintenance capabilities" without an explanation of what that entails— the TET's assessment, that CSI merely stated it will support the requirements but did not demonstrate an approach, has a rational basis and is supported by the record . . . .

- CSI's response[] for PWS Section 3.4.20 is similarly vague and fails to address many of the required services, and . . . is largely focused on past services it has rendered, not on the approach that it will offer . . . . Again, given the glaring

> omissions of required PWS elements—or even a
> delineation of an approach—in CSI's response, there is a
> rational basis for the TET's explanation that CSI lacked full
> understanding of the requirements of PWS 3.4.20 and its
> assignment of a significant weakness.

ECF No. 203 at 62-66.  Accordingly, the Government concludes "the contemporaneous evaluation record shows that the TET evaluated the specifics of CSI's approach and explained its reasoning for assessing these four significant weaknesses."  ECF No. 254 at 34.

It is true that the Court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp.*, 419 U.S. at 285-86 (citing *Colorado Interstate Gas Co.*, 324 U.S. at 595).  "However, a court cannot effectively review whether a procuring agency has properly exercised its discretion if the procuring agency does not adequately explain the rationale for its relevancy assessment."  *Mgmt. & Training Corp.*, 161 Fed. Cl. at 597.  And, without a rationale that is consistent with the record, the Court is unable to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Overton Park, Inc.*, 401 U.S. at 416.  This Court will not scour the record to "supply a reasoned basis for the agency's action that the agency itself has not given."  *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.  If the Agency intended to evaluate the proposal as insufficiently detailed, as the Government now argues, it could have done so.  Indeed, the Agency did, in fact, find many proposals insufficiently detailed and said so.  See, e.g., ECF No. 130 at AR 26631 ("Offeror does not explain what their 'cradle to grave' approach entails . . . .");  ECF No. 130 at AR 26551 ("Offeror failed to provide any details of [its] 11-step approach, thus failing to demonstrate a capability to perform these requirements.");  ECF No. 130 at AR 26678 ("However, the above statements are vague . . . .").  Given the clarity with which the Agency found proposals insufficiently detailed, the Court does not read an evaluation stating that CSI failed to provide an approach as saying the approach lacked sufficient detail.

The Significant Weaknesses assigned to CSI's proposal for PWS Sections 3.4.8, 3.4.10, 3.4.18, 3.4.20 were arbitrary and capricious.

### 4.    Commerce rationally assigned the Significant Weakness for PWS Section 3.4.19.

PWS Section 3.4.19 requires the contractor "to provide video and Video Teleconferencing (VTC) installation, operations, and maintenance services."  ECF No. 147-1 at AR 29564.  The PWS included a list of 12 bullet-points containing specified services that Commerce expected a contractor to provide.  *Id*. at AR 29564-55.  The TET Report identified eight of these services and concluded that CSI "proposed to monitor and test VTC, but did not provide an approach to demonstrate capability supporting these requirements."  ECF No. 130 at AR 26632.  To be clear, the Court does not read this evaluation to say that CSI failed to provide an approach to any of the requirements, only the subset of tasks called out in the TET Report.  Therefore, the question is not whether CSI provided an approach to any of the required services, only whether it clearly provided an approach or addressed the specific requirements identified in the TET Report.  *Bowman Transp.*, 419 U.S. at 285-86 (the Court "will uphold a decision of less

than ideal clarity if the agency's path may reasonably be discerned") (citing *Colorado Interstate Gas Co.*, 324 U.S. at 595).

Although there were 12 bullet points containing required services, the TET found that CSI's proposal did not provide an approach to perform the following eight required tasks:

- managing SVTC and DVTC management systems and infrastructure;

- performance tuning;[16]

- adding, modifying, and deleting video, SVTC, and DVTC accounts;

- deploying video, SVTC, and DVTC services upgrades;

- integrating video, SVTC, and DVTC capacities into other systems (e.g., VoIP teleconferencing, enterprise infrastructure services);

- standardizing protocol and interoperability;

- conferencing capabilities, and coordinating service interruptions and outages; and

- escalating issues that are not resolved

ECF No. 130 at AR 26632.  While CSI does point to some recent experience, it is not clear that its proposal addresses the specific tasks that the Agency found lacking.  For example, it may be inferred that CSI would perform "performance tuning" as part of the "analysis" it proposes, ECF No. 120 at AR 6667, it is not unequivocally clear that CSI responds to this requirement. Similarly, while one might infer that CSI's statement that it standardized equipment for a recent customer, *id.* at AR 6668, to mean CSI would support "interoperability," that inference is not compelled.  In other words, while standardizing components is one way to make sure that systems communicate with each other effectively, it may not be an option.  Commerce could realistically require a contractor to make disparate systems work together and CSI's proposal does not unquestionably speak to that service.

Given that CSI's proposal does not clearly address all of PWS Section 3.4.19's requirements, the Court will not disturb the Significant Weakness the Agency assessed for CSI's proposal.

5. Commerce rationally assigned the Significant Weakness for PWS Section 3.6.1.

---

[16] In the PWS, this requirement is "capacity and availability monitoring, and performance tuning."  ECF No. 147-1 at AR 29564.  The Court interprets the TET's removal of the monitoring to mean that the TET does not find any problem with CSI's response to the monitoring requirement.

PWS Section 3.6.1 requires the contractor "to provide diverse Cybersecurity and Information Assurance (IA) services that enforce, comply with, and support the Federal Information Security Management Act (FISMA) cybersecurity and IA security directives, Department of Homeland Security (DHS), DOC, and NIST policies and procedures." ECF No. 147-1 at AR 29574. According to the TET, CSI "failed to provide an approach to demonstrate capability to support these requirements." ECF No. 130 at AR 26632. CSI argues that "PWS Section 3.6.1 includes an illustrative list of seven services that are encompassed therein . . . and the phrase 'insider threat assessment' appears only a single time in the entire PWS, as a one-line bullet point." ECF No. 174-1 at 29-30. Thus, CSI argues that the RFP did not require it to provide a "distinct approach" to everything in the PWS, nor could it have given the 65-page limit. ECF No. 174-1 at 30.

But RFP Section M.2.3(a)a clearly states that the Agency would evaluate CSI's ability to meet the PWS requirements—all of them. ECF No. 118 at AR 1490. And CSI's argument fails to comply with the Agency's response to Question 208 from the procurement's questions and answers. In Question 208, a potential offeror asked Commerce:

> The IDIQ PWS requirements indicate that "For a contractor to be qualified for a Task Area, the contractor must be capable of performing all services within that Task Area." The Scope includes a statement that indicates "The examples are not exhaustive, and other IT services, as required, may be associated with the task areas defined in this PWS." Given the extent of elements covered, particularly under the "Additional Tasks" sub-sections, and the page limitation for responses, will the Government confirm that showing capabilities for only the core areas is deemed acceptable and that not every "Additional Tasks" bullet needs to be addressed?

ECF No. 118 at AR 976. In response, the Agency stated that "Evaluation will be based upon the core areas. Offerors able to address all areas beyond the core areas will be viewed more favorably." *Id.* In this context, the "additional tasks" are the tasks listed in the final section of certain task areas. *E.g.*, ECF No. 147-1 at AR 29553 (PWS Section 3.1.6 "Additional Tasks"), AR 29555 (PWS Section 3.2.2 "Additional Tasks"), AR 29557 (PWS Section 3.3.5 "Additional Tasks"), AR 29565-66 (PWS Section 3.4.21 "Additional Tasks"). Thus, the Agency clearly required a response to each of the tasks not contained in the "Additional Tasks" section of the proposal.

To the extent CSI claims that the solicitation's page limit and formatting requirements hindered its ability to provide an adequate response—this argument fails. The page and formatting limitations are clearly set forth in the RFP, which provides a 65-page limit for technical proposals. ECF No. 118 at AR 1473 (table of page limits). The RFP also sets forth specific font, spacing, and margin requirements. *Id.* at AR 1479. In other words, these requirements were clear on the face of the RFP and if CSI wanted to challenge them, the time to do so was before the proposal submission deadline. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the

bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims."). This reasoning "applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so." *COMINT Systems Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012). Therefore, CSI's claim that the terms of the solicitation limited its ability to provide an "adequate" response is unpersuasive.

CSI next argues that it did, in fact, address "insider threat assessment" in its proposal. ECF No. 174-1 at 30 (citing ECF No. 120 at AR 6690-92, 6689). While the Government recognizes that CSI addressed insider threat assessments in its general approach to Task Area 6, the Agency determined that CSI's proposal did not sufficiently *demonstrate capability* to support insider threat assessments . . . ." ECF No. 130 at AR 26632. In the end, the TET did not conclude that CSI failed to provide an approach at all. The only reference to "insider threat assessment" in CSI's proposal was that its subject matter experts "provide a wide-range of technical, functional, and managerial cybersecurity services including, but not limited to, . . . insider threat assessments . . . ." ECF No. 120 at AR 6689. Thus, CSI's proposal addresses its experience, but not an approach to how it would meet the PWS requirements. Because the TET supplied a reasoned basis for its determination that comports with the record, this Court will not second-guess the Agency's technical evaluation based on CSI's mere disagreement. Accordingly, the Agency's decision is rational, and the Court will not disturb it.

### C.    CSI fails to establish Commerce applied an unstated evaluation criterion regarding experience in classified environments.

CSI argues that Commerce applied an unstated evaluation criterion by awarding multiple Strengths for proposals that demonstrated the ability to perform certain tasks in both classified and unclassified environments. ECF No. 174-1 at 32-34. It is, of course, "beyond peradventure that the government may not rely upon undisclosed evaluation criteria in evaluating proposals . . . ." *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 386 (2003) (citation omitted). And the Agency "must disclose the factors' relative importance . . . ." *Id*. (citation omitted). Finally, "agency evaluation personnel are given great discretion in determining the scope of an evaluation factor." *Forestry Survs. & Data v. United States*, 44 Fed. Cl. 493, 499 (1999) (citing JOHN CIBINIC JR. & RALPH C. NASH JR., FORMATION OF GOVERNMENT CONTRACTS 830 (3rd ed. 1998)).

Here, Section M advised offerors that Commerce would evaluate proposals and determine whether they "[d]emonstrate the Offeror's ability to meet *or exceed* the Final CATTS PWS requirements and deliverables as contained in Attachment 1, and use proven, innovative methods to meet the Final CATTS PWS requirements, resolve complex issues, and provide continuous process improvement and implementation . . . ." ECF No. 118 at 1490 (emphasis added). Thus, the question is whether demonstrated experience in a classified environment met or exceeded the final requirements.

In Phase 1, offerors had to provide proof of their Top-Secret Facilities Clearance. ECF No. 118 at AR 1475. Further, the PWS explains that "[a]ll awardees must have an active Top-Secret Facilities Clearance." ECF No. 147-1 at AR 29578. Although offerors were required to provide proof of an active Top-Secret Facilities Clearance in Phase 1, they were not excluded

from Phase 2 if they did not yet have one.  The lack of an active clearance was only disqualifying at the time of contract award.  The RFP says this plainly: "If Offerors do not have a Top-Secret Facilities Clearance at the time of award, the Offeror will be ineligible for award."  ECF No. 118 at AR 1488.  In other words, the RFP requirement was to have the clearance at the time of award, not demonstrated experience in classified environments.

And given that much of the work would not be in classified environments, the PWS's six main task areas do not specifically require work in classified environments.  That said, the RFP states clearly that the work may require contractors to perform activities including "end-user support, systems administration, or cybersecurity intelligence activities" in secure, classified environments.  ECF No. 118 at AR 1425.  Further, the questions and answers during the procurement also shed light on why the Agency insisted on the security clearances and could reasonably benefit from the proven experience.  Several potential offerors sought to have Commerce remove the facility clearance requirement altogether and address it only in specific task orders that required security clearances to perform.  *E.g.*, ECF No. 118 at AR 967 (Questions 27-29).  In response, the Agency stated:

> The purpose of this solicitation is to provide for the efficient management, planning, and operation of all commodity and mission IT services for the Office of the Secretary (OS) and Commerce agencies located at Department headquarters.  OS and headquarters agencies have several national security areas which require cleared staff to provide IT services.  In addition, Commerce headquarters maintains an operational continuity of operations site at a classified government facility.  Although the OS and headquarters agencies also have unclassified IT functions, offerors must have a full understanding of the Department's national security missions and functions in order to holistically and efficiently plan and manage IT systems and services at Department headquarters. Therefore, offers must possess a Top Secret clearance to receive an award.

*Id*. (Answer 27).

Indeed, there were also requirements each person have "at a minimum . . . a successfully adjudicated Tier 3 (ADP II), formerly known as National Agency Check with Law and Credit (NACLC), investigation."  ECF No. 147-1 at AR 29578.  Some work required greater clearances.  Some "positions may require a successfully adjudicated Tier 5 (ADP III), formerly known as Single Scope Background Investigation (SSBI), investigation." *Id*.  And finally, some of the "work to be performed may additionally require security clearances up to and including Top Secret with Sensitive Compartmented Information (SCI) access." *Id*.  Although CSI contends this makes clear that all offerors had to have the necessary clearances, that is not the same thing as demonstrating experience in the classified environments.

In the end, Commerce sought to have a single contract vehicle to provide support across its headquarters operations.  This required the contract awardees to have the necessary facilities clearance.  But Commerce also recognized that much of the work may not involve classified

information.  Therefore, the PWS requirement was to have the necessary clearances to perform the work.  It rationally exceeded those requirements to demonstrate actual *experience* with systems in those environments.  And the importance of that experience is sufficiently disclosed to the offerors in the numerous provisions addressed above.  Offerors would, at a minimum, be on notice that Commerce would value demonstrated capability to provide "end-user support, systems administration, or cybersecurity intelligence activities" in classified environments.  ECF No. 118 at AR 1425.  And that is what Commerce awarded Strengths for—exceeding the requirements by demonstrating experience in the environments, not just the ability to do so, which is precisely the definition of a Strength.  Therefore, CSI fails to establish that Commerce employed any unstated evaluation criterion.

### D.   Prejudice

To establish prejudice, CSI "is not required to show that but for the alleged error, [it] would have been awarded the contract." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (citations omitted).  But "a showing of a mere possibility that the protester would have received the contract but for the error is inadequate to show prejudice . . . .  The proper standard lies between these polarities." *Id.*  Therefore, "the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." *Id.*

CSI prevailed on its challenges to 5 of the 8 Significant Weaknesses assessed for its technical proposal.  It is left with a Good past performance rating, ECF No. 130 at 28291; an evaluated price of $89,299,958.65, which is the 75th lowest price, *id*. at 28292; and 0 Significant Strengths, 10 Strengths, 4 Weaknesses, and 3 Significant Weaknesses.  That puts CSI in the zone of consideration, which is all that is required to establish prejudice. *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983).

Further, Commerce eliminated CSI from consideration based on the combination of Weaknesses and Significant Weaknesses in its proposal.  Under the SSP, a proposal is Unsatisfactory if it contains a single Deficiency or "a combination of Significant Weaknesses that represents a material failure to meet requirements.  Represents a high or unacceptable risk of unsuccessful contract performance." ECF No. 118 at 1512.  But there are no criteria in the RFP (or SSP) that dictate when a combination of Significant Weaknesses is an unacceptable risk.  This Court is certainly not able to determine whether, assuming a plaintiff prevails on some but not all its challenges to Significant Weaknesses, the remaining Significant Weaknesses still constitute a "high or unacceptable risk of unsuccessful contract performance." *Id.*  Nor can this Court determine whether CSI's Strengths offset the remaining Weaknesses and Significant Weaknesses.  Those are unquestionably for the Agency to decide.  During oral argument, the Government agreed, stating "if any of the significant weaknesses are knocked out, then it needs to go back to the Agency for reevaluation based on the criteria established by this Court and consideration of the other factors . . . ." ECF No. 263 at 66:21-25.  And for CSI, the Agency needs to determine whether the combination of Significant Weaknesses *alone* still amount to an unacceptable risk pursuant to the SSP.  Because CSI has succeeded in its challenge to 5 of the Significant Weaknesses, it has established prejudicial error.

For these reasons, the Court grants-in-part and denies-in-part CSI's MJAR and grants-in-part and denies-in-part the Government's and Defendant-Intevenors' Cross-MJARs.

## VII.   Syneren Technologies Corp. (No. 22-1460)

Commerce assessed Six Strengths and 6 Significant Weaknesses to Syneren's technical proposal.  Based on this combination of Significant Weaknesses, the Agency found Syneren's Technical proposal Unsatisfactory, which eliminated it from consideration for award.  Syneren challenges the merit of the negative evaluations and argues that it was arbitrary and capricious for the Agency not to hold discussions in this case.

### A.     Significant Weaknesses[17]

1.     <u>Commerce rationally assigned the Significant Weakness for PWS Section 3.3.1</u>

PWS Section 3.3.1 requires the contractor to provide "[l]ogistics support and inventory management includes, but is not limited to, the equipment, spares, and licensing inventory management; shipping and receiving; ordering, tracking, shipping, and expediting purchases; warehousing, storage, and staging."  ECF No. 147-1 at AR 29555.  According to the TET, Syneren's proposal states that it would identify "[ * * * ]."  ECF No. 130 at AR 26810.  But, the TET concluded that Syneren "does not demonstrate a methodology as to how this information will be used to provide the required services."  *Id*. at 26810-11.

Syneren argues that its "proposal clearly addresses Syneren's approach (*i.e.*, 'methodology') and ability to perform PWS Section 3.3.1 . . . [in a chart that] specifically describes how Syneren will provide logistical and management support . . . ."  ECF No. 179 at 24-25 (citing ECF No. 129 at AR 22469).  Accordingly, Syneren contends that "the evaluators' criticism that [it] had not 'demonstrate[d] a methodology' to provide these services and had not 'demonstrate[d]' its 'capability to support these requirements' cannot withstand scrutiny."  ECF No. 179 at 25.  But the Agency did not simply state that Syneren failed to address or provide an approach to meet the Solicitation requirements.  The TET also did not find that Syneren "failed to demonstrate a methodology"—full stop.  Rather, the TET clearly stated in its contemporaneous evaluation that this Significant Weakness turned on Syneren's failure to "demonstrate a methodology as to *how* this information [it proposed to collect] will be used to provide the required services."  ECF No. 130 at AR 26811 (emphasis added).  Thus, the TET acknowledged Syneren's claim that it would collect certain information but found it did not sufficiently explain how it would use that information to perform the work.

The Court will not second guess the Agency if the stated rationale is based on a consideration of the relevant factors and finds support in the record.  Indeed, "the minutiae of the

---

[17] Syneren makes several arguments that Section M of the RFP does not require offerors to provide an "approach" to show their "ability" to perform the PWS work.  Because that issue was more thoroughly briefed and argued in GenceTek's protest, the Court does not revisit separately here.  The reasons the Court found GenceTek's same interpretation of the RFP unreasonable apply equally here.  *See infra* Section VIII.A.

procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). And the Court does not find the TET's evaluation to be contradicted by the record. To the contrary, Syneren does state that it will [ * * * ] for completing PWS Section 3.3.1. ECF No. 129 at AR 22469. Because it is not clear how Syneren would perform the work beyond collecting information, the Agency's evaluation is not arbitrary and capricious.

Syneren also raises a disparate treatment argument regarding the Agency's evaluation of its proposal. According to Syneren, "the unreasonableness of DOC's critique of Syneren's proposal in this regard is highlighted by the disparate way in which DOC evaluated Ventech's proposal." ECF No. 179 at 26. Specifically, according to Syneren, [ * * * ]. *Id.* (citing ECF No. 129 at AR 24919-20). To prevail on this argument, Syneren would have to show that its proposal and VenTech's proposal are "substantively indistinguishable" on this point. *Office Design Grp.*, 951 F.3d at 1373. As the Government points out, they are not. ECF No. 254 at 57. While Syneren's proposal provides an approach that "will identify" certain information and prepare certain inventory reports, [ * * * ]." ECF No. 130 at AR 24919. The Court cannot conclude that these two approaches are substantively indistinguishable and "having the Court pass judgment regarding the relative merits of proposals that are not substantively indistinguishable 'would give a court free reign to second-guess the agency's discretionary determinations underlying its technical ratings' and '[t]his is not the court's role.'" *Tech. Innovation All.*, 149 Fed. Cl. at 132 (quoting *Office Design Grp.*, 951 F.3d at 1373).

Because the TET provided a reasonable explanation for its assessment of the Significant Weakness for PWS Section 3.3.1, the Court will not disturb it.

> 2.    Commerce rationally assigned the Significant Weakness for PWS Section 3.3.3.

PWS Section 3.3.3 requires the contractor to "provide education and training services. Services provide the principles and techniques of instructional design methodology to develop and deliver training materials and programs as well as provide customized education and training to CIO customers in varied venues and locations." ECF No. 147-1 at AR 29556. According to the Solicitation, "[t]raining formats may include 'train the trainer,' classroom, or virtual courses. Training materials may include, but are not limited to, user guides, training manuals, instructor manuals, and reference guides." *Id.* According to the TET, Syneren's proposal states that it "[ * * * ]." ECF No. 130 at AR 29067.

Syneren argues that its "proposal plainly met the requirement of PWS Section 3.3.3, under which contractors will 'develop and deliver training materials and programs' in formats which 'may include "train the trainer," classroom or virtual courses' and 'user guides, training manuals, and reference guides.'" ECF No. 179 at 27 (quoting ECF No. 118 at AR 1234). Indeed, the proposal states that Syneren will "[ * * * ]." ECF No. 129 at AR 22470. But, according to the Government, "[a]lthough Syneren's proposal states that it [ * * * ], the proposal did not explain *how* it would employ the principles and techniques identified in the proposal. Thus, in the agency's expert judgment, Syneren did not provide an approach or demonstrate capability to support the PWS 3.3.3 requirements." ECF No. 203 at 97.

Again, the TET did not ignore the fact that Syneren proposed to [ * * * ], only that it did not explain how.  And looking at Syneren's proposal, it would provide required services "[ * * * ]."  ECF No. 129 at AR 22470.  But this simply states that Syneren will do the required work.  The RFP, however, put offerors on notice that it would not consider mere statements of the requirements to be sufficient.  Specifically, the RFP instructed offerors that "[t]he Government considers statements that the prospective Offeror understands, can, or will comply with the specifications, or statements paraphrasing the requirements or parts thereof to be inadequate and unsatisfactory.  The Government further considers mere reiteration of the requirement or standard reference material to also be inadequate and unsatisfactory.  Such responses may result in a proposal being evaluated as Unacceptable and ineligible for award."  ECF No. 118 at AR 1474.  Nor can the Court find the Agency's evaluation arbitrary and capricious when Syneren's proposal boils down to a statement that it would perform the work pursuant to a plan that it has not yet created.

Because the Agency provided a rational explanation for its evaluation, the Court will not disturb it.

> 3.    Commerce's assessment of the Significant Weakness for PWS Section 3.3.4 was arbitrary and capricious.

PWS Section 3.3.4 requires the contractor to provide "IT infrastructure installation, necessary IT equipment and software for the solution, and decommissioning services for the participating IT organization and customer locations throughout the world."  ECF No. 147-1 at AR 29556.  According to the TET, Syneren "failed to provide an approach to performing the work."  ECF No. 130 at AR 29067.

Syneren argues the Agency inappropriately determined that its proposal failed to provide an approach for PWS Section 3.3.4.  ECF No. 179 at 29.  Specifically, Syneren claims that its proposal details a "[ * * * ]" as required by the solicitation.  *Id.*  Indeed, Syneren's proposal included a "[ * * * ] . . . ."  ECF No. 129 at AR 22470 (emphasis in original); *see also* ECF No. 129 at AR 22471 (Figure 5).  Accordingly, Syneren claims that "[t]he record simply does not explain how or why DOC's evaluators apparently overlooked Syneren's approach to PWS 3.3.4 and concluded that Syneren failed to provide any approach to it, even though the evaluation report cites to the pages in Syneren's proposal."  ECF No. 179 at 29.  The Government counters that, although Syneren's proposal identified "[ * * * ] without actually identifying an approach for performing the work."  ECF No. 203 at 99.  Further, the Government explains that because "[ * * * ] [w]hen measured against the PWS, Syneren's proposal did not provide the agency with enough information to demonstrate Syneren's capability to support the requirements of 3.3.4."  *Id.*

If the Agency intended to evaluate the proposal as insufficiently detailed, as the Government now argues, it could have done so.  Indeed, the Agency did, in fact, find many proposals insufficiently detailed and said so.  *See, e.g.*, ECF No. 130 at AR 26631 ("Offeror does not explain what their 'cradle to grave' approach entails . . . ."); ECF No. 130 at AR 26551 ("Offeror failed to provide any details of [its] 11-step approach, thus failing to demonstrate a capability to perform these requirements."); ECF No. 130 at AR 26678 ("However, the above statements are vague . . . .").  Given the clarity with which the Agency found proposals

insufficiently detailed, the Court does not read an evaluation stating that Syneren failed to provide an approach as saying the approach lacked sufficient detail.  "[A] court cannot effectively review whether a procuring agency has properly exercised its discretion if the procuring agency does not adequately explain the rationale for its relevancy assessment." *Mgmt. & Training Corp.*, 161 Fed. Cl. at 597.  And, without a rationale that is consistent with the record, the Court is unable to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park, Inc.*, 401 U.S. at 416.

Because Syneren's proposal plainly includes an approach to perform the PWS Section 3.3.4 work, the Court finds an evaluation that Syneren failed to provide an approach arbitrary and capricious.

### 4.   Commerce's assessment of the Significant Weakness for PWS Section 3.4.7 was arbitrary and capricious.

PWS Section 3.4.7 requires the contractor "to support the provisioning of storage services across all virtual and physical environments, to include but not limited to, administration and management support, backup, disaster recovery, emergency response, and Continuity of Operations (COOP)."  ECF No. 147-1 at AR 29560.  According to the TET, Syneren "failed to provide an approach to demonstrate capability to support these requirements" relating "to [ * * * ]."  ECF No. 130 at AR 29067.

Syneren argues that not only does its proposal provide a detailed approach, but it "[ * * * ] that would be used by Syneren in meeting PWS 3.4.7."  ECF No. 179 at 30.  Indeed, Syneren's proposal includes [ * * * ] to satisfy the requirements of PWS Section 3.4.7.  ECF No. 129 at AR 22481.  Among these are [ * * * ].  ECF No. 129 at AR 22481.  In response, the Government asserts that "Syneren's proposal . . . did not comply with the PWS requirements, because Syneren did not provide enough details or demonstrated capability to meet the critical requirement of [ * * * ]."  ECF No. 203 at 101.  And, according to the Government, Syneren's proposal included only "broad and general statements," for instance, which "do not contain the required detail as to how Syneren will [ * * * ]."  ECF No. 203 at 102.  Therefore, because "Syneren's proposal does not demonstrate [ * * * ]" and only asserts that it will [ * * * ], the Government claims the TET rationally assigned a Significant Weakness.  *Id.* (citing ECF No. 118 at AR 1474).

If the Agency intended to evaluate the proposal as insufficiently detailed, as the Government now argues, it could have done so.  Indeed, the Agency did, in fact, find many proposals insufficiently detailed and said so.  See, e.g., ECF No. 130 at AR 26631 ("Offeror does not explain what their 'cradle to grave' approach entails . . . .");  ECF No. 130 at AR 26551 ("Offeror failed to provide any details of [its] 11-step approach, thus failing to demonstrate a capability to perform these requirements.");  ECF No. 130 at AR 26678 ("However, the above statements are vague . . . .").  Given the clarity with which the Agency found proposals insufficiently detailed, the Court does not read an evaluation stating that Syneren failed to provide an approach as saying the approach lacked sufficient detail.  "[A] court cannot effectively review whether a procuring agency has properly exercised its discretion if the procuring agency does not adequately explain the rationale for its relevancy assessment." *Mgmt.*

*& Training Corp.*, 161 Fed. Cl. at 597.  And, without a rationale that is consistent with the record, the Court is unable to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Overton Park, Inc.*, 401 U.S. at 416.

Therefore, the Court cannot conclude that Syneren failed to provide an approach to the requirements and the evaluation is arbitrary and capricious.

5.    Commerce rationally assigned the Significant Weakness for PWS Section 3.4.17.

PWS Section 3.4.17 requires the contractor to provide "wireless and mobile device support . . . includ[ing], but [] not limited to, installing, operating, and maintaining wireless networks at designated government locations; complying with wireless security directives and guidelines; supporting authorized mobile device connections to the wireless network; and monitoring and reporting unauthorized access to the wireless network."  ECF No. 147-1 at AR 29563-64.  According to the TET, Syneren "only addressed [ * * * ]."  ECF No. 130 at AR 29068.

Syneren argues that its proposal did, in fact, "address[] the requirements of PWS Section 3.4.17," which "describe[ed] the methods it intends to use to [ * * * ]."  ECF No. 179 at 32 (citing ECF No. 129 at AR 22491).  Specifically, Syneren's proposal sets forth a list of [ * * * ] to comply with the PWS requirements.  ECF No. 129 at AR 22491-92.  In response, the Government argues that, "[w]hile Syneren's proposal addressed PWS 3.4.17, and did provide an approach to supporting mobile devices, in the agency's reasonable assessment, it 'failed to provide an approach for [ * * * ].'"  ECF No. 203 at 103.

Again, the Court will not replace the Agency's judgment with its own.  Syneren's proposal does state that it provides "[ * * * ]."  ECF No. 129 at AR 22491.  And that support "includes [ * * * ]."  *Id*.  But nothing about that statement indicates how Syneren [ * * * ]—i.e., Syneren's approach to doing so.  The remainder of the proposal section provides Syneren's "approach and innovative methods."  *Id*.  But none of these approaches address [ * * * ].  Syneren's proposal clearly addresses [ * * * ].  ECF No. 129 at AR 22491 (paragraph f).  It also discusses [ * * * ].  *Id*. (paragraph g).  These do not clearly address [ * * * ], so they do not provide an approach.

Because the Agency considered the proposal and articulated a rationale for its evaluation that is supported by the record, the Court will not disturb the Significant Weakness for PWS Section 3.4.17.

6.    Commerce rationally assigned the Significant Weakness for PWS Section 3.6.1.

PWS Section 3.6.1 requires the contractor "to provide diverse Cybersecurity and Information Assurance (IA) services that enforce, comply with, and support the Federal Information Security Management Act (FISMA) cybersecurity and IA security directives, Department of Homeland Security (DHS), DOC, and NIST policies and procedures."  ECF No.

147-1 at AR 29574.  According to the TET, "[Syneren's] proposal states that the Offeror will adhere to and comply with [ * * * ]."  ECF No. 130 at AR 29068.

Syneren argues that, although the Agency assigned a Significant Weakness for its purported "fail[ure] to demonstrate capability to perform policy development[,]" its proposal specifically represented an approach with respect to "[ * * * ]."  ECF No. 179 at 34.  Syneren's proposal highlights its expertise and experience in [ * * * ]."  ECF No. 129 at AR 22512.  In response, the Government claims, "[w]hile Syneren states that it has supported the [ * * * ], Syneren does not provide any details or approach as to how it previously completed these tasks.  Again, Syneren simply stating compliance with the PWS specifications is inadequate and unsatisfactory."  ECF No. 203 at 105-106 (citing ECF No. 118 at AR 1474).

A protestor must offer more than "naked claims" of disagreement to overcome "the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious."  *Tech Sys., Inc.*, 98 Fed. Cl. at 244 (quoting *Banknote*, 56 Fed. Cl. at 384).  And "the test for reviewing courts is to determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion . . . .'"  *Impresa Construzioni*, 238 F.3d at 1332-33 (quoting *Latecoere Int'l*, 19 F.3d at 1356).  Here, the Agency did not simply state that Syneren failed to address or provide an approach to meet the Solicitation requirements.  Rather, the Agency clearly stated that, although Syneren stated it would "[ * * * ] as required" by the PWS. ECF No. 130 at AR 29068.

The Government does not dispute that Syneren provides examples of its [ * * * ].  *See* ECF No. 129 at AR 22512.  But the question remains whether Syneren provides an approach to perform the work.  A review of Syneren's proposal does not clearly reveal such an approach.  Syneren points to its [ * * * ] in its proposal as providing the approach that the Agency was looking for.  ECF No. 239 at 22-25 (citing ECF No. 129 at AR 22511-14).  Commerce clearly considered this section of Syneren's proposal.  *See* ECF No. 130 at AR 26812 (citing pages 52-55 of Syneren's proposal, which are ECF No. 129 at AR 22511-14).  Syneren does discuss [ * * * ]."  ECF No. 129 at AR 22513.  But, given the deference to the Agency's technical evaluation, the Court does not find these statements necessarily provide the approach as to how Syneren would [ * * * ].

Because the Agency's evaluation considered the relevant factors and reached a reasonable conclusion based on the record before it, the Court will not disturb it.

### B.      Commerce did not abuse its discretion by choosing not to conduct discussions.

Syneren argues that "in addition to . . . DOC's flawed evaluation of Syneren's proposal, the record reveals a systemic flaw in the procurement that reasonably should have led DOC to conduct discussions."  ECF No. 179 at 2.

It is well settled that an "[a]ward may be made without discussions if the solicitation states that the Government intends to evaluate proposals and make award without discussions."  48 C.F.R. § 15.306(a)(3).  In this case, the RFP provided that "[i]t is the Government's intent to award upon initial proposals without discussions with Offerors . . . ."  ECF No. 118 at AR 1489

(RFP § M.2.2(d)(8)).  The RFP also provides that "[t]he Government reserves the right to make an award without discussions based solely upon initial proposals.  Therefore, offerors should ensure that their initial proposal constitutes their best offer in terms of both price and the technical solution being proposed."  ECF No. 118 at AR 1489-90.  Thus, the Agency clearly could award without discussions based on the provisions of the RFP.

And "[u]nder [48 C.F.R.] section 15.306(d)(3), whether discussions should be conducted lies within the discretion of the contracting officer."  *JWK Int'l Corp. v. United States*, 279 F.3d 985, 988 (Fed. Cir. 2002) (citation omitted).  That said, even "[w]hen a solicitation states that formal discussions are not required, there may be some circumstances in which the government's failure to hold discussions would be arbitrary and capricious."  *Essex Electro Eng'rs, Inc. v. United States,* 458 F. App'x 903 (Fed. Cir. 2011) (per curiam); *see also Oak Grove Techs., LLC v. United States*, 155 Fed. Cl. 84, 108 (2021) (stating that, although the general rule is that the contracting officer has discretion not to conduct discussions, "that does not mean that such discretion is plenary"); *Day & Zimmermann Servs. v. United States*, 38 Fed. Cl. 591, 604 (1997) (stating that the discretion not to conduct discussions "is not unfettered" and "must be reasonably based on the particular circumstances").  But these cases are, to be sure, the narrow exception to the rule or based on a different regulatory regime.  For example, *Oak Grove* arose in the context of a Department of Defense ("DoD") procurement to which a DoD FAR supplement applied.  Specifically, under 48 C.F.R. § 215.306, when the estimated value of a contract is over a specified dollar threshold, "contracting officers *should* conduct discussions."  *Oak Grove Techs.*, 155 Fed. Cl. at 108 (emphasis added).  Thus, Judge Solomson found that there was a regulatory presumption to have discussions and a decision not to do so required explanation.  No such provision applies to this procurement.

There are also extraordinary factual circumstances that can render the choice not to conduct discussions an abuse of discretion.  One such circumstance is when the record demonstrates that all offerors other than the awardee made an incorrect assumption about solicitation requirements.  *Ernst & Young. LLP v. United States*, 136 Fed. Cl. 475, 516-17 (2018).  This is the hook Syneren uses to attack the decision not to conduct discussions because Commerce disqualified 64 of the 87 proposals that it received.  ECF No. 179 at 36.[18]  And most of these disqualifications "appear[] to result from DOC's assignment of dozens of Significant Weaknesses for failing to demonstrate an 'approach' to meeting the PWS requirements."  *Id*.  But, according to Syneren, the RFP did not require offerors to demonstrate an approach, only their ability to perform the work.  *Id*. at 37 (citing RFP § M2.3(a), ECF No. 118 at AR 1490).  This, Syneren contends, demonstrates that many offerors shared the same misunderstanding of the RFP and renders the Agency's failure to have discussions arbitrary and capricious under *Ernst & Young*.

Even assuming the RFP did not require offerors to demonstrate their approach (for more on this issue, see the discussion in GenceTek's protest), it does not make the Agency's decision not to have discussions an abuse of discretion.  It is undeniably the case that Commerce assigned

---

[18] These numbers do not account for the fact that Commerce disqualified five offerors for failing to submit all the required documentation and another offeror that requested to be removed from consideration.  ECF No. 130 at AR 28245.

many Significant Weaknesses for failing to provide an approach. The Court has not counted them, but simply reading this opinion's resolution of challenges to numerous Significant Weaknesses suffices to prove the point (and the Court is not done yet). But, as the Court has explained many times already, the Agency faulted offerors for failing to provide an approach to PWS Sections that the Government now claims were insufficient in some way. For example, in a number of cases, the proposal section that Commerce evaluated as failing to provide an approach contains multiple references to the proposed "approach." *See, e.g.*, ECF No. 123 at AR 13272-313 (GenceTek proposal). Whatever the merit of the evaluation, the record demonstrates that offerors were not laboring under a view that an approach was not required. For further example, other assessed failures to provide an approach were due to the offeror addressing some, but not all, PWS Section requirements. *See, e.g.*, ECF No. 130 at AR 26725-28 (JCS evaluation). In these cases, too, the offerors clearly did not understand the RFP to not require an approach; instead, these offerors contended that certain elements were either not requirements or were addressed in other parts of their proposals. *See, e.g.*, ECF No. 164-1 at 7-27. Again, nothing about this supports the conclusion that there was mass confusion about what the RFP required. Thus, the Court cannot say there was a common misunderstanding of the need to provide an approach because in many instances the proposal being evaluated clearly included an approach.

Alternatively, Syneren argues that the Agency should have held discussions to get better pricing and thereby avoided the "markedly high prices" of two of the awardees, T&T and SONA. ECF No. 179 at 35-38; ECF No. 239 at 27. Even though T&T and SONA's prices were on the higher end of those received, the Agency found them fair and reasonable. ECF No. 130 at AR 26978 (price analysis summary). Indeed, all but one of the proposals included fair and reasonable prices. *See id*. at AR 26971-78. Syneren does not refute that conclusion.

In its reply to GenceTek's discussion argument, the Government counters that it was not arbitrary or capricious to award without discussions because Commerce anticipated awarding between 15-20 contracts and got 15 awardable proposals that each had fair and reasonable pricing. ECF No. 254 at 87-88 (citing *Int'l Data Prods., Corp.*, B-274654, 1996 WL 761964 (Dec. 26, 1996)). *International Data Products* rejected a similar challenge to a decision not to hold discussions because "[g]iven that the agency received several other proposals that demonstrated significantly greater merit, and given that the agency was able to accept one of those offers without discussion, we have no basis to disagree with" the decision not to hold discussions. *Id*. at *8. In *IAP Worldwide Servs., Inc. v. United States*, Judge Solomson considered *International Data Products* but concluded that 48 C.F.R. § 215.306, adopted after *International Data Products*, provided the regulatory default to have discussions that was missing from cases where 215.306 does not apply. 159 Fed. Cl. 265, 314 (2022). Therefore, Syneren's arguments about price do not provide a sufficient basis to find the contracting officer's decision not to hold discussions in this case arbitrary, capricious, or an abuse of discretion.

## C.    Prejudice

To establish prejudice, Syneren "is not required to show that but for the alleged error, [it] would have been awarded the contract." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (citations omitted). But "a showing of a mere possibility that the protester would have received the contract but for the error is inadequate to show prejudice . . . . The proper standard

lies between these polarities." *Id*. Therefore, "the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." *Id*.

Syneren prevailed on its challenges to 2 of the 6 Significant Weaknesses assessed for its technical proposal. It is left with a Good past performance rating, ECF No. 130 at 28354; an evaluated price of $[ * * * ], which is the 43rd lowest price, *id*.; and 0 Significant Strengths, 6 Strengths, 0 Weaknesses, and 4 Significant Weaknesses. That puts Syneren in the zone of consideration, which is all that is required to establish prejudice. *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983).

Further, Commerce eliminated Syneren from consideration based on the combination of Significant Weaknesses in its proposal. Under the SSP, a proposal is Unsatisfactory if it contains a single Deficiency or "a combination of Significant Weaknesses that represents a material failure to meet requirements. Represents a high or unacceptable risk of unsuccessful contract performance." ECF No. 118 at 1512. But there are no criteria in the RFP (or SSP) that dictate when a combination of Significant Weaknesses is an unacceptable risk. This Court is certainly not able to determine whether, assuming a plaintiff prevails on some but not all its challenges to Significant Weaknesses, the remaining Significant Weaknesses still constitute a "high or unacceptable risk of unsuccessful contract performance." *Id*. Nor can this Court determine whether Syneren's Strengths offset the remaining Significant Weaknesses. That is unquestionably the Agency's role. During oral argument, the Government agreed, stating "if any of the significant weaknesses are knocked out, then it needs to go back to the Agency for reevaluation based on the criteria established by this Court and consideration of the other factors . . . ." ECF No. 263 at 66:21-25. Because Syneren has succeeded in its challenge to 2 of the Significant Weaknesses, it has established prejudicial error.

For these reasons, the Court grants-in-part and denies-in-part Syneren's MJAR and grants-in-part and denies-in-part the Government's and Defendant-Intevenors' Cross-MJARs.

## VIII.   GenceTek, LLC (No. 22-1462)

Commerce assessed 1 Significant Strength, 10 Strengths, and 18 Significant Weaknesses to GenceTek's technical proposal. Based on this combination of Significant Weaknesses, the Agency found GenceTek's technical proposal Unsatisfactory, which eliminated it from consideration for award. GenceTek raises two challenges to the Agency's evaluation of its proposal.[19] First, GenceTek argues that Commerce unreasonably interpreted the RFP to require offerors to demonstrate their ability to perform the PWS requirements only through their experience. As a result, GenceTek argues that the Agency did not consider GenceTek's experience that it largely relied upon to show its ability. Second, GenceTek argues that it was irrational for the Agency not to consider holding discussions given the large number of offerors

---

[19] GenceTek initially raised a third challenge regarding the price evaluation but withdrew it. ECF No. 239 at 1.

that similarly failed to provide their approach to establish their ability to perform PWS requirements.

**A.      The RFP required an approach to establish ability.**

GenceTek's main argument is that the Agency unreasonably interpreted the RFP to require offerors to demonstrate their ability to perform the PWS requirements through their approaches to performing the work.  Thus, according to GenceTek, even though it provided an approach, "it focused on demonstrating 'ability' to meet the IDIQ PWS requirements by discussing its specific experience performing the various IDIQ PWS tasks on other contracts." ECF No. 177 at 8.  As a result, GenceTek contends that Commerce did not consider its experience, only its approach, and assessed the 18 Significant Weaknesses.  *E.g.*, *id*. at 23.

Most of GenceTek's claims turn on its interpretation of the RFP.  As GenceTek sees it, Section M of the RFP provides that the Agency would evaluate proposals to determine whether offerors demonstrated their ability to perform the PWS work.  So far, the Government agrees.  Where the dispute arises is whether an offeror had to provide a detailed technical approach to demonstrate its ability.  According to the Government, when read in conjunction with Section L, the answer is yes.  GenceTek, however, argues that Section M only provides that the Agency would evaluate "ability" and that there is no limitation on how an offeror could demonstrate its ability.  Thus, according to GenceTek, an offeror could demonstrate ability through approach, but could also do so with experience.  While the Government contends that it did consider experience in evaluating offerors' ability, it argues that the RFP read as a whole requires an approach for each PWS work requirement.  The crux of the issue is whether the RFP requires offerors to provide an approach to each PWS work requirement, which is a question of interpretation.

The interpretation of a solicitation is a question of law, *Banknote*, 365 F.3d at 1353 (citing *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1999)), and follows the same principles governing the interpretation of a contract, *id*. at n.4 (citing *Grumman Data Sys.,* 88 F.3d at 997-98).  Thus, the Court first looks to the plain language of the solicitation.  *Id*. at 1353 (citing *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc)).  In doing so, the Court also "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions."  *Id*.  (citing *Coast Fed. Bank*, 323 F.3d at 1038).  "An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous."  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).  "If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning . . . ."  *Banknote*, 365 F.3d at 1353 (citing *Coast Fed. Bank*, 323 F.3d at 1038).

The Court begins, as it must, with the text of the RFP.  As with standard government contracts, the evaluation criteria are found in Section M.  In the CATTS RFP, Section M 2.3(a) states:

The Government will evaluate the following elements that make up the Offeror's technical/management capability. The elements are of equal relative importance.  Offers must:

a. *Demonstrate the Offeror's ability to meet or exceed* the Final CATTS PWS requirements and deliverables as contained in Attachment 1, and use proven, innovative methods to meet the Final CATTS PWS requirements, resolve complex issues, and provide continuous process improvement and implementation, all while maintaining and tracking high levels of customer satisfaction.

b. Demonstrate how the Offeror's approach will adapt to evolving technological innovations and the dynamic nature of the organization (impacted by changing regulations, laws, and executive directions) to improve service delivery and ensure ongoing organizational improvement.

c. Demonstrate the Offeror's ability and approach to manage and staff (to include retaining) key personnel and non-key personnel, to include teaming arrangements, to support each of the task areas with the appropriate clearance levels, education, and certifications to adequately meet the requirements of the Final CATTS PWS for future task orders.

d. Demonstrate the Offeror's understanding and approach to provide a smooth, undisrupted transition (phase in and out) to include:

  a. How the offeror will implement a proven, feasible and successful methodology for transitioning;

  b. How the offeror will identify and mitigate transition risks.

ECF No. 118 at AR 1490-91 (emphasis added).

GenceTek's view is that the emphasized language makes clear that the evaluation is based on the offeror demonstrating an "ability" to perform the PWS work, not an "approach."  It is apparent that ability and approach mean different things.  *Blue Tech Inc. v. United States*, 155 Fed. Cl. 229, 238 (2021) (citing *States Roofing Corp. v. Winter*, 587 F.3d 1364, 1370-72 (Fed. Cir. 2009) ("[T]he Court presumes that different terms imply different meanings.").  In fact, in this RFP ability and approach must mean different things because if ability and approach do not mean different things, then Section M 2.3(a)c renders one of the terms meaningless. Specifically, offerors must "[d]emonstrate the Offeror's ability *and* approach to manage . . . ." *Id*. (emphasis added).  Given the conjunctive, these must mean different things.

And the RFP's use of "ability" in some elements and "approach" in others also indicates that when Commerce meant to say approach, it did so. This is further confirmed by the fact that the Section M criteria for the Task Order 1 evaluation mirror the language above for the IDIQ competition with one major difference—the Task Order 1 criteria provide that Task Order 1 proposals must "[d]emonstrate the Offeror's *detailed technical approach* to meeting or exceeding the Task Order PWS requirements." ECF No. 118 at AR 1492. This makes sense given that the IDIQ Contract does not provide specific work to be done, while the Task Orders do. Thus, evaluating ability for the IDIQ and approach for the Task Order is a perfectly rational way to evaluate proposals.

If this Court were reading Section M in isolation, it would agree with GenceTek. Indeed, this argument tracks very closely to this Court's analysis in *Blue Tech, Inc. v. United States*, 155 Fed. Cl. 229 (2021). But the Court favors an interpretation that gives meaning to all the RFP's provisions, if reasonable. *Id.* at 238. Therefore, the Court turns to Section L, upon which the Government relies, to find the detailed technical approach.

Section L includes several references to providing an approach. First, Section L states that the "Technical Proposal, consists of the offeror's proposal delineating its capabilities *and how it intends to perform contract requirements*. The Technical Proposal will be evaluated in accord with the criteria contained in Section M." ECF No. 118 at AR 1478 (emphasis added). This provision could not be clearer. The Technical Proposal had to include an offeror's capabilities and how an offeror intended to perform the PWS work requirements, and that Commerce would evaluate this information under Section M. Again, given that capability and how an offeror intended to perform are listed in the conjunctive, the Court understands them to be distinct and each required. Notably, this provision appears under the header "Evaluation Factor 1 – Technical. General." ECF No. 118 at AR 1478. To the extent there remains doubt that Commerce was looking for an approach, the opening of the PWS itself states that the "objective" of the procurement is that "[t]he OCIO is seeking Contractors who can deliver solutions that can strategically *deliver an approach* to securely operate and manage the current IT infrastructure as well as provide engineering and design expertise to develop and execute plans to migrate to a 'to be state.'" ECF No. 147-1 at AR 29548 (emphasis added).

And Section L contains further instruction regarding the contents of the Technical Proposal. Here, Section L provides:

> (2) Technical Proposal. Evaluation Factor 1 - Technical Approach/Management Capability. The offeror shall clearly address each of the technical evaluation criteria in Section M, and, at a minimum, cover each element.. [sic] The offeror shall:
>
> (a) Provide a detailed technical approach to performing the work in the Final CATTS PWS (Attachment 1).

ECF No. 118 at AR 1479. This provision moves the analysis forward in several ways. First, it reiterates that to satisfy Section M Evaluation Factor 1, the offeror *shall* provide a detailed technical approach. And "[u]nlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171

(2016). Thus, offerors had to include their technical approach for the work. Second, it also makes clear that Commerce would evaluate the required technical approach under Section M.

Here lies the issue. The only Section M provision that addresses the PWS work is Section M 2.3(a)a. But, as explained above, that provision provides that Commerce would assess an offeror's "ability," which must mean something different than "approach" in this RFP because of Section M 2.3(a)c's use of both terms in the conjunctive. Is there a way to harmonize Section L's statement that offerors must provide a technical approach to satisfy Section M with Section M's statement that it would only evaluate ability? Some intervenors contend that there is a sufficiently close nexus between "approach" and "ability" to allow the Court to find ability to include approach. *E.g.*, ECF No. 193 at 15. But that argument does not fit comfortably here because this RFP clearly makes these terms distinct.

There is another option. While most of the argument has focused on the words "ability" and "approach," the Section M 2.3(a)a criteria go a bit further. In addition to evaluating an offeror's ability to perform the PWS Work, it continues "and use proven, innovative methods to meet the Final CATTS PWS requirements . . . ." ECF No. 118 at AR 1490. The Government contends that this language allowed Commerce to consider experience, which it did. But this language is not necessarily so limited; it can also support the Government's argument that an offeror must satisfy "ability," at least in part, through its "approach."

To the extent there is much difference between a method and an approach, method is certainly capacious enough to include an approach. With this understanding, the RFP provides that Commerce would evaluate an offeror's ability to perform the PWS work and its approach to doing so. In other words, Section M 2.3(a)a provides that Commerce would evaluate an offeror's ability (1) to perform the PWS work and (2) use innovative methods to meet the PWS requirements. It appears clear that an offeror cannot demonstrate an ability to use innovative methods to meet PWS requirements if it does not tell the Agency what those methods—*i.e.*, approaches—are. During argument, The Court probed if this is what the Government was arguing:

> THE COURT: So Section A is saying you have to give your ability to meet the requirements. So what I'm asking, is the part after the "and" what you are saying is the approach that everyone failed on?
>
> MS. VICKS: I am saying proven innovative methods, an approach is a method. And that is a way to read this, yes.

ECF No. 263 at 179:17-23. And after some back-and-forth, the Government elaborated: "Yes. Proven innovative methods is approach, to answer Your Honor's question, and conforms with the requirements in Section L to provide an approach and delineate your capabilities." *Id.* at 180:24-181:2. So it does.

On this reading, the Court finds two problems with GenceTek's interpretation. First, an offeror could not conceivably demonstrate an ability to use proven innovative methods to meet PWS requirements without ever explaining what those methods are—*i.e.*, providing an approach

to do the work.  And because this is part of the "ability" that Commerce was to evaluate, the approach was required to demonstrate ability.  Second, reading Section M.2.3(a) to allow offerors to establish their ability to perform the PWS requirements without relying on their approach does not harmonize Section M with Section L's directives that offerors must include the detailed technical approach to satisfy Section M.  Because GenceTek's interpretation does not effectively harmonize Sections L and M or account for Section M's explicit provision regarding the offeror's approach, the Court finds it unreasonable.

And GenceTek's argument fails as a factual matter.  Although GenceTek contends that Commerce did not consider experience in evaluating whether GenceTek demonstrated its ability to perform the PWS requirements, the record makes clear that Commerce did, in fact, consider experience in its analyses.  In fact, Commerce awarded offerors Strengths based explicitly on their demonstrated experience.  Indeed, Commerce awarded GenceTek's proposal two Strengths (one for a Task Area 2 requirement and one for Task Area 6 requirement) based on experience.  One such Strength was because GenceTek [ * * * ].  ECF No. 130 at AR 26693.  Similarly, Commerce awarded GenceTek a Strength for its electronic records management solution because GenceTek demonstrated successful implementation of its proposed solution and [ * * * ].  *Id*. at AR 26692.  Given that Commerce clearly considered GenceTek's experience when evaluating its ability under M.2.3(a)a, the record contradicts GenceTek's argument as a factual matter.

Because the Government properly required an approach to demonstrate an offeror's ability to perform the work and did, in fact, consider GenceTek's demonstrated experience in evaluating its proposal, GenceTek fails to show that Commerce acted arbitrarily or capriciously assigning GenceTek's proposal 18 Significant Weaknesses.

### B.    Commerce did not abuse its discretion by choosing not to conduct discussions.

GenceTek next argues that it was arbitrary and capricious or an abuse of discretion for the contracting officer not to even consider whether to hold discussions with offerors.  ECF No. 177 at 36.  GenceTek raises the same confusion argument that Syneren makes—i.e., that the contracting officer should have had discussions because the record shows widespread confusion about the need to demonstrate ability through an approach.  Because the Court's resolution of the confusion argument Syneren raises applies equally to GenceTek's argument, the Court does not discuss it again here.  Rather, the Court focuses on GenceTek's argument that it was arbitrary and capricious for the Agency not to consider holding discussions.

GenceTek concludes that the Agency never considered holding discussions because the record does not contain documentation of any such consideration.  ECF No. 238 at 26-26.  But this argument misses the mark.  As the Federal Circuit has explained, "[g]enerally, '[c]ontracting officers are not obligated by the APA to provide written explanations for their actions.'" *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1313 (Fed. Cir. 2021) (quoting *Impresa*, 238 F.3d at 1337) (second alteration in original).  This is because their decisions "are not adjudicatory decisions to be made on the record after a hearing." *Impresa*, 238 F.3d at 1337 (citing *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999)).  "Nor are they formal rulemakings." *Id*.

Here, the RFP states clearly that Commerce intended to award contracts without discussions. ECF No. 118 at AR 1489. It did so. When the RFP states an intent to award without discussions "and the Government determines it is necessary to conduct discussions, the rationale for doing so shall be documented in the contract file." 48 C.F.R. § 15.306. No similar requirement exists for the contracting officer's decision not to hold discussions. Given that the FAR only provides a documentation requirement for a decision to hold discussions when the RFP states an intent not to (*i.e.*, when an agency is changing its intended course), the Court cannot find the absence of documentation regarding the contracting officer's decision not to hold discussions to mean that she did not do so in this procurement. *Impresa*, 238 F.3d at 1337 (discussing the documentation of a responsibility determination under the FAR).

GenceTek's reliance on *Palantir USG, Inc. v. United States*, 904 F.3d 980 (Fed. Cir. 2018), for the proposition that the record must still be sufficient to allow meaningful judicial review does not change the calculus. *Palantir* provides that "even where an explanation or reason is not required for an agency's determination, a reviewing court has the power to require an explanation." *Id.* at 995 (citing *Impresa*, 238 F.3d at 1338). But when deciding whether to require the Agency to provide an explanation, something GenceTek has not formally asked this Court to do, "the agency decision is entitled to a presumption of regularity." *Impresa*, 238 F.3d at 1338 (citation omitted). "Because of that presumption of regularity, the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious." *Id.* (citation omitted). And GenceTek "bears a heavy burden." *Id.*

GenceTek does not meet this heavy burden to overcome the presumption of regularity in this case. To carry this burden, GenceTek points to different internal Commerce documents, including the SSP and the Commerce Acquisition Manual. ECF No. 177 at 37. But the SSP does not help GenceTek overcome the presumption of regularity. It provides that the contracting officer will "[l]ead[] discussions, if applicable" and "[r]equest[] final proposal revisions, if discussions are conducted." ECF No. 1504. And the SSP provides that the SSEB Chair was to "make a recommendation to the SSA regarding whether award should be made based on initial proposals or whether conducting discussions with the most highly rated offerors is in the Government's best interest." *Id.* at AR 1505. While this could support GenceTek's argument, the very next responsibility listed in the SSP is for the SSEB Chair to "[p]repare[] a *written* recommendation for award . . . ." *Id.* (emphasis added). Thus, there is no requirement that any discussion recommendation be in writing; rather, the SSP indicates that no requirement exists by not specifically requiring a writing while doing so for other requirements. Thus, the SSP does not overcome the presumption of regularity here.

GenceTek also relies upon the Commerce Acquisition Manual 1315.3 ("CAM") to provide a requirement to document a decision to not hold discussions. ECF No. 177 at 37. But this reliance does not satisfy GenceTek's heavy burden either. First, the CAM provides "policy and guidance for formal selection of source(s) in competitive negotiated acquisitions." *Id.* § 1.2, *available at* https://www.commerce.gov/sites/default/files/oam/CAM%201315.3%20-%20Source%20Selection%28Rev.%20July2014%29.pdf. Thus, it is not clear that it is binding on the Agency because it does not bind the Agency to its terms in every case. *E.g., Farrell v. Dep't of the Interior*, 314 F.3d 584, 590-91 (Fed. Cir. 2002). Second, the CAM provides that procedures governing procurements vary for different procurements, thereby deferring to the

specific documents governing specific procurements—the RFP and SSP.  *Id.* § 5.3.  Thus, even though Commerce policy may be to have evaluators "prepare discussion questions as part of the narrative," the lack of such questions does not overcome the lack of such a requirement in the SSP or the discretion the FAR affords the Agency.  Therefore, the CAM fails to rebut the presumption of regularity here.

Because the record does not support extraordinary circumstances making the choice not to hold discussions arbitrary and capricious, nor rebut the presumption of regularity, GenceTek fails to carry its heavy burden to challenge the Agency's decision to award without discussions in this case.

### C.    Conclusion

Because GenceTek fails to establish error in the Agency's evaluation, the Court denies GenceTek's MJAR and grants the Government's and Defendant-Intervenors' Cross-MJARs.

### IX.    RarisRex, LLC (No. 22-1477)

Commerce assessed RarisRex's technical proposal 6 Strengths, 3 Weaknesses, 3 Significant Weaknesses, and 16 Deficiencies.  Based on the Deficiencies, Commerce found RarisRex's proposal Unsatisfactory, which eliminated it from consideration.  RarisRex challenges the merit of the negative technical evaluations.

### A.    Commerce rationally assigned Deficiencies to RarisRex's proppsal.

Commerce assigned RarisRex's Technical Proposal 16 Deficiencies because it "did not demonstrate its ability to meet or exceed the requirements of PWS Task Area 4, Sections 3.4.2, 3.4.3, 3.4.4, 3.4.5, 3.4.6, 3.4.7, 3.4.8, 3.4.9, 3.4.11, 3.4.12, 3.4.13, 3.4.14, 3.4.15, 3.4.16, 3.4.18, 3.4.20" and "failed to address these requirements or provide an approach to demonstrate capability."  ECF No. 130 at AR 26779 (emphasis omitted).  The assignment of any one Deficiency makes RarisRex ineligible for award.  ECF No. 118 at AR 1489 ("A proposal receiving an '*Unsatisfactory*' or 'Fail' rating in one or more factors *shall be removed from further consideration* for award or continued evaluation.") (emphasis added); *id.* at AR 1512 (describing an "Unsatisfactory" rating as "Proposal does not meet solicitation requirements and *contains one or more Deficiencies* and/or a combination of Significant Weaknesses that represents a material failure to meet requirements.  Represents a high or unacceptable risk of unsuccessful contract performance.") (emphasis added).

RarisRex contends it adequately addressed the PWS Task Area 4 Sections in pages 18-23 of its Technical Proposal.  ECF No. 172-1 at 11-14 (citing ECF No. 158-1[20] at AR 19742-47); ECF No. 234 at 5-7 (citing ECF No. 172-1 at 12-14) (stating that "[t]hese approaches were discussed at length previously in RarisRex's opening brief and Amended Complaint").  This is the page range listed in the Technical Proposal's table of contents as addressing PWS Task Area

---

[20] This section of the AR originally appeared at ECF No. 127.  Due to large portions of RarisRex's proposal being illegible, the Government re-produced it at ECF No. 158-1.  The Court refers to the pages in ECF No. 158-1 throughout its discussion of RarisRex's protest.

4.  ECF No. 158-1 at AR 19712; *see also id.* at AR 19742-47.  The Government disagrees, arguing that RarisRex simply contends that its various approaches satisfy each of the PWS Sections to which Commerce assigned a Deficiency.  ECF No. 203 at 167-68.

The Court cannot look at RarisRex's proposal and determine that it addressed all the requirements of the RFP.  Specifically, the section addressing Task Area 4 appears at ECF No. 158-1 at AR 19742-47.  RarisRex's specific references to PWS Task Area 4 are merely PWS Sections listed in a chart.  And looking at these pages, the Court finds that the proposal references certain PWS Task Area 4 sections, but its text and table do not clearly address all the requirements.  For example, RarisRex's only explicit reference to PWS Section 3.4.20 is in Figure 2.5 of the Technical Proposal.  ECF No. 158-1 at AR 19743.  The only description of PWS Section 3.4.20 provided is the requirement header: "Knowledge Wall & Vid Display Integration, O&M."  *Compare id.* at AR 19743, *with* ECF No. 147-1 at AR 29565 (requirements of PWS Section 3.4.20).  The Court finds nothing clearly addressing:

> [E]ngineering, installing, and programming video display systems; conducting routine operational tests and fault isolation on video display systems; optimizing system operation and resource utilization; aiding users in using systems; maintaining and operating a wide variety of video display equipment to include video feed devices, channel and layout controls, audio, and video display components; continuously monitoring all component equipment and taking corrective action for restoration to operational readiness.

ECF No. 147-1 at AR 29565.  RarisRex did give a several-page description of its [ * * * ] approach to providing PWS Task Area 4 IT Operations and Maintenance.  ECF No. 158-1 at AR 19742-47.  But describing which people will perform IT Operations and Maintenance requirements is not the same as demonstrating that the people responsible for performing the IT Operations and Maintenance requirements have the ability to perform them.  The latter, not the former, is what the RFP required.  ECF No. 118 at AR 1490 ("Offers must: Demonstrate the Offeror's ability to meet or exceed the Final CATTS PWS requirements and deliverables . . . .").

Nor is RarisRex saved by its complaint.  In its briefing, RarisRex points to paragraph 41 of its complaint that its asserts shows where it addressed each requirement.  ECF No. 234 at 5 n.2 (citing ECF No. 172-1 at 15-16).  But a number of these cited pages are to sections of its proposal dealing with other sections of the PWS.  For example, the table in paragraph 41 addressing PWS Section 3.4.6 points to AR 19766.  ECF No. 167 at 16.  But this page appears in a discussion about Task Area 6, not Task Area 4.  There does not appear to be any cross-reference to this cited page, which the RFP required.  ECF No. 118 at AR 1472.  This happens repeatedly in the paragraph 41 table.  *E.g.*, ECF No. 167 at 14-23 (citations to pages outside of AR 19742-47).  The Court will not fault the Agency for not piecing together a response to requirements from different sections of the proposal relating to different PWS Sections when there is not a cross-reference.  Again, the RFP clearly instructed offerors to use cross-references and explicitly stated that failure to so would be at the offeror's own risk.  ECF No. 118 at AR 1474 (RFP § L.2).  RarisRex does not argue that Commerce missed certain cross-references, just

that it didn't credit the entirety of the proposal.  While "[a]gencies must indeed review the whole proposal . . . they are not compelled to comb the record for information that an offeror does not otherwise adequately present through a well-written proposal."  *CACI, Inc*, 158 Fed. Cl. at 19 (citations omitted).

This pattern repeats itself throughout the briefing.  The Court does not go through each one of the PWS Sections because a single deficiency is disqualifying.  That said, a quick review of RarisRex's proposal suggests that the same issues permeate it and most, if not all, the Deficiencies find adequate support in the record.

### B.      RarisRex fails to satisfy its burden to establish disparate treatment.

RarisRex raises multiple disparate treatment arguments because Commerce assigned other proposals a Weakness or Significant Weakness for purportedly failing to provide an approach to some of the same PWS Sections for which the Agency assessed RarisRex Deficiencies.  To prevail on such an argument, RarisRex must show that its proposal is "substantively indistinguishable" from the ones it compares to.  *Office Design Grp.*, 951 F.3d at 1373.  RarisRex, however, does not establish that its proposal is substantively indistinguishable from those it compares itself to.

RarisRex complains that some offerors or awardees only received Weaknesses or Significant Weaknesses for purportedly failing to provide an approach to PWS Sections where RarisRex received Deficiencies for the same alleged failure.  ECF No. 172-1 at 19-22.  Again, however, RarisRex would need to show that its proposal was substantively indistinguishable from these proposals.  RarisRex does not do so.  This is further emphasized by the fact that the difference between a Weakness, Significant Weakness, and Deficiency reduces to the amount of risk created by the proposal's assessed flaw.  A Weakness "increases the risk of unsuccessful contract performance"; a Significant Weakness "appreciably increases the risk of unsuccessful contract performance"; and a Deficiency "increases the risk of unsuccessful performance to an unacceptable level."  ECF No. 118 at AR 1510.  It is not enough to merely claim that another offeror received a different rating under the same PWS Section.

RarisRex's argument regarding Addx demonstrates this point.  RarisRex complains Commerce found that both it and Addx did not provide an approach to PWS Section 3.4.4.  ECF No. 172-1 at 19-20.  As explained above, Commerce clearly found RarisRex's proposal failed to satisfy 3.4.4, which had multiple requirements.  By contrast, Commerce found Addx satisfactorily addressed all but one portion of 3.4.4.  ECF No. 130 at AR 26563 (assessing a Weakness for only failing regarding "support services required for end users").  Because RarisRex's and Addx's proposals were not substantively indistinguishable, the Agency did not engage in disparate treatment.

Similarly, RarisRex complains that The Prospective Group ("TPG") received a Significant Weakness for not adequately addressing PWS Section 3.4.20, while it received a Deficiency.  ECF No. 172-1 at 22.  Here, the TET concluded that:

> The PWS requires the Offeror to provide an approach to
> demonstrate capability to support PWS Task Areas 3.4.19, and

> 3.4.20.  The Offeror's [TPG's] proposal states past experience in these task areas; however, it does not provide an approach as to how the Offeror will perform successfully (Offeror's Technical Volume, p. 30-31, 37).  The requirements of PWS, Sections 3.4.19 and 3.4.20 are key components of Task Area 4, IT Operations and Maintenance.  Therefore, the Offeror's lack of demonstrated capability and full understanding of the requirements in these PWS areas substantially increases the risk of unsuccessful performance.

ECF No. 130 at AR 26584.  Of course, RarisRex contends that Commerce arbitrarily assigned its "virtually indistinguishable or nearly identical proposal" a Deficiency when it should have received a Significant Weakness like TPG.  ECF No. 172 at 22.  However, a review of TPG's Technical Proposal reveals that, unlike RarisRex, whose only mention of PWS Section 3.4.20 is in a table, TPG provided subheadings followed by paragraphs of description:

> **Past Experience:** Team TPG's in-house engineers and programmers implement, operate, and maintain video solutions: enterprise video signage and video broadcast systems at HHS-TV; Emergency Operations centers at FBI; and public hearing broadcast facilities for the SEC and FEC. We support these mission-critical video systems through routine operational tests and immediate fault remediation to meet customer uptime requirements. Our designs minimize electrical, network, and personnel resource requirements. We support and train end-users to use systems effectively and upgrade systems to meet their evolving business goals.

> **Approach:** Team TPG will provide DOC with knowledge wall and video display integration and O&M services. We will engineer and install AV display systems with video feed and display components, and program them with channel, layout, and operational controls.

ECF No. 129 at AR 23850.  The Court cannot find that Commerce treated RarisRex disparately with respect to PWS Section 3.4.20 given the significantly higher level of detail that TPG provided.

RarisRex's briefing raised a variety of challenges in addition to its contention that its Deficiencies were improperly assigned.  Because the Court finds that Commerce acted within its discretion in assigning RarisRex's Technical Proposal Deficiencies for its failure to demonstrate ability in PWS Task Area 4, RarisRex necessarily remains ineligible for award even if the Court were to find in RarisRex's favor on the other issues it raised.  ECF No. 118 at AR 1510 ("A Deficiency is defined as a material failure of a proposal to meet a Government requirement or a combination of Significant Weaknesses in a proposal that increases the risk of unsuccessful performance to an *unacceptable* level.") (emphasis added).  Therefore, the Court will not address RarisRex's other challenges.

## C.      Prejudice

As explained above, RarisRex must show prejudicial error to prevail.  To do so, it "must show that there was a substantial chance it would have received the contract but for the government's error in the bid process."  *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1380 (Fed. Cir. 2009) (citing *Bannum, Inc. v. United States*, 404, F.3d 1346, 1358  (Fed. Cir. 2005)).  Given that at least one of the Deficiencies Commerce assigned to RarisRex's proposal was rationally assessed, RarisRex cannot establish prejudice.  The SSP provides that Commerce would use an adjectival rating system that defines an Unsatisfactory technical rating as one where the "Proposal does not meet solicitation requirements and contains one or more Deficiencies and/or a combination of Significant Weaknesses that represents a material failure to meet requirements.  Represents a high or unacceptable risk of unsuccessful contract performance."  ECF No. 118 at AR 1512.  Thus, a single Deficiency results in a technical proposal being Unsatisfactory.  And "[a] proposal receiving and 'Unsatisfactory' or 'Fail' rating in one or more factors *shall be removed from further consideration* for award or continued evaluation."  ECF No. 118 at AR 1489 (RFP § M.2.2(d)(5)) (emphasis added).  As a result, no matter how erroneous any other part of the Agency's evaluation of RarisRex's proposal may be, the fact that a Deficiency survives the Court's review means that the Agency "shall" remove RarisRex's proposal from further consideration.

Because RarisRex cannot establish prejudice, the Court denies RarisRex's MJAR and grants the Government's and Defendant-Intervenors' Cross-MJARs.

## X.      AttainX, Inc. (No. 22-1492)

Commerce assessed AttainX's technical proposal 7 Strengths, 2 Weaknesses, and 7 Significant Weaknesses.  Based on the combination of Significant Weaknesses, Commerce found AttainX's proposal Unsatisfactory, which eliminated it from consideration.  AttainX challenges the merit of the negative technical evaluations, the lack of enforcement of the font and spacing requirements, the disproportionate assessment of Significant Weaknesses, and Commerce's failure to conduct an offset of strengths and weaknesses as the RFP required.

### A.      Weaknesses

#### 1.      Commerce rationally assigned the Weakness for PWS Section 3.4.4.

AttainX's Technical Proposal received a Weakness for PWS Section 3.4.4 because the PWS required demonstration of ability to "deliver remote support services for customers that include, but are not limited to: tailored directory service entries, organizational mailboxes, distribution lists, etc.; approved add-on applications" yet AttainX's Technical Proposal "failed to address these requirements or provide an approach to demonstrate capability (Offeror's Technical Volume, p. 22)."  ECF No. 130 at AR 26613.  These were two of five services listed by the PWS in bullet points.  ECF No. 147-1 at AR 29558-59.  AttainX does not deny that its Technical Proposal did not address these services listed in PWS Section 3.4.4, but contends that its Technical Proposal should not have received a Weakness all the same.  ECF No. 170-1 at 29 ("DOC chose to give a weakness for specific bullet points not addressed including directory service entries or add-on support.  In the jargon-heavy world of IT services, AttainX should be

praised for providing a clear and understandable approach to existing systems maintenance."). The PWS required Offerors to address each technical issue.  ECF No. 147-1 at AR 29552 ("For a contractor to be qualified for a Task Area, the contractor must be capable of performing *all services* within that Task Area.") (emphasis added).  The Court will therefore not take it upon itself to determine what number of bullet points must be directly addressed, especially when PWS Task Area 4 clearly states that "The *required services* of Task Area 4 include, but are not limited to, the following."  *Id.* at AR 29557 (emphasis added).  That determination is best left to Commerce, and there is nothing arbitrary or capricious about the Weakness assigned to PWS Section 3.4.4.

### 2.    Commerce rationally assigned the Weakness for PWS Section 3.4.6.

AttainX's Technical Proposal received a Weakness for PWS Section 3.4.6 because the PWS required demonstration of ability to "provide server administration and management for virtual and physical servers," which "[s]ervices include, but are not limited to: documenting computer hardware, system support, and/or diagnostic software, and configuration settings for the full life cycle of the delivered capability; performing system startup, shutdown, diagnostics, file management, user and group setups, and determination of login scripts; performing data and file storage administration and related functions including provisioning and monitoring backups and restorations; supervising or training computer operators; consulting on computer problems beyond the knowledge of the customer and technical support staff (PWS, Section 3.4.6, p. 14-15)," yet AttainX's Technical Proposal "did not provide an approach to demonstrate capability to support these requirements (Offeror's Technical Volume, p. 24-25)."  ECF No. 130 at AR 26613.  These were five of nine services listed by the PWS in bullet points.  ECF No. 147-1 at AR 29559-60.  AttainX contends that its "approach responded to each of the five items its [sic] alleged to have omitted."  ECF No. 170-1 at 30.  The Court addresses two of these items below.

Commerce assigned this Weakness in part because it concluded that AttainX's Technical Approach "did not provide an approach to demonstrate capability to support" services that included "documenting computer hardware, system support, and/or diagnostic software, and configuration settings for the full life cycle of the delivered capability."  ECF No. 130 at AR 26613.  AttainX does not deny that its Technical Approach did not separately address the documentation function but contends it did not need to because it addressed the documentation function by addressing the installation function.  ECF No. 170-1 at 30 ("Part and parcel of installing hardware and performing configuration services is documenting these activities.  By committing to perform all *required* tasks, AttainX confirmed it would also document these activities.").  The RFP separates the installation function from the documentation function, ECF No. 118 at AR 1237, so it is reasonable for Commerce to require these functions to be addressed separately and explicitly.  Therefore, it was reasonable for Commerce to determine that AttainX's Technical Proposal did not address this bullet point.

Commerce also concluded that AttainX's Technical Approach "did not provide an approach to demonstrate capability to support" services that included "performing system startup, shutdown, diagnostics, file management, user and group setups, and determination of login scripts."  ECF No. 130 at AR 26613.  AttainX does not deny that its Technical Approach did not separately address the system startup and shutdown function, but contends it did not need to because "[i]t is intrinsic of highly available server architecture the system was successfully

cycled through shutdown and startup procedures.  In so far as diagnostics are concerned, AttainX explained that it would perform routine monitoring of servers."  ECF No. 170-1 at 30-31. Whether or not something is intrinsic is not immediately clear, and there is nothing arbitrary or capricious in concluding that it is not.  In other words, Commerce's determination that AttainX's Technical Proposal did not demonstrate ability to perform the system startup and shutdown function was within Commerce's discretion and rational.

As the foregoing discussion makes clear, AttainX's Technical Proposal did not address every bullet point listed in PWS Section 3.4.6.  The PWS required Offerors to address each technical issue.  ECF No. 147-1 at AR 29552 ("For a contractor to be qualified for a Task Area, the contractor must be capable of performing *all services* within that Task Area.") (emphasis added).  The Court will therefore not take it upon itself to determine what number of bullet points must be directly addressed, especially when PWS Task Area 4 clearly states that "The *required services* of Task Area 4 include, but are not limited to, the following."  ECF No. 147-1 at AR 29557 (emphasis added).  That determination is best left to Commerce and AttainX has not demonstrated that Commerce's conclusions were arbitrary or capricious.

Therefore, Commerce rationally assessed the Weaknesses for PWS Sections 3.4.4 or 3.4.6, and the Court will not disturb them.

## B.  Significant Weaknesses

### 1.  Commerce rationally assigned the Significant Weakness for PWS Section 3.4.5.

PWS Section 3.4.5 requires a contractor to provide various support at domestic and international sites.  ECF No. 147-1 at AR 29559.  Commerce assessed a Significant Weakness to AttainX's proposal for PWS Section 3.4.5 because "[t]he Offeror did not provide an approach to demonstrate capability in supporting these requirements (Offeror's Technical Volume, 22-23)." *Id.* at AR 26613-14.

According to AttainX, it provided an approach to Section 3.4.5.  Of course, the mere disagreement with the Agency's evaluation is not sufficient.  *Tech Sys., Inc.*, 98 Fed. Cl. at 244. Again, the RFP required offerors to provide an approach.  ECF No. 118 at AR 1479.  AttainX's proposal is replete with statements that it will perform the work.  For example, it states that AttainX [ * * * ].  ECF No. 119 at AR 5126.  Similarly, AttainX commits to [ * * * ].  *Id*. at AR 5127.  There is no apparent approach as to how it will perform these requirements, only that AttainX will do so.  But the RFP makes clear that merely stating that an offeror would or could perform the work would not be sufficient.  ECF No. 118 at AR 1474.

AttainX's argument that requiring a detailed approach amounted to an unstated evaluation criterion is not compelling.  ECF No. 170-1 at 20.  Here, AttainX argues that PWS Section 3.4.5 only listed services that may be required, and more detailed responses were only required for specific task orders.  But the PWS does not state that the Section 3.4.5 are things that may be required.  To the contrary, the RFP states that the required support "includes, but is not limited to," the listed services.  ECF No. 147-1 at AR 29559.  And, as explained above, the RFP stated clearly that offerors simply stating that they would perform the required work would

be insufficient.  And there was nothing unstated about the fact that the RFP required a technical approach and would evaluate offerors on their approaches.

Therefore, Commerce rationally assessed the Weakness for PWS Sections 3.4.5 and the Court will not disturb it.

2.   Commerce rationally assigned the Significant Weakness for PWS Section 3.4.8.

AttainX's Technical Proposal received a Significant Weakness for PWS Section 3.4.8 because "[t]he Offeror's approach failed to demonstrate capability with PKI (Offeror's Technical Volume, p. 25)."  ECF No. 130 at AR 26614.  PWS Section 3.4.8 requires that the Offeror demonstrate that they can provide "systems database and account administration to operate, maintain, and sustain the enterprise shared applications and infrastructure services (e.g., Exchange and Email, SharePoint, Identity Credential and Access Management (ICAM), Directory Service, Public Key Infrastructure (PKI), etc.)."  ECF No. 147-1 at AR 29560-61.

AttainX's Technical Proposal did not address PKI.  But AttainX contends that "the importance and depiction of PKI in the Solicitation" is "significantly overstate[d]" because "[t]he PWS mentioned PKI once as one of several exemplars within a descriptive parenthetical" containing a "nonexclusive list of program access examples" which was "buried in the third of four paragraphs discussing the requirements of PWS Section 3.4.8."  ECF No. 233 at 20-21.  AttainX contends that "[t]his hardly put offerors on notice that omitting either direct or indirect references to PKI would result in a significant weakness."  *Id.* at 21.  AttainX also contends that Commerce acted unreasonably by not disclosing that PKI would be "given predominant weight" in Commerce's evaluation of PWS Section 3.4.8.  *Id.* (citing *Isratex, Inc. v. United States*, 25 Cl. Ct. 223 (1992) (holding that "if a requirement is of more import than might be clear from the solicitation, the agency must say so")).

But as discussed above, the RFP did require offerors to address PKI.  The Solicitation provided that each offeror would be evaluated, in part, based on ability to "[d]emonstrate [its] ability to meet or exceed the Final CATTS PWS requirements . . . ."  ECF No. 118 at AR 1490.  And the plain text of PWS Section 3.4.8 provides that "[t]hese services *will include* but are not limited to . . . infrastructure services (e.g., . . . Public Key Infrastructure (PKI), etc.)."  ECF No. 147-1 at AR 29560 (emphasis added).  Given that "infrastructure services" is a broad term, the parenthetical narrows it to specific items that offerors should expect to perform.

Commerce did not act arbitrarily and capriciously or abuse its discretion when it assigned AttainX's Technical Proposal a Significant Weakness because it believed that failure to address PKI would "substantially decrease service availability and increase security risks."  *See* ECF No. 118 at AR 1510 ("A Significant Weakness is a flaw that appreciably increases the risk of unsuccessful contract performance.").

AttainX contends that its Technical Proposal was treated disparately from BrightPoint's and CW-LTS's because theirs "did not spend significant time discussing PKI[,]" and did not receive Significant Weaknesses.  ECF No. 170 at 22-23.  But BrightPoint and CW-LTS did spend *some* time explicitly discussing PKI in their Technical Proposals.  ECF No. 120 at AR

6410-11 (BrightPoint Technical Proposal); ECF No. 121 at AR 8752 (CW-LTS Technical Proposal). AttainX did not. ECF No. 119 at AR 5129 (AttainX Technical Proposal). This makes AttainX's Technical Proposal not substantively indistinguishable from, BrightPoint's and CW-LTS's Technical Proposals which were not awarded Significant Weaknesses for their demonstrations of capability with PKI. *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) ("To prevail at the Claims Court, a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals.").

AttainX also argues that its Technical Proposal was treated disparately from Enterprise Solutions & Management's, Reston Consulting Group's, and RIVA Solutions' which "failed to mention PKI" yet did not receive "a weakness or significant weakness for this omission." ECF No. 170 at 22. The Government points to the differences in these proposals as compared to AttainX's to demonstrate they are not substantively indistinguishable. ECF No. 254 at 130-132. For example, Enterprise Solutions & Management ("ES&M") explicitly addressed its support for PKI and other standards for encryption and identity verification. ECF No. 123 at AR 12593. Reston Consulting Group, unlike AttainX, proposed to transition Commerce [ * * * ]. ECF No. 128 at AR 20508. The Court cannot say this is not sufficient; that is for the Agency to determine. The same is true of [ * * * ]. ECF No. 128 at 20768, 20771. Again, it is within the Agency's discretion to determine if these statements are sufficient to satisfy the PKI requirement, but these aspects of RIVA's proposal establish that it not substantively indistinguishable from AttainX's proposal. *Office Design Grp.*, 951 F.3d at 1372.

Finally, AttainX contends that its Technical Proposal was treated disparately from MetroIBR's because AttainX's was considered "an unacceptable risk," ECF No. 130 at AR 26615, while MetroIBR's was considered "a low risk," *Id.* at AR 26539, even though both Technical Proposals received Significant Weaknesses for failing to address PKI. ECF No. 170 at 22. But AttainX's argument misses the mark. Its proposal was not found to be a high risk of unsuccessful performance due to the Significant Weakness for PKI. The Agency found AttainX's proposal to represent an unacceptable risk due to the combination of seven Significant Weaknesses. ECF No. 130 at AR 26615. But the Agency found MetroIBR's proposal to pose a low risk because the two Significant Weaknesses it received were offset by its numerous Strengths. *Id.* at AR 26539. AttainX's argument fails because AttainX's Technical Proposal is not nearly identical to, and therefore not substantively indistinguishable from, MetroIBR's Technical Proposal. *Office Design Grp.*, 951 F.3d at 1372.

Because Commerce rationally assigned a Significant Weakness to AttainX's proposal for PWS Section 3.4.8, the Court will not disturb it.

### 3.   Commerce rationally assigned the Significant Weakness for PWS Section 3.4.11.

PWS Section 3.4.11 requires various IT management services. ECF No. 147-1 at AR 29562. The Agency assessed a Significant Weakness because "[t]he Offeror's proposal states they will support the requirements, but does not demonstrate capability to meet or exceed PWS requirements, and it does not provide an approach as to how the Offeror will perform successfully (Offeror's Technical Volume, p. 27)." ECF No. 130 at AR 26614.

AttainX argues that it clearly provided an approach and showed capability to perform all PWS Section 3.4.11 requirements. But like its response to PWS Section 3.4.5, AttainX's proposal is replete with statements that it will provide certain types of work, but it is lacking on explanations of how. *See* ECF No. 119 at AR 5131. Indeed, AttainX's proposal references certain procedures that it has in place:

[ * * * ]

ECF No. 119 at AR 5131. Yet nowhere is there any indication of what any of these procedures were, how AttainX planned to prepare them, or what they might contain. For the same reasons that the Court found the Agency's evaluation of AttainX's proposal regarding PWS Section 3.4.5, the Court finds the evaluation of PWS Section 3.4.11 to be rational and supported by the record.

AttainX also raises three disparate treatment arguments relating to offerors that "did not provide much more detail than AttainX." ECF No. 170-1 at 24. First, AttainX argues that Commerce disparately treated its proposal vis-à-vis Centuria, which purportedly "provides similar generalized description[s] of its solution . . . ." *Id.* It is true that both AttainX and Centuria described their services in somewhat similar terms. Compare ECF No. 120 at AR 7009-10 ([ * * * ]) *with* ECF No. 119 at AR 5131 ([ * * * ]). But Centuria does not stop there. When discussing "Innovative and proven methods to solve complex issues" relating to PWS Section 3.4.11, Centuria's proposal states that it also discusses generating [ * * * ]. ECF No. 120 at AR 7009-10. Centuria also proposed to perform [ * * * ]. *Id.* Thus, Centuria provided an explanation of how it would perform the work—i.e., gave an approach. Because AttainX does not include similar items in its proposal, its argument fails under *Office Design Grp.*, 951 F.3d at 1372.

Second, AttainX argues disparate treatment regarding ProGov's proposal. This argument is somewhat confusing because AttainX cites to ProGov's response to PWS Section 3.4.11, which appears on pages 26-27 of its proposal, ECF No. 127 at AR 19235-36. ECF No. 170-1 at 24 (citing ECF No. 127 at AR 19235-36). But the language AttainX quotes comes from ProGov's response to PWS Section 3.4.12. See ECF No. 127 at AR 19236 ("ProGov's collective experience . . . "). It is unclear how ProGov's response to PWS Section 3.4.12 sheds light on the evaluation of AttainX's response to PWS Section 3.4.11. In any event, ProGov's response to PWS Section 3.4.11 is not substantively indistinguishable from AttainX's proposal. For example, [ * * * ]. ECF No. 127 at AR 19235. It also proposed [ * * * ]. *Id.* In short, AttainX's and ProGov's proposals are not substantively indistinguishable, and the disparate treatment argument fails. *Office Design Grp.*, 951 F.3d at 1372.

Finally, AttainX argues that it got a Significant Weakness while Reston Consulting Group did not get a Significant Weakness but "merely provided a bulleted list with six general capabilities, which provided a roughly comparable level of detail to AttainX." ECF No. 170-1 at 24-25. Reston proposed to [ * * * ]. ECF No. 128 at AR 20478. And Reston's proposal provides that it would, if necessary, [ * * * ]. *Id.* Thus, Reston highlighted a benefit to the Agency from its approach based on [ * * * ]. *Id.* AttainX, however, insists that Reston does not actually propose PDU and UPS monitoring, and that the Government's argument demonstrates that the Agency was "filling in the space" in Reston's proposal because "PDU and UPS

monitoring is not a stated component of [Reston's] approach." ECF No. 233 at 24-25. The Court, however, does not agree that the Government was arbitrarily and capriciously "filling in the space" or reading Reston's proposal "charitably." As discussed above, Reston proposed to [ * * * ]. ECF No. 128 at AR 20478. And Reston proposed [ * * * ]. *Id.* It is, therefore, not filling in anything for the Agency to conclude that Reston proposed to monitor PDU and UPS equipment (as the proposal explicitly states) and recognize the benefit of ensuring power availability. Again, these proposals are not substantively indistinguishable because AttainX does not make similar statements in its proposal.

Nor can the Court agree with AttainX that its proposal is similar enough to Centuria's, ProGov's, and Reston's to make the Significant Weakness AttainX got for PWS Section 3.4.11 improper. ECF No. 170-1 at 25. To the extent AttainX suggests that Centuria, ProGov, and Reston should have gotten Significant Weaknesses, the Agency was not required to assign the same rating to materially different proposals. *Tech. Innovation All., LLC v. United States*, 149 Fed. Cl. 105, 132 (2020) (citing *Office Design Grp.*, 951 F.3d at 1373) ("Indeed, having the Court pass judgment regarding the relative merits of proposals that are not substantively indistinguishable 'would give a court free reign to second-guess the agency's discretionary determinations underlying its technical ratings' and '[t]his is not the court's role.'"). And to the extent AttainX argues that it should only have gotten a Weakness for its lack of detail, that is merely an invitation to the Court to reevaluate its proposal to determine how much risk it poses to the Agency. *See* ECF No. 118 at AR 1510 (defining Weakness as a flaw that "increases the risk of unsuccessful contract performance" and Significant Weakness as one that "appreciably increases the risk of unsuccessful contract performance). That is for the Agency to decide, and nothing AttainX points to shows that the Agency's evaluation was improper.

Therefore, Commerce rationally assessed the Significant Weaknesses for PWS Section 3.4.11 and the Court will not disturb it.

    4.   <u>Commerce rationally assigned the Significant Weakness for PWS Section 3.4.12.</u>

PWS Section 3.4.12 requires offerors to provide enterprise data backup, disaster recovery, and continuity of operations support. ECF No. 147-1 at AR 29562. Commerce assessed a Significant Weakness for PWS Section 3.4.12 because "[t]he Offeror did not provide an approach to demonstrate a capability to support these requirements (Offeror's Technical Volume, p. 27-28)." ECF No. 130 at AR 26614. AttainX points to its Technical Proposal that it contends contains an approach to PWS Section 3.4.12. *See* ECF No. 119 at AR 5131-32 (emphasis added). The Government defends the evaluation on the ground that the Agency's rationale is clear from the record. ECF No. 203 at 204. According to the Government, while AttainX addresses its documentation of certain requirements, its proposal not address the operational requirements.

For example, while PWS Section 3.4.12 requires planning, it also requires offerors to "verify[] enterprise data backup, DR, and COOP capabilities during installation" and the "creating and executing recurring enterprise data backup, DR, and COOP scenarios to test and verify continued capabilities." ECF No. 147-1 at 29562. Although AttainX's proposal clearly addresses documenting the PWS requirements, it does not clearly address the verification of

capabilities and executing of testing scenarios.  See ECF No. 119 at AR 5131-32.  And the fact that AttainX addresses certain execution for cloud-based components is not clearly the verification and testing across the enterprise that the PWS requires.

The Agency did not simply state that the Offeror failed to provide an approach to meet the Solicitation requirements.  Rather, the Agency clearly stated that the Offeror did not address specific requirements of PWS Section 3.4.12 and, in doing so, sufficiently explained its rationale for assigning a Significant Weakness.  Section M.2.3(a)a indicates that the Agency will evaluate the Offeror's ability to meet or exceed the Final CATTS PWS requirements—all of them.  ECF No. 118 at AR 1490.  This Court will not second-guess the Agency's technical evaluation based on mere disagreement, and declines AttainX's invitation to wade into a technical assessment of its own.  That is a matter for the Agency.  Accordingly, the Agency clearly set forth its rationale for assessing this Significant Weakness in the contemporaneous evaluation.  Therefore, the Agency's evaluation is not arbitrary or capricious and must be sustained.

> 5. <u>Commerce rationally assigned the Significant Weakness for PWS Section 3.4.17.</u>

AttainX's Technical Proposal received a Significant Weakness for PWS Section 3.4.17 because "[t]he Offeror did not provide an approach for installing, operating, or maintaining wireless networks (Offeror's Technical Volume, p. 32)."  ECF No. 130 at AR 26614.  PWS Section 3.4.17 requires that the Offeror demonstrate that they can provide "wireless and mobile device support as identified in individual Task Orders. Wireless and mobile device support includes, but is not limited to, installing, operating, and maintaining wireless networks at designated government locations; complying with wireless security directives and guidelines; supporting authorized mobile device connections to the wireless network; and monitoring and reporting unauthorized access to the wireless network."  ECF No. 147-1 at AR 29563-64.  AttainX's Technical Proposal did address *operation* and *maintenance* of wireless networks, but admittedly did not address *installation* of wireless networks when discussing AttainX's ability to perform PWS Section 3.4.17.  ECF No. 119 at AR 5136; *see also* ECF No. 170 at 26 n.10 ("As AttainX did not anticipate using an installation process [ * * * ], it did not duplicate this information in its discussion . . . .").  AttainX contends that it addressed these requirements when responding to the requirements of PWS Section 3.3.4.  ECF No. 170 at 26 ("Responding to the requirements of PWS Section 3.3.4, Customer Infrastructure Installation, Build Outs, and Decommissioning, AttainX explained that [ * * * ].") (footnote omitted).

But AttainX does not argue that the Government missed a cross-reference.  And the RFP's instructions clearly state, in underlined text to emphasize the point, that "<u>Cross-references should be utilized to preclude unnecessary duplication of data between sections.</u>"  ECF No. 118 at AR 1472 (emphasis in original).  And the RFP instructed offerors to "examine and follow all instructions.  Failure to do so will be at the Offeror's own risk."  ECF No. 118 at AR 1474.  It was not incumbent on the Agency to search out responsive material in the proposal without a cross-reference.  *CACI, Inc.*, 158 Fed. Cl. at 19 ("Agencies must indeed review the whole proposal, but they are not compelled to comb the record for information that an offeror does not otherwise adequately present through a well-written proposal.").

Again, the Agency did not simply state that AttainX failed to provide an approach to meet the Solicitation requirements.  Rather, the Agency clearly stated that AttainX did not address specific requirements of PWS Section 3.4.17 and, in doing so, sufficiently explained its rationale for assigning a Significant Weakness.  Section M.2.3(a)a indicates that the Agency will evaluate the Offeror's ability to meet or exceed the Final CATTS PWS requirements—all of them.  ECF No. 118 at AR 1490.  This Court will not second-guess the Agency's technical evaluation based on mere disagreement.  Accordingly, the Agency clearly set forth its rationale for assessing this Significant Weakness in the contemporaneous evaluation.  Therefore, the Agency's evaluation is not arbitrary or capricious and must be sustained.

      6.     <u>Commerce rationally assigned the Significant Weakness for PWS Section 3.4.19.</u>

AttainX's Technical Proposal received a Significant Weakness for PWS Section 3.4.19 because:

> The Offeror addressed identifying requirements to design a solution, but did not address the following requirements: managing SVTC and DVTC management systems and infrastructure; capacity and availability monitoring, and performance tuning; troubleshooting, and testing associated equipment; adding, modifying, and deleting video, SVTC, and DVTC accounts; coordinating service interruptions and outages; responding to incidents and outages; executing corrective actions to resolve the issue; escalating issues that are not resolved (Offeror's Technical Volume, p. 33-34).

ECF No. 130 at AR 26614-15.

AttainX does not dispute that it did not address each requirement, in PWS Section 3.4.19, but contends that it did not have to.  ECF No. 233 at 27.  According to AttainX, it "demonstrated that it could assist with teleconferencing, so DOC's conclusion that [the] lack of some details largely increased the risk of performance is unreasonable."  *Id*.  The Court cannot agree.  The PWS required Offerors to address each requirement of the PWS work sections.  Specifically, it states that "[f]or a contractor to be *qualified* for a Task Area, the contractor must be capable of performing *all services* within that Task Area."  ECF No. 147-1 at AR 29552 (emphasis added).  Although AttainX may have established its capability to perform some of the work, it admits it did not address all of them, making the conclusion that failed to address those requirements rational.  Further, it is not for the Court to determine what number of tasks offerors must directly address (the RFP does that), or the level of risk that is associated with the failure to address certain requirements (that is for Commerce to decide).

Because the Agency clearly stated that AttainX did not address specific requirements of PWS Section 3.4.19 and, in doing so, sufficiently explained its rationale for assigning a Significant Weakness.  Therefore, the Agency's evaluation is not arbitrary or capricious and the Court will not disturb it.

### C.       Commerce did not fail to enforce formatting requirements.

AttainX contends that "several offerors circumvented the Solicitation's strict font size and page limitations by manipulating the Solicitation's exception for data tables and graphics." ECF No. 233 at 1; *see also id.* at 2-8.  The RFP requires that "All narrative text shall be 1.5-spaced and have black text on white background, with the exceptions of graphics, screenshots, tables, headers, footers, and any item excluded from the page count which may be single-spaced."  ECF No. 118 at AR 1472.  And regular text had to be either 11-point Ariel or 12-point Times New Roman.  *Id.*  But there was an exception for text in tables, it could be any size "as long as it is easily readable."  *Id.*  Several awardees did, as AttainX details, make rather extensive use of tables.

AttainX contends that its argument boils down to the "deceptively simple question: What constitutes a table?"  ECF No. 233 at 2.  While AttainX frames its question as what a table is, a fair amount of its argument focused on the fact that certain awardees used a lot of tables.  For example, AttainX complains that ES&M "utilized 29 tables in its proposal" that were single-spaced with small font.  *Id.* at 4.  Similarly, AttainX complains that Reston used 20 tables, which included detail with respect to its technical approach.  *Id.*

These arguments beg the question whether AttainX's argument is that tables cannot have narrative text or that certain awardees made excessive use of tables.  So, during oral argument, the Court asked.  ECF No. 263 at 237:11-24.  AttainX responded that its argument is that tables cannot contain narrative text.  *Id.* at 237:25-238:12.  The problem, however, is that AttainX's own Technical Proposal makes use of text boxes (i.e., tables) that use narrative text to explain the required proven innovative methods that AttainX proposed.  *See, e.g.*, ECF No. 119 at AR 5111.  AttainX cannot contend that narrative text and tables must be distinct when its own proposal uses narrative text in tables as well.  *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1162 (Fed. Cir. 2004) (indicating that protester must have relied on its interpretation of the solicitation when it prepared its proposal).  Nor did AttainX ask any questions about the formatting and table requirements during the procurement's question and answer period, or did AttainX protest the RFP requirements before submitting its proposal.  In the end, AttainX chose to draft its proposal based on its interpretation of the RFP formatting requirements.  But that interpretation was not compelled by the RFP and AttainX cannot force its interpretation on the Agency and other offerors.  *IAP World Servs., Inc. v. United States*, 152 Fed. Cl. 384, 399-400 (2021) (collecting cases).

And this is not the first time the Court has been called upon to resolve a dispute about the use of tables.  In *Metropolitan Interpreters & Translators, Inc. v. United States*, the Court concluded that "the agency did not err in accepting [an offeror]'s quote," which contained "boxes filed [sic] with narrative text," because "[t]he RFQ expressly permitted vendors 'to use different fonts and sizes for graphs, illustrations, tables, etc. permitted they remain legible.'" and "[t]he pages cited to by defendant as examples of MVM's alleged misconduct include sections that both could reasonably be interpreted as tables and are legible."  145 Fed. Cl. 495, 507 (2019) (citations omitted).  The same rationale applies here.

Some Offerors did indeed use many tables filled with more narrative text than others.  But this Court will not determine when table usage becomes excessive because that

determination is left to Commerce because there is nothing in the RFP providing criteria against which to measure excess table use.  Therefore, Commerce did not award contracts to noncompliant proposals.

> ### D.   AttainX fails to establish that Commerce improperly assigned Significant Weaknesses to proposals.

AttainX next argues that the Government unreasonably departed from the stated evaluation criteria by assigning a disproportionate number of Significant Weaknesses to Technical Proposals.  ECF No. 233 at 8-13.  AttainX contends the Government did this in order to avoid "the hard work of doing and documenting those value determinations" required in a best value tradeoff, as "only significant weaknesses could be combined in a manner that would make an entire proposal unacceptable." *Id.* at 8, 11.  AttainX asserts that Commerce assigned "840 significant weaknesses" and "147 weaknesses," but "25 total significant strengths" and "431 strengths." ECF No. 170 at 8-9.  Thus, AttainX contends that if Commerce had analyzed Technical Proposals according to the stated evaluation criteria, it would have either found more Significant Strengths than Strengths, or more Weaknesses than Significant Weaknesses. *Id.*

To support its contention that Commerce assigned a disproportionate number of Significant Weaknesses, AttainX points out that it received a Significant Weakness for failing to address PKI, but another offeror, Kerps, received only one Significant Weakness for failing to address four Task Areas.  ECF No. 170-1 at 11.  But AttainX misreads the record.  Commerce did not assess just one Significant Weakness to Kerps for failing to demonstrate capability to support four Task Areas.  Rather, it assessed four Significant Weaknesses, combined in a single bullet point.  This is readily apparent from the record.  As the TET Report makes clear, the Agency assessed Kerps a total of nine Significant Weaknesses.  ECF No. 130 at AR 26730.  And although the record includes only six bullet points under Kerps' Significant Weaknesses, these six bullets reflect the nine total PWS Sections that Commerce found to be inadequate.  *Id*. at 26731-32.

AttainX's reliance on *Frawner Corp. v. United States*, 161 Fed. Cl. 420 (2022), to demonstrate improper evaluations is misplaced.  In *Frawner*, the agency advised offerors that it would evaluate the relevance of past performance references using three sub-factors—scope, magnitude, and complexity.  *Id*. at 445.  During its evaluation, the agency assigned each sub-factor an adjectival rating and automatically applied the lowest sub-factor rating to the overall relevance rating.  This case, however, is different.  Commerce did not similarly rate proposals using the lowest rating.  Again, the distinction between a Weakness, Significant Weakness, and Deficiency is largely the amount of risk the flaw posed to contract performance.  ECF No. 118 at AR 1510.  As discussed at length in this opinion, Commerce's evaluations at times found the failure to address a single requirement to be a Significant Weakness (*e.g.*, PKI) while other failures to address a several requirements in a PWS Section to be only a Weakness. *See, e.g.*, ECF No. 130 at AR 26613 (assessing a Weakness for failing to address several requirements); *see also supra* Section X.A.1 (discussing the Weakness assigned AttainX's proposal for PWS Section 3.4.4).  Unlike in *Frawner*, there is nothing in this record indicating the Agency systematically misapplied Significant Weaknesses or applied any unstated criteria to the proposals.  As the Government points out, it would have been analogous if the Government had rated every proposal Unsatisfactory that got any two or more Significant Weaknesses.  It did not.

Because the record does not demonstrate the Agency applied any unstated evaluation criteria, AttainX challenge to the purportedly disproportionate number of Significant Weakness fails.

### E.    Commerce did conduct an offset analysis for AttainX's proposal.

Finally, AttainX contends that "no offset occurred" when Commerce evaluated its Technical Proposal, and that this failure to offset "deviated from the stated evaluation criteria . . . ." ECF No. 233 at 14. At the conclusion of the technical evaluation, the TET assigned an adjectival rating for each proposal. The Source Selection Plan defines these adjectives in part based on whether Strengths offset Weaknesses. ECF No. 118 at AR 1512. For AttainX, the TET's rationale for finding its proposal Unsatisfactory does not indicate that an offset analysis was performed. ECF No. 130 at 26611 (no mention of offset analysis).

The Government counters that Commerce was not required to conduct an offset analysis under the SSP. This is because the SSP's definitions of the adjectival ratings only consider whether Strengths offset Weaknesses for Excellent, Good, Satisfactory, and Marginal ratings, while the definition of Unsatisfactory makes no reference to offsets. *See* ECF No. 118 at AR 1512. The Government may be correct, but the record shows that the TET did, in fact, understand the RFP as calling for an offset analysis for Unsatisfactory proposals. *See* ECF No. 130 at AR 26607 (A-TEK Evaluation), AR 26626 (BNL Evaluation), AR 26628 (CAN Softtech Evaluation), AR 26645 (CVTek Evaluation), AR 26691 (GenceTek Evaluation), AR 26706 (INCATech Evaluation), AR 26769 (Prime Source Evaluation). It is not apparent why the TET did not conduct an offset analysis when evaluating AttainX's Technical Proposal. *Id.* at AR 26611 (AttainX Evaluation).

Alternatively, the Government argues that the SSA conducted an offset analysis in his when evaluating AttainX's proposal. Specifically, the SSA stated that "[t]he numerous significant weaknesses identified are not offset by any strengths contained in the proposal." ECF No. 130 at AR 28286. AttainX sees it differently. It reads the SSA's statement to confirm that he did not consider any Strengths when conducting the offset. ECF No. 223 at 16. But the SSA clearly states that AttainX's Strengths do not offset its Significant Weaknesses. Therefore, the Court cannot agree with AttainX that no offset analysis took place that considered its Strengths.

In the end, assuming the RFP required the TET to perform an offset analysis, the TET failed to conduct that analysis for unknown reasons. The SSA, however, did perform the analysis in the first instance. AttainX does not argue that it was prejudiced by the SSA performing the analysis rather than the TET, only that it was prejudiced by the lack of an analysis altogether. AttainX thus fails to meet its burden to demonstrate prejudice by the SSA's performing the offset analysis in the first instance.

### F.    Conclusion

Because AttainX fails to establish error in the Agency's evaluation, the Court denies AttainX's MJAR and grants the Government's and Defendant-Intervenors' Cross-MJARs.

## XI.    JCS Solutions, LLC (No. 22-1519)

Commerce assessed JCS's technical proposal 7 Strengths, 1 Weaknesses, and 14 Significant Weaknesses.  Based on the combination of Significant Weaknesses, Commerce found JCS's proposal Unsatisfactory, which eliminated it from consideration.  JCS challenges the merit of the negative technical evaluations and the disparate enforcement of the font and spacing requirements.

### A.      Weakness

#### 1.      Commerce rationally assigned the Weakness for PWS Section 3.1.4.

Under PWS 3.1.4, contractors must provide various Customer Experience Management ("CEM") tasks, including "operations planning, contingency planning, exercise support planning, defining and documenting customer 'as-is' and 'to-be' architectures, creating and monitoring customer service-level agreements, and analyzing operational performance measurements and associated trends to ensure services meet customer missions, goals and objectives."  ECF 147-1 at AR 29553.  The Agency assigned JCS a weakness for PWS Section 3.1.4 because JCS's "approach is centered around ITSM[21] tools and does not address other required CEM services such as operations planning, contingency planning, and exercise support planning."  ECF 130 at AR 26724.

JCS's proposal does focus on ITSM.  The one paragraph response explains the specific software that JCS proposes to use and its capabilities.  ECF No. 124 at AR 15517.  And, as the TET concluded, there is not a clear reference to the required "operations planning, contingency planning, and exercise support planning."  ECF 130 at AR 26724.  Therefore, there is nothing on the face of JCS's proposal that shows anything irrational about the Agency's evaluation.

Recognizing that its proposal does not address all the Section 3.1.4 requirements in the section responding to the requirements, JCS argues it references CEM services such as operations planning, contingency planning, exercise support planning in other sections of its proposal in addition to providing a holistic approach.  ECF 164 at 5-6. (citing to PWS Sections 3.4.9, 3.4.7, 3.4.12, and 3.6).  And because it addressed these items in other parts of its proposal, JCS argues it did not repeat its experience or approach to certain services where PWS requirements overlapped because of page and formatting limitations.  But this argument ignores the RFP's clear instruction that "Cross-references should be utilized to preclude unnecessary duplication of data between sections."  ECF No. 118 at AR 1472 (emphasis in original).  JCS did not provide any cross-reference to these other sections of its proposal.  Nor did JCS identify any of these other pages in its Compliance Matrix, in which JCS identified the specific pages in its proposal where its responses to PWS Sections are found.  JCS only identified the one page that the TET evaluated.  ECF No. 124 at AR 15504 (listing only "Page 11," which is ECF No. 124 at AR 15517, as responding to PWS Section 3.1.4).  Finally, the RFP warned offerors that they "shall examine and follow all instructions.  Failure to do so will be at the Offeror's own risk." ECF No. 118 at AR 1474.  Thus, it was not incumbent on the Agency to search out responsive material in the proposal without a cross-reference.  *CACI, Inc.*, 158 Fed. Cl. at 19 ("Agencies must indeed review the whole proposal, but they are not compelled to comb the record for

---

[21] "ITSM" stands for Information Technology Service Management.  ECF No. 147-1 at AR 29557.

information that an offeror does not otherwise adequately present through a well-written proposal.").  And the record is clear that the Agency did review the entirety of the proposal. Commerce assessed a strength for JCS's proposal regarding PWS Section 3.1.4 for its proposing to use "human-centered design principles" and new technologies to perform the work.  ECF No. 130 at AR 26723.  Notably, this Strength is based on language that appears in JCS's response to PWS Sections 3.5B and 3.5B.1.  *Id.* (citing pages 33-34 of JCS's proposal, which are ECF No. 124 at AR 15539-40).

JCS also raises a disparate treatment argument vis-à-vis BrightPoint's proposal because "although the two offerors presented similar approaches, BrightPoint was not assessed a weakness for its CEM services.  Rather, it was assessed a strength for this aspect of its proposal." ECF No. 164-1 at 6.  To establish disparate treatment, JCS must show that its proposal and the other proposals are "substantively indistinguishable."  *Office Design Grp.*, 951 F.3d at 1372. They are not.  BrightPoint offers a five-point approach to CEM.  ECF No. 120 at AR 6394.  And BrightPoint further explains its approach:

[ * * * ]

*Id.* at AR 6395.  Although BrightPoint's proposal explains its approach further, the Court need not delve deeper.  JCS does not propose similar approaches.  *See* ECF No. 124 at AR 15516. Because these proposals were not substantively identical, Commerce was under no obligation to assign them the same rating.

Finally, JCS argues that the Weakness was arbitrary and capricious because the Agency assessed both a Strength and a Weakness for its response to PWS Section 3.1.4, which was "patently irrational."  ECF No. 164-1 at 7.  But there was nothing irrational about the Agency assessing both a Strength and a Weakness to JCS's response to PWS Section 3.1.4 because that section required contractors to perform multiple different, albeit related, tasks.  ECF No. 147-1 at AR 29553 (listing the various services required under the Section).  Among the requirements are the various planning requirements that the Agency found missing from JCS's proposal.  *Id.* PWS Section 3.1.4 also calls on contractors to "implement Customer Experience Management (CEM) strategies to improve customer service interactions, to increase customer expectations, satisfaction, loyalty, and advocacy."  *Id.*  Commerce found JCS's response to exceed this requirement and merited a Strength.  ECF No. 130 at AR 26723.  In short, there is nothing inconsistent about the finding that JCS exceeded some of the PWS Section 3.1.4 requirements and fell short of satisfying others.  Therefore, the presence of the Strength for PWS Section 3.1.4 does not render the Weakness for PWS Section 3.1.4 irrational.

Therefore, the Agency rationally assigned the Weakness for PWS Section 3.1.4 and the Court will not disturb it.

### B.      Significant Weaknesses

1.      <u>Commerce rationally assigned the Significant Weakness for PWS Section 3.3.4.</u>

PWS Section 3.3.4 requires offerors to provide various IT infrastructure installation and decommissioning tasks, make recommendations, and related activities.  ECF No. 147-1 at

AR 29556.  The Agency assigned JCS a Significant Weakness for PWS Section 3.3.4 because, "[a]lthough [JCS]'s proposal cites experience performing in classified and unclassified environments, [JCS] failed to provide the required approach to demonstrate capability to address the above requirements."  ECF No. 130 at AR 26725.

JCS does not contend that it addressed all the requirements in its response to Section 3.3.4, it argues it addressed PWS Section 3.3.4's requirements "in other aspects of its proposal, which appear to have been ignored by the Agency."  ECF No. 164-1 at 9.  Thus, JCS relies on roughly ten other sections of its proposal to supply the response to Section 3.3.4.  *Id.* at 9-10 (citing ECF No. 124 at AR 15517 (PWS Sections 3.1.5/3.1.6), 15521-22 (PWS Section 3.3.1), 15522 (PWS Section 3.3.3), 15525 (PWS Section 3.4), 15526-27 (PWS Section 3.4.3), 15527 (PWS Section 3.4.5), 15528 (PWS Section 3.4.8), 15530-31 (PWS Section 3.4.12), 15532 (PWS Section 3.4.15), 15534 (PWS Section 3.4.18), 15534-35 (PWS Section 3.4.19), 15535 (PWS Sections 3.4.20/3.4.21), 15567 (RFP Section M.2.3.a.b)).  While the Government acknowledges that other sections of JCS's proposal may address PWS Section 3.3.4 requirements, it recognizes that nothing in JCS's proposal directed the Government to any of these other sections.  ECF No. 203 at 211-12.

But the Agency is "not compelled to comb the record for information that an offeror does not otherwise adequately present through a well-written proposal."  *CACI, Inc.-Fed.*, 158 Fed. Cl. at 19.  This is particularly true here because the RFP instructed offers that "[c]ross-references should be utilized to preclude unnecessary duplication of data between sections."  ECF No. 118 at 1472 (emphasis in original).  And the RFP instructed offerors to "examine and follow all instructions.  Failure to do so will be at the Offeror's own risk."  ECF No. 118 at AR 1474.  JCS did not include a cross-reference in its response to PWS Section 3.3.4 to any of the additional sections that it relies upon now.  In addition, the RFP required offerors to include an index or cross-index for their proposals as well.  ECF No. 118 at AR 1471.  In its index to its technical proposal, which JCS styled a "Proposal Requirements Compliance Matrix," JCS points only to page 17 of its proposal, which the TET reviewed, as responding to PWS Section 3.3.4.  ECF No. 124 at AR 15504.  Given that JCS did not cross-reference any other section in the text of its response to PWS Section 3.3.4 or in its compliance matrix, the Court will not fault the Agency for not finding responsive material elsewhere in the proposal.  Thus, the challenge to this Significant Weakness fails.

JCS also argues that if this Significant Weakness was rational, then Commerce engaged in disparate treatment for failing to assign Significant Weaknesses to BrightPoint and Centuria's proposals because they purportedly did "no more than reference certain requirements . . . ."  ECF No. 164-1 at 10-11.  But JCS's argument is misplaced.  The reason that the Significant Weakness survives JCS's challenge is not because JCS did not provide enough detail (the Court does not opine on that), it is that the information JCS does provide is scattered throughout the proposal and Commerce was not required to piece together a response to this requirement from disparate parts of JCS's proposal without cross-references.  JCS does not make any argument that BrightPoint or Centuria similarly dispersed its response to 3.3.4 throughout their proposals, so these proposals are not substantively indistinguishable and JCS's arguments fail.  *Office Design Grp*, 951 F.3d at 1372.

Finally, JCS argues the Agency engaged in disparate treatment and/or irrationally evaluated JCS's proposal when it recognized JCS cited experience in classified and unclassified environments in relation to PWS Section 3.3.4, yet did not assign JCS a Strength while BrightPoint, CW-LTS, and Enterprise each got a Strength for their experience performing in classified and unclassified environments.  ECF No. 164-1 at 30-31.  The Government counters "the TET evaluated each task area and awarded a strength if the Offeror provided an approach that increased the likelihood of successful contract performance . . . and provided a benefit to the Government."  ECF No. 203 at 224 (citing ECF No. 118 at AR 1509).  While "BrightPoint, CW-LTS, and Enterprise all received a strength because they showed an approach to support the task area requirement in a classified environment, which is a benefit to the Government[,]" "JCS cannot expect a strength when it did not provide an approach that conferred a benefit to the Government."  *Id.* (citations omitted).

Indeed, BrightPoint, CW-LTS, and Enterprise each got a Strength for PWS Section 3.2.1 because they demonstrated "[ * * * ]," which "[ * * * ]."  ECF No. 130 at AR 26520 (BrightPoint proposal), AR 26523 (CW-LTS proposal), AR 26531 (Enterprise proposal).  BrightPoint and CW-LTS also each received a Strength for PWS Section 3.4.6 for [ * * * ].  ECF No. 130 at AR 26520 (BrightPoint proposal), AR 26524 (CW-LTS proposal).  BrightPoint also received  a Strength for PWS Section 3.4.20 for "demonstrate[ing] extensive experience in engineering, installing, programming, and maintaining Video Teleconference (VTC), audio visual (AV), and knowledge walls in both classified environments . . . and unclassified environments."  ECF No. 130 at AR 26520.  But none of these awardees received a Strength for mentioning classified and unclassified experience.  They got Strengths for satisfying contract requirements in classified and unclassified environments.  Because JCS failed to satisfy contract requirements, its proposal is not substantively indistinguishable from BrightPoint's, CW-LTS's, or Enterprise's proposals and the argument fails.  *Office Design Grp*, 951 F.3d at 1372.

JCS also argues "awardee T and T Consulting was awarded a strength for merely 'demonstrat[ing] the capability to support SIPRNET and NIPRET [sic],'" while "JCS detailed this exact same experience, yet was irrationally denied the strength."  ECF No. 164-1 at 31 (citing ECF No. 130 at 26544-45).  As a factual matter, JCS did not detail the "exact same experience."  According to JCS, its experience is [ * * * ].  ECF No. 164-1 at 30 n.5.  T&T, on the other hand, explained that:

> Our technicians currently maintain over [ * * * ] Non-Secure
> Internet Protocol Routing Network (NIPRNET) and [ * * * ]
> Secure Internet Protocol Routing Network (SIPRNET) Windows
> Enterprise [ * * * ]. We maintain and administer the [ * * * ] for
> both SIPRNET and NIPRNET. We provide [ * * * ].  We [ * * * ].

ECF No. 129 at AR 23128.  Nor T&T just describe its experience, it also went on to discuss how it performed required tasks in those environments.  Id. at AR 23138-39.  Because these proposals were not substantively indistinguishable, Commerce was under no obligation to assign the same rating.  *Office Design Grp.*, 951 F.3d at 1372.

As demonstrated, none of these awardees received a Strength for mentioning classified and unclassified environments in PWS Section 3.3.4.  It is within the Agency's discretion to

consider the demonstration of classified and unclassified environments a Strength for some PWS Sections but not for others.

Therefore, the Agency rationally assigned the Significant Weakness for PWS Section 3.3.4 and the Court will not disturb it.

2.    Commerce rationally assigned the Significant Weakness for PWS Section 3.4.2.

PWS Section 3.4.2 provides that Commerce will expect offerors to provide "desk-side support" services.  ECF No. 147-1 at AR 29558.  Among these services are desk-side assistance, locally resolving account and access issues, tailoring organizational mailboxes and distribution lists, loading software applications, and moving, installing, and configuring end-user devices and peripherals.  *Id*.

The Agency assigned JCS a Significant Weakness for its proposal to 3.4.2 because JCS "only addresses first contact resolution and direct handoff between shifts and does not provide an approach to demonstrate capability to support the above requirements."  ECF No. 130 at AR 26725.  JCS argues it "speaks to its history of successful desk-side assistance, among other issues addressed [in the PWS]" when it states in Section 3.4.2 that:

> [ * * * ], we supported over [ * * * ] users with deskside service, including advanced Geographic Information System (GIS), statistical, and legacy GOTS applications requiring creating and maintaining exemptions to organizational image standards. We track and record all issues and ticket requests from inception to resolution via ticketing systems including ServiceNow.

ECF No. 164-1 at 11 (quoting ECF No. 147-1 at AR 15526).  But the Court cannot second-guess the Agency.  PWS Section 3.4.2 requires more than just desk-side support.  It requires things like "tailoring directory service entries, organizational mailboxes, distribution lists, etc., to meet customer requirements."  ECF No. 147-1 at AR 29558.  Perhaps recognizing this, JCS argues it addresses the requirements beyond first contact resolution and direct handoff in other parts of its proposal.  ECF No. 164-1 at 11-12 (citing to responses to PWS Sections 3.4.3 and 3.4.9).  Again, there is no cross-reference to these other sections.  And in its index to its technical proposal, which JCS styled a "Proposal Requirements Compliance Matrix," JCS points only to pages 19-20 of its proposal, which the TET reviewed, as responding to PWS Section 3.4.2.  ECF No. 124 at AR 15504.  Given that JCS did not cross-reference any other section in the text of its response to PWS Section 3.4.2 or in its compliance matrix, the Court will not fault the Agency for not finding responsive material elsewhere in the proposal.

Finally, JCS raises several disparate treatment arguments regarding the evaluation of PWS Section 3.4.2, alleging that BrightPoint's and Centuria's proposals did no more than "regurgitate" the PWS's requirements yet were not given Significant Weaknesses.  ECF No. 164-1 at 12.  But again, BrightPoint and Centuria do address the proposal requirements in their proposals in the sections specifically identified as responding to PWS Section 3.4.2.  ECF 120 at AR 6407-08 (BrightPoint proposal), AR 7002-03 (Centuria proposal).  Therefore, JCS's proposal is not substantially indistinguishable from BrightPoint's and Centuria's proposals and the

technical ratings of BrightPoint and Centuria are immaterial to this issue because Commerce "is under no obligation to assign dissimilar proposals the same evaluation rating." *Office Design Grp.*, 951 F.3d at 1372.

Therefore, the Agency rationally assigned the Significant Weakness for PWS Section 3.4.2 and the Court will not disturb it.

        3.   <u>Commerce rationally assigned the Significant Weakness for PWS Section 3.4.4.</u>

Under PWS Section 3.4.4, offerors would have to provide Enterprise Systems Maintenance and Repair.  ECF No. 147-1 at AR 29558-59.  Among the offeror's responsibilities included a wide variety of services involving hardware maintenance, supporting inventory management, preventative maintenance, and equipment sanitation and disposal.  Commerce assigned JCS a Significant Weakness for PWS Section 3.4.4 because JCS "failed to provide the required approach to demonstrate capability to address the above requirements."  ECF No. 130 at AR 26725.

JCS, however, insists that its "proposal clearly delineates" the Section 3.4.4 requirements. ECF No. 164-1 at 13.  The Government counters that the Agency rationale was clear, JCS merely rephrases the PWS requirements and instead of addressing the requirements of support of hardware and software and required delivery of remote support services to customers, JCS fails to address these concepts and "makes general statements about irrelevant services . . . to ensure infrastructure is operating securely."  ECF No. 203 at 214.  The Agency rationally assigned JCS a Significant Weakness for its failure to provide an approach to PWS Section 3.4.4.  Looking at JCS's proposal for PWS Section 3.4.4, JCS did not clearly address some of the specific bullet points for remote support service, such as "surge support for patch management," hardware and software recapitalization, or equipment security sanitization and disposal.  ECF No. 124 at AR 15527.

Nor is JCS's argument that it addressed these requirements in other parts of its proposal compelling.  ECF No. 164-1 at 13 (citing a passage in Section 3.3.3 on page 16, Section 3.3.4/3.4.5 on page 17, and Section 3.3.4/3.4.5 on page 19 of its proposal).  There is no argument that the Government missed a cross-reference, nor are there any.  And JCS's index does not direct the Agency to any pages outside of PWS Section 3.4.4 for its response to that section. Thus, Commerce had no obligation to go searching for responsive information throughout the proposal.  *CACI, Inc.*, 158 Fed. Cl. at 19 (2021) ("Agencies must indeed review the whole proposal, but they are not compelled to comb the record for information that an offeror does not otherwise adequately present through a well-written proposal.").  There was nothing arbitrary or capricious about the assignment of this Significant Weakness.

JCS also argues disparate treatment because while it claims to have provided a detailed approach to meeting the requirements "throughout its proposal," certain awardees "simply reiterate the requirements, without explaining how such requirements would actually be met" yet did not receive Significant Weaknesses.  ECF No. 164-1 at 13-14.  JCS again references BrightPoint's proposal as simply reiterating PWS requirements but did not get a Significant Weakness.  *Id*. (citing ECF No. 120 at AR 6408-09).  There are two problems with this

argument.  First, as with JCS's prior disparate treatment argument, there is no argument that BrightPoint spread its response "throughout its proposal" like JCS did.  Thus, they are not substantively indistinguishable as *Office Design Group* requires.  Second, it is certainly not clear to the Court that BrightPoint simply restated requirements, and not arbitrary or capricious for the Agency to conclude otherwise.  For example, BrightPoint stated that it would [ * * * ].  ECF No. 120 at AR 6408 (emphasis added).  This certainly appears to be more than merely rephrasing the original requirement of "support[ing] installed hardware and software maintained to the availability levels defined in the individual Task Orders."  ECF No. 147-1 at AR 29558.

Therefore, the Agency rationally assigned the Significant Weakness for PWS Section 3.4.4 and the Court will not disturb it.

> ### 4.    Commerce's assessment of the Significant Weakness for PWS Section 3.4.5 was arbitrary and capricious.

Pursuant to PWS Section 3.4.5, offerors would need to provide certain IT support services at remote sites, including being able to run entire remote sites independently, cabling services, hardware installation, systems administration, video teleconferencing support, and troubleshooting hardware and software.  ECF No. 147-1 at AR 29559.  The Agency assigned JCS a Significant Weakness for PWS Section 3.4.5 because JCS "does not demonstrate a capability to provide this support OCONUS."  ECF No. 130 at AR 26725.

JCS argues the Agency's assignment of this Significant Weakness was irrational and contrary to the record because "JCS' proposal details its approach to PWS Section 3.4.5 and specifies JCS' experience in providing support OCONUS."  ECF No. 164-1 at 14.  Indeed, its proposal states it provides relevant services in CONUS and OCONUS offices specifically.  ECF No. 124 at AR 15527.  This would certainly appear to address providing these services in OCONUS offices.  But the Government argues that the reference to OCONUS sites only applies to certain maintaining certain applications like Microsoft Teams.  ECF No. 203 at 215-16.

The problem with the Government's argument is that it ignores that JCS's proposal also states that it "manage[s] enterprise-scale global network infrastructure, covering a wide array of unique network contracts/providers, and manages networking hardware upgrades *at domestic and international sites*."  ECF No. 124 at AR 15527 (emphasis added).  This is clearly not limited to things like Microsoft Teams.  Thus, JCS referred to its work being done at domestic and international sites, and in CONUS and OCONUS sites.  It is thus not clear how the Agency determined that JCS satisfied all the requirements for the CONUS sites but not the OCONUS sites because the proposal clearly proposes the same services for both CONUS and OCONUS sites.

Finally, the Government argues that JCS does not address all the requirements.  ECF No. 203 at 215-16.  The Court cannot accept this argument because it is not what the Agency said in the contemporaneous record.  In other words, the Agency did not say JCS failed to address all the requirements, only that it did not think JCS demonstrated a capability at OCONUS sites.  Therefore, the Court will not entertain an argument that JCS failed to establish the requirements other than for OCONUS sites.  JCS proposes to do the same services for CONUS and OCONUS

sites and touts its capability to provide these services at domestic and international sites.  If the proposal satisfies the requirements for CONUS, it would appear to do the same for OCONUS.

The Agency's assignment of this Significant Weakness is not supported by the record and, therefore, arbitrary and capricious.

       5.     <u>Commerce rationally assigned the Significant Weaknesses for PWS Sections 3.4.11, 3.4.16, and 3.4.19.</u>

PWS Work Sections 3.4.11, 3.4.16, and 3.4.19 call upon the offeror to provide various services, including Data Center and equipment room management; network operations and management; and video teleconferencing installation, operations, and maintenance.  ECF No. 147-1 at AR 29562-65.

The Agency assigned JCS three Significant Weaknesses, PWS Sections 3.4.11, 3.4.16, and 3.4.19 (one for each section) because JCS's proposal "does not demonstrate capability to meet or exceed requirements, and it does not provide an approach as to how [JCS] will perform successfully . . . ."  ECF No. 130 at AR 26726.  JCS disputes the assertion that it failed to satisfy these requirements, which it claims it fully addressed.  ECF No. 164-1 at 16 (citing ECF No. 124 at AR 15530, 15532-33, and 15534-35).

Although JCS states it fully detailed its approach for these sections, JCS "spends the rest of its argument about those PWS Sections citing to other places it believes Commerce should have looked to find support."  ECF No. 203 at 211-12.[22]  Again, for the reasons stated above, the Court will not fault the Agency for not finding responses to requirements from other parts of JCS's proposal absent the required cross-reference.  Commerce was not required to search out this information.  *CACI, Inc.*, 158 Fed. Cl. at 19 (2021) ("Agencies must indeed review the whole proposal, but they are not compelled to comb the record for information that an offeror does not otherwise adequately present through a well-written proposal.").

Therefore, the Agency rationally assigned the Significant Weaknesses for PWS Sections 3.4.11, 3.4.16, and 3.4.19 and the Court will not disturb them.

       6.     <u>Commerce rationally assigned the Significant Weakness for PWS Section 3.4.6.</u>

The Agency assigned JCS a Significant Weakness for PWS Section 3.4.6 because JCS "[did] not provide a methodology for planning and responding to service outages, managing system resources, or optimizing system performance within the IT infrastructure environment" and for failing to "demonstrate the ability to support Mac, Linux, or other Unix-based Commercial off the Shelf (COTS) Server environment."  ECF No. 130 at AR 26726.  PWS

---

[22] Contrary to JCS's argument, the Government did respond to JCS's arguments about these Significant Weaknesses in its Cross-MJAR.  Because JCS sole argument that it provided a response to these PWS Sections in disparate parts of its proposal, the Government's response at ECF No. 203 at 211-12, which is not relegated to a footnote, preserves the argument.

Section 3.4.6 provides for offerors to support various administration and management services for physical and virtual servers. ECF No. 147-1 at AR 29559-60.

Once again, JCS insists that it provided the required information. But JCS points to other sections of its proposal to show where it addressed "to managing system resources and optimizing system performance." ECF No. 164-1 at 17 (quoting from Section 3.4.9 and Section 3.4.16 of its proposal). JCS points to another section of its proposal to show that its proposal "clearly demonstrates the ability to support Mac, Linux and Unix-based COTS server environments." *Id.* at 18-19 (quoting from Sections 3.4.10 and 3.4.15 of its proposal). JCS, however, failed to cross reference those sections in its proposal's section on PWS Section 3.4.6. As stated, the Agency had no duty to look at other sections to determine if the requirements of PWS Section 3.4.6 had been met.

JCS also argues disparate treatment because "[w]hile JCS was seemingly downgraded for listing specific systems that it has experience with, other offerors were not penalized for simply stating that they have the ability to support 'Mac, Linux, and Unix-based COTS server environments,' without more detail or explanation as to this requirement." ECF No. 164-1 at 19 (citing ECF No. 120 at AR 6408 (BrightPoint's approach to PWS Section 3.4.3)). And once again, JCS compares itself to BrightPoint. But JCS does not allege, nor does the record support, that BrightPoint spread its response to Section 3.4.6 across different sections of its proposal without cross-references. On that point, BrightPoint's proposal is not substantively indistinguishable, and the argument fails. *Office Design Grp*, 951 F.3d at 1372.

And it is also not clear at all that JCS got a Significant Weakness for listing specific systems that it has experience with. Again, there were portions of the PWS requirements that JCS did not address in the section of its brief that it identified as responding to PWS Section 3.4.6. That is what JCS got a Significant Weakness for, not the specific software it identified. Therefore, JCS's disparate treatment claim fails.

Therefore, the Agency rationally assigned the Significant Weakness for PWS Section 3.4.6 and the Court will not disturb it.

　　　　7.　　Commerce rationally assigned the Significant Weakness for PWS Section 3.4.7.

PWS Section 3.4.7 deals with storage administration and management. There were numerous potential services related to managing storage services across virtual and physical environments. ECF No. 147-1 at 29560. Commerce assigned JCS a significant weakness for PWS Section 3.4.7 because JCS "failed to provide the required approach to demonstrate capability to address the [PWS Section 3.4.7] requirements." ECF No. 130 at AR 26727. JCS contends that "[t]he crux of this significant weakness is JCS' alleged failure to detail its solution to ensuring and maintaining operational and efficient storage capabilities." ECF No. 164-1 at 20. JCS, however, argues that its proposal details its approach to these requirements.

But in reviewing JCS's proposal for PWS Section 3.4.7, it is not obvious that JCS addressed all requirements. The entirety of the response is:

> Team JCS has considerable success implementing fully integrated, multi-service storage, and collaboration platforms for federal customers. Our core storage design is aligned with standard taxonomies and Office of Management and Budget (OMB) mandate for "Open by default, closed by exception" data sharing policies. In addition to Team JCS's expertise in establishing and implementing storage services for federal customers, we will ensure administration and management support, backup, disaster recovery, emergency response, and COOP across all virtual and physical environments.

ECF No. 124 at AR 15528. Perhaps this includes a commitment to "monitor, allocate, and recommend system storage usage in accordance with appropriate directives" or "document its capabilities to include size, speed, accessibility, and scalability," ECF No. 147-1 at AR 29560, but it does not obviously do so. And this Court cannot find it arbitrary and capricious for the Agency not to have found these requirements in the proposal section.

Perhaps recognizing that the response to PWS Section 3.4.7 does not address all the PWS requirements, JCS argues it satisfied PWS Section 3.4.7 in other sections of its proposal. ECF No. 164-1 at 20-21 (citing its proposal for Sections 3.2.1/3.2.2, 3.4.8, 3.4.11, and 3.4.12). But JCS's proposal does not include cross-references to any of these newly identified sections. ECF No. 124 at AR 15504. The Court does not fault the Government for not piecing these references together. *CACI, Inc.-Fed.*, 158 Fed. Cl. at 19; *see also supra* Section XI.A.1.

Therefore, the Agency rationally assigned the Significant Weakness for PWS Section 3.4.4 and the Court will not disturb it.

### 8.   Commerce rationally assigned the Significant Weakness for PWS Section 3.4.8.

PWS Section 3.4.8 requires offerors to support multiple infrastructure services, including PKI. ECF No. 147-1 at 29560-61. The Agency assigned JCS a Significant Weakness for PWS Section 3.4.8 because JCS "failed to demonstrate capability with PKI." ECF No. 130 at 26727.

JCS argues the RFP did not require JCS to demonstrate capability with PKI because the RFP referenced PKI as one of five examples of infrastructure services that may be utilized, meaning JCS could not have been on notice it was required to demonstrate capability with PKI. ECF No. 164-1 at 21-22. The Government counters the plain language of "will include" in PWS Section 3.4.8 gave offerors notice they were required to demonstrate capability with PKI. ECF No. 203 at 216. To bolster its point, the Government argues similar language was used throughout the proposal yet is not being challenged by JCS. *Id.* at 217.

The Solicitation provides offerors would be evaluated in part on their ability to "[d]emonstrate [their] ability to meet or exceed the Final CATTS PWS requirements[.]" ECF No. 118 at AR 1490. The plain words of PWS Section 3.4.8 provide that "[t]hese services *will include* but are not limited to . . . infrastructure services (*e.g.*, . . . Public Key Infrastructure (PKI), etc.)." ECF No. 147-1 at AR 29560-61 (emphasis added). JCS was therefore required to

set forth its ability to meet or exceed the requirement to provide PKI services. As the Agency found and as the record demonstrates, JCS "failed to demonstrate capability with PKI." ECF No. 130 at 26727.

JCS also argues disparate treatment compared to BrightPoint, CW-LTS, and DotIT that merely mentioned the term "PKI" without explaining how they would implement it. The Government counters that JCS's proposal "is narrowly focused on the transition of IT infrastructure and services to major cloud providers" which "does not, in any way, address operating, maintaining, or sustaining PKI services" while "BrightPoint and dotIT provided a number of PKI services." ECF No. 203 at 223-24 (citing ECF No. 124 at AR 15528 (JCS's proposal); ECF No. 120 at AR 6410 (BrightPoint's proposal); and ECF No. 121 at AR 10259-60 (DotIt's proposal)). Here, too, JCS is trying to compare its proposal that did not address PKI to three proposals that did. But that distinction makes clear these proposals are not substantively indistinguishable under *Office Design Group*, which defeats the argument. *See* ECF No. 120 at AR 6410-11 ("Team BP creates, operates, and maintains several cloud environments for the DOC NS3, including . . . Public Key Infrastructure (PKI). . . ."); ECF No. 121 at AR 10259-60 ([ * * * ]); ECF No. 121 at AR 8752 ("Team CW-LTS offers . . . [ * * * ] including . . . Public Key Infrastructure (PKI).").

Finally, JCS argues that the fact Centuria got a Strength for utilizing PKI further demonstrates PKI was not a PWS requirement. ECF No. 164-1 at 22 n.4. Not so. PWS Section 3.4.8 identifies PKI as a required "enterprise shared applications and infrastructure services." ECF No. 147-1 at AR 29560. But the Agency acted rationally when it assigned Centuria a strength for *PWS Section 3.4.17* for proposing to utilize PKI for mobile devices. *See* ECF No. 130 at 26550. The use of PKI for mobile devices is not clearly within PWS Section 3.4.8, which deals with enterprise computing applications (e.g., email, directory services, etc.). The Agency did not engage in disparate treatment in its decision not to assign BrightPoint, CW-LTS, or dotIT a Significant Weakness for their respective proposals, and for assigning Centuria a Strength in a separate section entirely for utilizing PKI.

Therefore, the Agency rationally assigned the Significant Weakness for PWS Section 3.4.8 and the Court will not disturb it.

> 9.    Commerce rationally assigned the Significant Weakness for PWS Section 3.4.10.

The Agency assigned JCS a Significant Weakness for its proposal for PWS Section 3.4.10 because JCS "did not provide an approach to demonstrate capability to support these requirements" and because JCS's "proposal cites experience with MS Windows 2003-2016 . . . which is outdated." ECF No. 130 at AR 26727. PWS Section 3.4.10 instructs offerors to provide various services in data centers. ECF No. 147-1 at AR 29561-62.

JCS argues it referenced its use of current tools, including the reference to Windows 2003-2016, throughout its proposal. ECF No. 164-1 at 23. And, according to JCS, its "specific reference to Windows 2003-2016 in this list is based on its current support of DOC ITA and its experience that many government users have opted for extended support of this program through January 2027, making this experience directly relevant to DOC performance." *Id.* But the Court

cannot find the evaluation arbitrary and capricious because whether Windows 2003-2016 is outdated is a question solely for the Agency when there is no clear provision of the RFP to the contrary.  Alternatively, JCS argues that even if the conclusion that certain software was outdated, "it would only be rational for this not to factor appreciably into the Agency's evaluation, rather than argue that it increases the risk of unsuccessful contract performance."  ECF No. 235 at 9.  But this is a mere disagreement with the Agency's determination that the software was out of date and would lead to certain risks to the Government.  That is not sufficient to upset the Agency's determination.

Finally, JCS raises a disparate treatment argument because BrightPoint was given an Excellent technical rating with zero assessed Weaknesses despite not having provided any detail about current tools with respect to PWS Section 3.4.10 and not having "reference[d] the ability to troubleshoot equipment, repair warranty, or upgrade and disposal capabilities."  ECF No. 164-1 at 24.  Regarding JCS's disparate treatment claim, the Government counters "[b]ecause each of JCS's arguments in relation to [PWS Section 3.4.10 and other Sections] make it clear that JCS does not in fact believe its offer was 'substantively indistinguishable,' the arguments are meritless."  ECF No. 203 at 223.  And the point isn't that BrightPoint did not provide version information, but rather that JCS provided version information the Agency found outdated.  JCS's and BrightPoint's proposals are thus not substantially indistinguishable, and the disparate treatment argument fails.  *Office Design Grp*, 951 F.3d at 1372.

Therefore, the Agency rationally assigned the Significant Weakness for PWS Section 3.4.10 and the Court will not disturb it.

> 10.    Commerce rationally assigned the Significant Weakness for PWS Section 3.4.12.

PWS Section 3.4.12 instructs offerors to "provide support for planning, execution and management of enterprise data backup, emergency response, and disaster recover (DR), and continuity of operations (COOP) operations and support."  ECF No. 147-1 at AR 29562.  The Agency assigned JCS a Significant Weakness for PWS Section 3.4.12 because even though JCS's proposal "demonstrates a tested backup and restoration process . . . the Offeror does not provide an approach for emergency response, disaster recovery (DR) or COOP."  ECF No. 130 at 26727-28.

JCS argues the Agency's assessment is internally contradictory because it states JCS demonstrated a tested backup and restoration process yet did not provide an approach for emergency response, DR, or COOP.  This is because "[t]he approaches to emergency response, DR, and COOP are inherently intertwined with backup and restoration of systems and data."  ECF No. 164-1 at 25.  The Government counters, "the RFP required offerors to demonstrate multiple requirements regarding data backup, disaster recovery, and continuity of operations" and "[d]emonstration of one requirement does not necessarily demonstrate another, even if the requirements are related."  ECF No. 203 at 218.  While disaster recovery and continuity of operations may be intertwined with backup and restoration processes, they need not be.  That is a question for the Agency.  And it is certainly reasonable to conclude that routine backup and recovery is not the same as, or inherently intertwined with, emergency recovery, disaster recovery, or continuity of operations.

And to demonstrate that it did provide a response to these issues, JCS points to other sections in its proposal.  ECF No. 164-1 at 25 (quoting from Sections 3.4.7 and 3.4.15 of its proposal).  But JCS failed to cross-reference these sections and the Government was not required to search JCS's proposal to determine if JCS satisfied the requirements of PWS Section 3.4.12. *CACI, Inc.*, 158 Fed. Cl. at 19 (2021) ("Agencies must indeed review the whole proposal, but they are not compelled to comb the record for information that an offeror does not otherwise adequately present through a well-written proposal.").

Therefore, the Agency rationally assigned the Significant Weakness for PWS Section 3.4.12 and the Court will not disturb it.

11.    Commerce rationally assigned the Significant Weakness for PWS Section 3.4.18.

Under PWS Section 3.4.18, offerors were expected to provide a variety of telecommunications support services, including supporting "Plain Old Telephone Services (POTS) and Voice over Internet Protocol (VOIP)," infrastructure,  capacity monitoring, voice integration with other systems, conference services, responding to issues and outages, among others.  ECF No. 147-1 at AR 29564.  The Agency assigned JCS a Significant Weakness rating for its approach to PWS Section 3.4.18 because JCS "failed to provide the required approach to demonstrate capability to address the above requirements. [JCS] states that with MS Teams there is already a cloud base [sic] PBX system and a local PBX system is no longer needed. [JCS] proposed a solution instead of providing an approach to meet the PWS requirements."  ECF No. 130 at AR 26728.

JCS insists it proposed "a solution such as utilizing UCaaS solutions such as Microsoft Teams Calling," which "does not required locally-maintained PBX equipment."  ECF No. 164-1 at 26.  But it is not clear how proposing to use Microsoft Teams fully responds to the RFP.  While it may be true that JCS explained how using Microsoft Teams would not require locally maintained equipment, that is not the question.  The Agency asked for *specific* support services that include maintaining locally maintained equipment.  It is also not clear how, as the Government argues, proposing to use Microsoft Teams satisfies the requirements to "provid[e] protocol standardization and interoperability, service coordination of interruptions and outages, and corrective actions to resolve issues."  ECF No. 203 at 218.

JCS also contends that the evaluation was irrational because "one on [sic] hand, the Agency credited offerors for the use of certain programs," such as when JCS received a strength in PWS Section 3.5C.1 for certain partnerships, "while on the other hand, the Agency downgraded offerors for 'outdated' tools or failing to describe how it would use a certain program."  ECF No. 235 at 10-11 (citing ECF No. 130 at AR 26724).  But that is not an accurate statement of what the evaluation states.  The evaluation assigned the Significant Weakness because although JCS proposed to use Microsoft Teams, it did not explain how that would satisfy all requirements, including service coordination and responding to outages.  There is nothing irrational about that conclusion, which has nothing to do with the specific software at issue.  And this is entirely consistent with the Agency's assignment of a Strength to JCS for PWS Section 3.5C.1 for exceeding the requirements of that section by providing that it utilizes certain partnerships.

Therefore, the Agency rationally assigned the Significant Weakness for PWS Section 3.4.18 and the Court will not disturb it.

12.   Commerce rationally assigned the Significant Weakness for PWS Section 3.4.20.

PWS Section 3.4.20 calls for support relating to knowledge walls and video display services and support, end-user support, and continuous monitoring of equipment. ECF No. 147-1 at AR 29565.  The Agency assigned JCS a Significant Weakness for PWS Section 3.4.20 because JCS failed to "provide an approach to demonstrate capability to support these requirements."  ECF No. 130 at AR 26728.  But this was not a blanket failure to provide an approach, the Agency identified three of the six bullet-pointed tasks in PWS 3.4.20 as the ones that JCS failed to satisfy—"optimizing system operation and resource utilization"; "aiding users in using systems"; and "continuously monitoring all component equipment and taking corrective action for restoration of operational readiness."  *Id.*

According to JCS, it did "sufficiently detail[] its capability to provide the required services" in its proposal.  ECF No. 164-1 at 27.  But, as the Government counters "JCS's references to its experienced personnel and corporate knowledge do not demonstrate 'how it intends to perform contract requirements,'" because, for example, "JCS's references to its personnel and corporate knowledge do not demonstrate its approach to optimizing system operation, aiding users in using systems, and continuous monitoring of all component equipment."  ECF No. 203 at 218-19.  Indeed, looking at JCS's proposal, it clearly addresses its experience setting up and routinely testing knowledge walls and video displays.  ECF No. 124 at AR 15535.  But those are different PWS Section 3.4.20 requirements than the ones that Commerce assessed the Significant Weakness for.  In other words, Commerce evaluated the proposal as satisfying the requirements that it spoke directly to.  But the issue remains whether JCS responded to the subset of requirements that Commerce attached the Significant Weakness to.  Because JCS's proposal does not clearly speak to those three requirements, the Court does not find the evaluation to be arbitrary or capricious.

Therefore, the Agency rationally assigned the Significant Weakness for PWS Section 3.4.20 and the Court will not disturb it.

**C.   The Agency did not disparately enforce page limits or font requirements.**

JCS argues the Agency disparately enforced the RFP's strict page limitation with font and size requirements for narrative text.  ECF No. 164-1 at 32-33.  This argument fails entirely as a factual matter.  Here, the record is abundantly clear that the Agency did not find *any* proposal noncompliant with the RFP's page and font limits.  JCS does not point to any negative action by the Agency relating to violation of the page limits or font and spacing requirements.  In reality, JCS is not arguing that the Agency disparately enforced the RFP's requirements but that it did not enforce the requirements as JCS interpreted them.  That is a substantial difference.

Because the Court laid out the font and spacing requirements in response to AttainX's protest, it does not repeat them here.  *See supra* Section X.C.  Here, JCS argues while it strictly

complied with the RFP's requirements, "other offerors [such as CW-LTS] skirted the rules by utilizing tables for pages of their technical proposal," which allowed those offerors "to utilize smaller spacing and fonts, thus including more text and information regarding their approaches. ECF No. 164-1 at 33 (emphasis omitted). JCS argues the Agency thus applied the RFP inconsistently, which resulted in disparate treatment. *Id.* at 34 (citing *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020)). Additionally, "it is patently unreasonable for the Agency to permit an interpretation of the formatting requirements so as to permit an offeror to draft the majority of its proposal in a way so as to avoid the Solicitation's formatting requirements. To be clear, JCS is not protesting the actual formatting requirements, but rather the Agency's interpretation and application of the same." ECF No. 235 at 17 (emphasis omitted).

But JCS's arguments fail for several related reasons. First, there is no RFP limitation on the content that could be in tables or what might constitute excessive use of tables. As explained in AttainX's protest, this Court will not create one of its own. Second, JCS utilized a number of tables containing text and text boxes utilizing smaller fonts than the RFP otherwise requires. *E.g.*, ECF No. 263 at 257:12-258:5 (conceding tables in JCS's proposal). But JCS distinguishes its use of tables and text boxes because "they are generally not essential to our proposal." *Id.* at 257:16-17. If JCS's proposal contains a number of tables and text boxes that are not essential, however, it only begs the question why they are there and if JCS needed more space it did not remove the non-essential elements of its proposal. In the end, JCS utilized tables and text boxes throughout its proposal and the Court will not resolve a dispute about excessive use when the RFP provided no such limitation. Thus, the Agency did not engage in disparate treatment against JCS.

### D.    Prejudice

To establish prejudice, JCS "is not required to show that but for the alleged error, [it] would have been awarded the contract." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (citations omitted). But "a showing of a mere possibility that the protester would have received the contract but for the error is inadequate to show prejudice . . . . The proper standard lies between these polarities." *Id.* Therefore, "the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." *Id.*

JCS prevailed on its challenges to 1 of the 14 Significant Weaknesses assessed for its technical proposal. It is left with an Excellent past performance rating, ECF No. 130 at 28329; an evaluated price of $80,085,051.79, which is the 56th lowest price, *id.*; and 0 Significant Strengths, 7 Strengths, 1 Weaknesses, and 13 Significant Weaknesses.

Commerce eliminated JCS from consideration based on the combination of Significant Weaknesses in its proposal. Under the SSP, a proposal is Unsatisfactory if it contains a single Deficiency or "a combination of Significant Weaknesses that represents a material failure to meet requirements. Represents a high or unacceptable risk of unsuccessful contract performance." ECF No. 118 at 1512. But there are no criteria in the RFP (or SSP) that dictate when a combination of Significant Weaknesses is an unacceptable risk. This Court is certainly not able to determine whether, assuming a plaintiff prevails on some but not all its challenges to

Significant Weaknesses, the remaining Significant Weaknesses still constitute a "high or unacceptable risk of unsuccessful contract performance." *Id.* Nor can this Court determine whether JCS's Strengths offset the remaining Weaknesses and Significant Weaknesses. Those are unquestionably for the Agency to decide. During oral argument, the Government agreed, stating "if any of the significant weaknesses are knocked out, then it needs to go back to the Agency for reevaluation based on the criteria established by this Court and consideration of the other factors . . . ." ECF No. 263 at 66:21-25. Because JCS has succeeded in its challenge to 1 of the Significant Weaknesses, it has established prejudicial error.

For these reasons, the Court grants-in-part and denies-in-part JCS's MJAR and grants-in-part and denies-in-part the Government's and Defendant-Intevenors' Cross-MJARs.

## XII.   SaiTech, Inc. (No. 22-1549)

Commerce assessed SaiTech's technical proposal 3 Strengths, 4 Weaknesses, and 8 Significant Weaknesses. Based on the combination of Significant Weaknesses, Commerce found SaiTech's proposal Unsatisfactory, which eliminated it from consideration. SaiTech challenges the merit of the negative technical evaluations and the Agency's lack of enforcement of the font and spacing requirements.

### A.   Significant Weaknesses

1.   Commerce rationally assigned the Significant Weakness for PWS Section 3.2.1.

PWS Section 3.2.1 covers electronic records management ("ERM"). The PWS explains that contractors would be "expected to provide capabilities to plan, design, implement, and provide on-going support of ERM systems that meet or exceed the NARA Universal ERM Requirements (see Attachment A)." ECF No. 147-1 at AR 29554-55. And the PWS made clear that the NARA requirements contained "six sections based on the lifecycle of ERM: 1) Capture, 2) Maintenance and Use, 3) Disposal, 4) Transfer, 5) Metadata, and 6) Reporting." *Id.*

SaiTech received a Significant Weakness for PWS Section 3.2.1 because although its "approach states [ * * * ], the offeror failed to provide an approach to demonstrate capability to support the full ERM lifecycle." ECF No. 130 at AR 26793. But SaiTech contends that it did provide such an approach that satisfied all requirements. ECF No. 169-1 at 16 (citing ECF No. 147-1 at AR 29669).

The Agency rationally assigned this Significant Weakness because SaiTech states it will [ * * * ]." ECF No. 147-1 at AR 29669. But RFP Section L provides "[t]he Government considers statements that the prospective Offeror understands, can, or will comply with the specifications, or statements paraphrasing the requirements or parts thereof to be inadequate and unsatisfactory." ECF No. 118 at AR 1474. While SaiTech's proposal does provide some experience, much of it boils down to stating [ * * * ]. ECF No. 147-1 at AR 29669. The Court cannot say that the Agency acted arbitrarily or capriciously in concluding that SaiTech's proposal was inadequate under the RFP.

SaiTech next argues disparate treatment vis-à-vis its proposal and four awardees' proposals that got Strengths for their proposals that were purportedly substantively indistinguishable from SaiTech's.  ECF No. 169-1 at 16-18.[23]  But SaiTech fails to establish that its proposal is substantively indistinguishable from those it compares itself to, dooming its arguments.  For example, SaiTech contends that RIVA simply stated [ * * * ].  *Id*. at 16-17.  This argument does not survive scrutiny.  RIVA did not [ * * * ].  ECF No. 128 at AR 20753.  And [ * * * ].  *Id*. at AR 20754.  Because these proposals are not substantively indistinguishable, the Agency was not obligated to rate them the same way.  *Office Design Grp*, 951 F.3d at 1372.

And while it acknowledges that BrightPoint's proposal is long, SaiTech insists that "in essence it is not much different from SaiTech's" other than the Strength it got.  ECF No. 169-1 at 17-18.  As SaiTech reads it, Brightpoint similarly [ * * * ].  *Id*. at 18.  Again, the record belies the notion that these proposals are substantively indistinguishable.  BrightPoint proposed to [ * * * ].  ECF No. 120 at AR 6396-97.  It also addressed [ * * * ] in the PWS, and additional features.  *Id*. at 6397-6400.  Because these proposals are not substantively indistinguishable, the Agency was not obligated to rate them the same way.  *Office Design Grp*, 951 F.3d at 1372.

SaiTech similarly claims disparate treatment when compared to CW-LTS's proposal evaluation because CW-LTS simply states [ * * * ] but got Strengths.  ECF No. 169-1 at 18 (citing ECF No. 120 at AR 8739-40).  SaiTech claims to have said "functionally" the same thing.  But the difference is that CW-LTS said much more.  CW-LTS proposed [ * * * ].  ECF No. 120 at AR 8739-40.  Because these proposals are not substantively indistinguishable, the Agency was not obligated to rate them the same way.  *Office Design Grp*, 951 F.3d at 1372.

Finally, SaiTech contends that NOVA's proposal is substantively indistinguishable from SaiTech's but got a Strength rather than a Significant Weakness like SaiTech did.  ECF No. 169-1 at 18.  Here, SaiTech's argument is that NOVA said [ * * * ], like SaiTech did.  But again, that is not all NOVA said in its proposal.  Like RIVA, NOVA got a strength for proposing [ * * * ].  ECF No. 130 at AR 26540.  And NOVA explained in more detail its processes and approach to [ * * * ].  ECF No. 125 at AR 17857-89.  Because these proposals are not substantively indistinguishable, the Agency was not obligated to rate them the same way.  *Office Design Grp*, 951 F.3d at 1372.

SaiTech's response and reply merits discussion because of a recurrent pattern of argument that is not sufficient to carry its burden.  With only rare exception, SaiTech's response and reply does nothing to refute the Government's or Intervenors' arguments; rather, it simply restates why SaiTech believes it satisfied the requirements of a given PWS section and raises a new disparate treatment argument.  *E.g.*, ECF No. 236 at 12-13.  For example, SaiTech never once mentions, much less responds to, the arguments the Government raised in its Cross-MJAR regarding the differences between SaiTech's proposal and those of RIVA, BrightPoint, CW-LTS,

---

[23] In its reply brief, SaiTech argues for the first time that Koniag Management Service's proposal contained no more of an approach than SaiTech's as its proposal [ * * * ], yet Koniag did not receive a Significant Weakness.  ECF No. 236 at 13.  This does not appear to be in response to anything the Government argued, and Koniag never mentioned SaiTech in its Cross-MJAR.  Because SaiTech makes the argument for the first time in its reply brief, the Court will not entertain it and considers it waived.

and NOVA for PWS § 3.2.1.  Because SaiTech failed to address these arguments in its reply, SaiTech has waived its arguments that the Agency disparately treated its proposal on this PWS section.  *E.g.*, *Golden IT, LLC v. United States*, 157 Fed. Cl. 680, 695-96 (2022) (collecting cases); *see also* ECF No. 247 at 13-14 (BrightPoint arguing that SaiTech failed to respond to any of its arguments); ECF No. 248 at 7-8 (CW-LTS arguing that SaiTech abandoned its disparate treatment arguments); ECF No. 254 at 156-57 (Government characterizing this change as "abandon[ing]" the disparate treatment argument).

In addition to not responding to the arguments in the Cross-MJARs, SaiTech's response and reply raises an entirely new disparate treatment argument relating to the Agency's evaluation of Koniag's proposal that SaiTech insists "contains no more of an approach" to PWS Section 3.2.1 than its own.  ECF No. 236 at 13.  Again, this argument is not responding to anything the Government argued in its Cross-MJAR.  It is simply raising a new argument in what the Court must consider the reply portion of its response and reply.  The Government calls out SaiTech for changing its argument and Koniag explicitly argues the new argument is waived.  ECF No. 253 at 3-4.  As Koniag argues, a party that fails to raise arguments in its MJAR waives them.  As this Court has often stated in cases including bid protests, "[a]rguments made for the first time in a response brief — particularly those necessary to establish prejudice, consistent with the plaintiff's burden — are waived."  *Ahtna Logistics, LLC v. United States*, 163 Fed. Cl. 488, 516 (2022) (collecting cases).  Because SaiTech's disparate treatment argument regarding Koniag rests solely on the administrative record and does not respond to any argument made in Cross-MJARs, SaiTech has waived it under *Ahtna Logistics* and the line of cases it relies upon.  Therefore, the Agency rationally assigned the Significant Weakness for PWS Section 3.2.1 and the Court will not disturb it.

    2.    Commerce rationally assigned the Significant Weakness for PWS Section 3.3.1.

PWS Section 3.3.1 calls for a variety of shipping, receiving, warehousing, and inventory management.  ECF No. 147-1 at AR 29555.  Commerce assigned SaiTech a Significant Weakness for PWS Section 3.3.1 because SaiTech "did not provide the required detailed technical approach to demonstrate capability in supporting these requirements."  ECF No. 130 at AR 26793-94.

SaiTech argues its proposal did address its capability and provided an approach.  ECF No. 169-1 at 19.  The Agency rationally assigned SaiTech a Significant Weakness for its proposal for PWS Section 3.3.1.  The Agency's evaluation states SaiTech "did not provide the required detailed technical approach to demonstrate capability in supporting these requirements." ECF No. 130 at AR 26793-94.  According to the Government, the path to the Agency's rationale is clear because SaiTech's proposal [ * * * ].  ECF No. 203 at 244.  As examples, SaiTech's proposal states that it [ * * * ] and that it [ * * * ] and [ * * * ].  ECF 147-1 at AR 29671.  But the RFP makes clear that simply stating that an offeror will comply with requirements without more may be considered inadequate.  ECF No. 118 at AR 1474.

In its reply, SaiTech again restates its view that it satisfied the PWS requirements but acknowledges that it [ * * * ].  ECF No. 236 at 14.  But SaiTech insists that the PWS does not require "just-in-time" inventory methodologies but the TET "created a requirement for that

specific phrase, rather than whether the approach proposed addressed the goals of the PWS, as required by the RFP." *Id.* There are two problems with this argument. First, the Government did not argue that the Agency assigned the Significant Weakness for failing to address just-in-time inventory management. *See* ECF No. 203 at 242-45. The Government's argument was that SaiTech merely stated it would perform according to requirements. Second, the PWS does not make a mere passing reference to just-in-time inventory methodology, it unequivocally creates a requirement. PWS Section 3.3.1 provides that the "Contractor *will also* develop and implement the techniques, processes, and procedures *to maintain a 'just-in-time' inventory methodology* to ensure customer fulfillment while reducing warehousing cost of storage." ECF No. 147-1 at AR 29555 (emphasis added). The "will also" makes "just-in time" inventory methodology mandatory and in addition to whatever else PWS Section 3.3.1 requires. This could hardly be any clearer. Thus, SaiTech's failure to address "just-in-time" inventory methodology further supports the conclusion that SaiTech failed to provide an approach to demonstrate its capability to provide the required services and justifies the Significant Weakness the TET assessed SaiTech's proposal.

SaiTech pushes back by arguing disparate treatment of its proposal as compared to T&T and Reston Consulting Group ("Reston"). First, SaiTech complains that it got a Significant Weakness for failing to mention just-in-time inventory management, but T&T only got a Weakness. ECF No. 236 at 14 (citing ECF No. 130 at AR 26545-46). Even giving SaiTech the benefit of the doubt as to whether the Agency evaluation rested on just-in-time inventory management sufficiently to avoid waiver, SaiTech's argument fails because it ignores the difference between its evaluation and T&T's. The TET assessed T&T a Weakness for failing to address only just-in-time inventory management. ECF No. 130 at AR 26545-46. But SaiTech's proposal got a Significant Weakness for failing to provide its approach to multiple requirements (i.e., stating [ * * * ]). Thus, the Agency did not engage in disparate treatment in its treatment of T&T's proposal in comparison to SaiTech's because their proposals were not substantially indistinguishable. *Office Design Grp*, 951 F.3d at 1372.

Second, SaiTech's reply raises a new disparate treatment argument relating to Reston's approach because, according to SaiTech, Reston simply used the phrase "just-in-time" in its proposal. ECF No. 236 at 14. Although SaiTech could and should have made this argument in its MJAR (it is based on SaiTech's conclusion that it got its Significant Weakness for failing to address just-in-time inventory management, not the Government's argument), even if the evaluation rested on just-in-time inventory management, SaiTech's argument fails on the merits. According to SaiTech, despite being substantially indistinguishable, SaiTech's proposal got a Significant Weakness, but Reston did not get any Strength or Weakness for PWS Section 3.3.1. Reston's proposal, however, did not just use the phrase "just-in-time," it states Reston would [ * * * ]. ECF No. 128 at AR 20472. All of this is clearly directed at a just-in-time approach that [ * * * ]. Thus, SaiTech's and Reston's proposals are not substantively indistinguishable and, therefore, Commerce was not obligated to assign them the same ratings. *Office Design Grp*, 951 F.3d at 1372.

Here, the Agency did not simply state that the Offeror failed to provide an approach to meet the Solicitation requirements. Rather, the Agency clearly stated that the Offeror did not address certain requirements of PWS Section 3.3.1 and, in doing so, sufficiently explained its rationale for assigning a Significant Weakness. Section M.2.3(a)a indicates that the Agency will

evaluate the Offeror's ability to meet or exceed the Final CATTS PWS requirements—all of them.  ECF 118 at AR 1490.  And it is well within the Agency's discretion to determine whether the Offeror's proposal is sufficiently detailed to pass muster, so long as that determination is not arbitrary or capricious.  Indeed, "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."  *E.W. Bliss*, 77 F.3d at 449.  This Court will not second-guess the Agency's technical evaluation based on mere disagreement and declines the Offeror's invitation to wade into a technical assessment of its own.  That is a matter for the Agency.  Accordingly, the Agency clearly set forth its rationale for assessing this Significant Weakness in the contemporaneous evaluation.  Therefore, the Agency rationally assigned the Significant Weakness for PWS Section 3.3.1 and the Court will not disturb it.

3. <u>Commerce rationally assigned the Significant Weakness for PWS Section 3.3.3.</u>

Under PWS 3.3.3, a successful offeror will have to provide various education and training services, which include designing materials and programs, as well as providing training "in varied venues and locations."  ECF No. 147-1 at AR 29556.  The Agency assigned SaiTech a Significant Weakness for this section because SaiTech "[ * * * ] does not demonstrate a full understanding of the requirements . . . nor does it provide an approach for how [SaiTech] will perform successfully."  ECF No. 130 at AR 26794.

SaiTech first argues that [ * * * ] "did show an understanding of the PWS section."  ECF No. 169-1 at 19.  But the mere disagreement with the TET's evaluation is not sufficient to show the Agency's determination to be arbitrary and capricious.  *E.g.*, *CRAssociates, Inc. v. United States*, 102 Fed. Cl. 698, 717-18 (2012).  And SaiTech does not allege that the Agency missed anything or failed to consider some aspect of its experience.

SaiTech also argues that it did provide an approach in its proposal that satisfied the PWS requirements.  But when it comes to approach, the proposal provides [ * * * ].  ECF No. 147-1 at AR 29672.  Then SaiTech's proposal states [ * * * ].  In other words, SaiTech stated it would perform most of the contract requirements.  But the Court cannot find it arbitrary and capricious for the Agency to conclude that an approach consisting of determining the requirements with the Government during performance is insufficient.

Nor is it explicitly clear that SaiTech did, in fact, address all PWS requirements.  SaiTech acknowledges that it did not explicitly address things like [ * * * ] and [ * * * ], but claims that these items were covered under what SaiTech called [ * * * ] in its proposal.  *Id*.  And SaiTech contends the Agency should not have downgraded its proposal for not "parroting" certain requirements.  ECF No. 169-1 at 20. But it is not arbitrary and capricious for the Agency to conclude that things like [ * * * ] are not encompassed in [ * * * ].  Therefore, the Court cannot conclude that the Agency acted arbitrarily by concluding that SaiTech's experience failed to demonstrate a full understanding of the requirements of PWS Section 3.3.3.

Finally, SaiTech argues its approach was "eerily similar" to MetroIBR's, yet MetroIBR got a Strength for its approach while SaiTech got a Significant Weakness.  ECF No. 169-1 at 20.  As for the Strength, the Agency did not award that for the overall approach, but specifically for

102

proposing to utilize [ * * * ] where possible to maintain [ * * * ].  ECF No. 130 at AR 26536.  Given that SaiTech did not similarly offer [ * * * ], its proposal was not substantively indistinguishable on that front and Commerce was under no obligation to evaluate its proposal the same as MetroIBR's.  *Office Design Grp*, 951 F.3d at 1372.  Similarly, MetroIBR's proposal is not substantially identical to SaiTech's.  SaiTech does state [ * * * ].  ECF No. 147-1 at AR 29672-73.  But that is almost all SaiTech says.  MetroIBR, on the other hand, provides a [ * * * ] plan to developing training materials, providing additional detail for each of the [ * * * ] stages.  ECF No. 125 at AR 16707-08.  These proposals are not substantively indistinguishable.

Perhaps realizing that its disparate treatment argument regarding MetroIBR was not going to prevail, SaiTech abandons it in its reply.  As explained above, this abandonment constitutes a waiver, if not a concession that there was no disparate treatment vis-à-vis MetroIBR.  *See supra* Section XII.A.1.  And SaiTech's new disparate treatment argument does not respond to anything the Government argued and, therefore, SaiTech waived it by failing to raise it in its MJAR.  *Id*.  Even if SaiTech did not waive its newfound disparate treatment argument regarding RIVA's proposal, it fails on the merits.  According to SaiTech, RIVA's and SaiTech's proposals were virtually identical in that both cited [ * * * ], yet only SaiTech received a Significant Weakness.  ECF No. 236 at 15-16.  Because the Agency concluded RIVA's approach to PWS Section 3.3.3 did not warrant a Strength or Weakness, it did not provide a written analysis of RIVA's approach, but the rationale is clear from the record.  ECF No. 254 at 161.  Specifically, RIVA proposed [ * * * ].  ECF No. 128 at AR 20757-58.  SaiTech [ * * * ]; instead, SaiTech simply stated it [ * * * ].  ECF No. 147-1 at AR 29672-73.  That is not substantially indistinguishable from RIVA's proposal and, therefore, Commerce was not required to assign the same evaluation rating to both.  *Office Design Grp*, 951 F.3d at 1372.  The Court therefore holds the Agency's assignment to SaiTech of a Significant Weakness for PWS Section 3.3.3 was rational and supported by the record.  Therefore, the Agency rationally assigned the Significant Weakness for PWS Section 3.3.3 and the Court will not disturb it.

### 4.   Commerce rationally assigned the Significant Weakness for PWS Sections 3.4.5 and 3.4.8.

PWS Sections 3.4.5 and 3.4.8 require field support services and various enterprise cloud services respectively.  Commerce assigned a Significant Weakness to SaiTech for each of these sections (i.e., two Significant Weaknesses) in a single bullet point because SaiTech "states past experience in these task areas, but the experience does not demonstrate capability to support the requirements, and it does not provide an approach as to how [SaiTech] will perform successfully."  ECF No. 130 at AR 26794.

#### a)   *Commerce rationally assigned the Significant Weakness for Section 3.4.5*

Section 3.4.5 covers requirements to provide general IT support services including running entire sites independently, basic cabling and computer installation, administration of desktop and server systems, video teleconference support, and troubleshooting hardware and software issues at domestic and international locations.  ECF No. 147-1 at AR 29559.  SaiTech's MJAR contends that it provided the necessary approach because it proposed [ * * * ].  ECF No. 169-1 at 21 (quoting ECF No. 147-1 at AR 29680).  While Commerce recognized SaiTech's

[ * * * ], it found it not sufficient to demonstrate capability and faulted SaiTech for not providing an approach as to how it would perform the work.  As the Government argues, SaiTech's proposal states [ * * * ].  To that end, all SaiTech's proposal states is that SaiTech [ * * * ].  ECF No. 204 at 245 (quoting ECF No. 147-1 at AR 29680).  Given that SaiTech never explains what those processes are, it is not arbitrary and capricious for the Agency to assign a Significant Weakness for failing to provide an approach to perform the work.

In its response and reply, ECF No. 236, SaiTech changes course significantly.  It does nothing to respond to the Government's arguments about SaiTech's lack of an approach as to how it would use [ * * * ] or what the processes SaiTech identified for [ * * * ] are.  Instead, SaiTech mischaracterizes its evaluation and attacks the straw man it created.  Specifically, SaiTech argues that the Agency determined "that SaiTech's proposal contained *no* information that demonstrated SaiTech's understanding or that explained its approach to successfully perform PWS 3.4.5 . . . ."  ECF No. 236 at 17 (emphasis added).  Thus, SaiTech argues that its proposal clearly satisfies PWS Section 3.4.5 because it has some information about how it would perform.  But that is *not* what the TET concluded.  The TET concluded that SaiTech's "experience does not demonstrate capability to support the requirement, and it does not provide an approach as to how the Offeror will successfully perform."  ECF No. 130 at AR 26793.  In other words, the issue is not whether SaiTech's proposal contained any information demonstrating its understanding of the proposal, but whether the information satisfied PWS Section 3.4.5.  Again, the Court cannot find it arbitrary and capricious for the Agency to find [ * * * ] insufficient when the offeror never says what is [ * * * ].

Finally, SaiTech once again attempts to add a disparate treatment argument vis-à-vis Koniag's proposal that was not raised in its MJAR or made in response to a Government argument.  Understandably, Koniag argues that the Court should not allow the new argument because SaiTech did not raise it in its MJAR but easily could have.  ECF No. 253 at 3-4.  As explained above, *see supra* Section XII.A.1, the Court considers arguments raised for the first time in a reply to be waived.  Here, SaiTech's argument simply restates why it thinks it satisfied the PWS requirements without reference to any argument the Government or Koniag made in their Cross-MJARs and raises the disparate treatment argument.  That does not justify SaiTech failing to raise the argument in its MJAR.

On the merits, the Government is correct that SaiTech's and Koniag's proposals are not substantively indistinguishable.  Again, SaiTech's approach is [ * * * ].  Koniag's proposal is, admittedly, sparse in response to PWS Section 3.4.5 and did not get either a Strength or Weakness of any kind, so there is no contemporaneous analysis of its evaluation.  But, as SaiTech argues, Koniag's one paragraph response focused largely, if not entirely, on experience. ECF No. 125 at AR 16036.  And on the Government's standard, it does not appear to contain an approach.  Therefore, the Government pulls together an approach in Koniag's responses to PWS Section 3.4.5 and other sections.  ECF No. 254 at 163-64.  While it is somewhat incongruous for the Government to piece together a response to this section for Koniag, which did not cross-reference any of these additional sections, it is not necessarily impermissible.  Even under *CACI*, the Government has to evaluate the entire proposal holistically and credit responsive information that it locates in other sections of a proposal.  *CACI, Inc.*, 158 Fed. Cl. at 19 (2021) ("Agencies must indeed review the whole proposal, but they are not compelled to comb the record for information that an offeror does not otherwise adequately present through a well-written

proposal."). And Koniag did provide the missing approaches in other parts of its proposal. *E.g.*, ECF 125 at AR 16028, AR 16034-36, AR 16039-40, AR 16042-43, and AR 16046. This is substantively distinguishable from SaiTech's proposal referencing [ * * * ]. Nor does SaiTech point to other sections of its proposal to fill in the missing detail. The Court therefore holds the Agency's assignment to SaiTech of a Significant Weakness for PWS Section 3.4.5 was rational and supported by the record.

> b) *Commerce rationally assigned the Significant Weakness for PWS 3.4.8*

PWS Section 3.4.8 calls for certain enterprise cloud services, including the management of cloud infrastructure and related tasks. ECF No. 147-1 at AR 29560-61. Again, the TET evaluated SaiTech's proposal and concluded that "[t]he Offeror's proposal states past experience in these task areas, but the experience does not demonstrate capability to support the requirements, and it does not provide an approach as to how the Offeror will perform successfully." ECF No. 130 at AR 26794.

SaiTech argues it did provide [ * * * ] to cover the requirements for PWS Section 3.4.8 because it is [ * * * ] and part of [ * * * ]. ECF No. 169-1 at 21. In addition, SaiTech also touted [ * * * ]. *Id.* And SaiTech's proposal states that it [ * * * ]. *Id.*; *see also* ECF No. 147-1 at AR 29683. While the Government concedes the relevant [ * * * ], it counters that SaiTech failed to provide an approach to perform the PWS requirements and characterizes SaiTech's argument as simply inviting the Court to supplant the Agency's evaluation with its own. ECF No. 203 at 237-38. Here, the only things that SaiTech touts as an approach are [ * * * ]. ECF No. 169-1 at 21-22 (discussing [ * * * ]); ECF No. 236 at 18 (discussing [ * * * ]). The Court cannot find the Agency's conclusion that [ * * * ] constitutes an approach to performing the required work.

SaiTech's disparate treatment argument regarding MetroIBR is puzzling. According to SaiTech, its proposed approach to PWS Section 3.4.8 "was extremely similar to MetroIBR's proposal, which was given a strength." ECF No. 169-1 at 22. But, as MetroIBR points out, the TET assigned its proposal a Significant Weakness as well for failing to provide an approach regarding PKI implementation. ECF No. 197 at 8-9. In other words, the TET also found the failure to provide an approach by MetroIBR for part of the PWS requirements to be a Significant Weakness, in the same way it did SaiTech. Insofar as SaiTech contends that the disparate treatment is due to MetroIBR's assessed Strength for PWS Section 3.4.8, that argument fails because the Agency did not assign MetroIBR a Strength for its overall approach to the work. *See* ECF No. 236 at 17 n.6. Rather, the Agency assigned MetroIBR's proposal a Strength specifically because it proposed to "use Artificial Intelligence for [ * * * ], such as [ * * * ]." ECF No. 130 at AR 26536. While SaiTech may understand a proposal to use [ * * * ], ECF No. 237 at 17 n.6, to constitute an offer that is substantially indistinguishable from MetroIBR's, that understanding is without merit. Having such experience is not a proposal to use AI in the manner that MetroIBR did. Given that SaiTech's proposal included no such offering, its proposal and MetroIBR's proposal were not substantively indistinguishable, and Commerce was under no obligation to assign them the same evaluation. *Office Design Grp*, 951 F.3d at 1372.

In its response and reply, SaiTech again restates its arguments that it provided an approach and attempts to add a bevy of new disparate treatment arguments relating to ProGov,

Reston, RIVA, and Centuria.  ECF No. 236 at 18-19.  Again, a plaintiff is not claiming to respond to arguments raised by the Government or Intervenors, which challenge the raising of these new arguments in reply.  *E.g.*, ECF No. 243 at 11 (ProGov arguing SaiTech waived its argument by failing to raise in its MJAR); ECF No. 254 at 164 (Government arguing SaiTech is "mov[ing] the goal posts").  Again, SaiTech may not raise new arguments in its reply that it did not raise in its MJAR.  *See supra* Section XII.A.1.

Even if the Court were to consider SaiTech's newfound arguments, they fail on the merits.  According to SaiTech, it satisfied the Section 3.4.8 in its response to that section and to others (without any cross-reference).  Specifically, SaiTech relies on statements in its proposal [ * * * ] to establish its approach to Section 3.4.8.  ECF No. 169-1 at 22.  SaiTech's challenge to ProGov is that "ProGov simply includes the second sentence of PWS 3.4.8, with fluff in the beginning that in no way conveys how it will accomplish the requirements."  ECF No. 236 at 18-19 (citing ECF No. 127 at AR 19232).  What SaiTech considers "fluff" is not so easily dismissed.  ProGov [ * * * ].  ECF No. 127 at AR 19232-33.  And the Government points to this section and other sections of ProGov's proposal to show the full approach.  ECF No. 254 at 165 (citing ECF No. 127 at AR 19226-27, 19230-34, 19238-39, 19244-45, 19249-50, and 19261).  The review of these sections confirms that SaiTech's and ProGov's proposals were not substantively indistinguishable.  Of course, given that SaiTech must point to [ * * * ] to show an approach, it cannot complain when the Government does the same in response.  SaiTech also argues disparate treatment because "SaiTech, ProGov, Reston, and RIVA all make [ * * * ] which they plan to utilize during contract performance, and of their use of specific programs, but, again, only SaiTech received a weakness."  But again, as the Government counters, these offerors provided far more detail about their approach than SaiTech and did not merely [ * * * ].  ECF No. 254 at 165-67.

This Court will not second-guess the Agency's technical evaluation based on mere disagreement.  Accordingly, the Agency clearly set forth its rationale for assessing this Significant Weakness in the contemporaneous evaluation.  Therefore, the Agency rationally assigned the Significant Weakness for PWS Section 3.4.8 and the Court will not disturb it.

5.    Commerce rationally assigned the Significant Weakness for PWS Section 3.4.10.

PWS Section 3.4.10 covers various support required for infrastructure maintenance, including inventory control, hardware and software recapitalization, security management, hardware repair, moving hardware, diagnosing equipment problems, coordinating in warranty and out of warranty repairs, upgrading equipment and sanitizing equipment no longer needed for the work.  ECF No. 147-1 at AR 29561-62.  The Agency assigned SaiTech a Significant Weakness because "[t]he Offeror's proposal states past experience in this task area, but the experience does not demonstrate a full understanding of the requirements above, nor does it provide an approach to demonstrate how the Offeror will perform successfully."  ECF No. 130 at 26795.

According to SaiTech, "this is an incorrect evaluation" because it "highlighted [its] [ * * * ] and approach with [ * * * ]."  ECF No. 169-1 at 22-23.  Of course, simply complaining that an evaluation is "incorrect" will not suffice to demonstrate error by the Agency.

*CR Associates, Inc. v. United States*, 102 Fed. Cl. 698, 717-18 (2012) ("[M]ere disagreements with the contracting officer's particular assessment . . . [are] not nearly enough to demonstrate that the CO's findings were arbitrary or capricious."). And looking at SaiTech's proposal, it is not clear that it addressed all elements of the requirement. Indeed, SaiTech acknowledged that it did not provide "an exhaustive approach to [ * * * ]." ECF No. 169-1 at 23. While Commerce may have inferred such support from the [ * * * ] that SaiTech listed, it was not required to. And SaiTech's response focuses significantly on [ * * * ], which, given how little SaiTech said about other hardware, further supports the evaluators' conclusion that SaiTech did not demonstrate its ability to perform all of the work requirements.

SaiTech next argues that "PWS 3.4.10 itself is so lengthy that it is virtually impossible to demonstrate a specific approach for each item listed within it given the Solicitation's page limitations." *Id.* But if SaiTech wished to complain about the page limits, it had to do so before it submitted its proposal. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.").

And in its response and reply, SaiTech raises a disparate treatment argument that its proposal was substantively indistinguishable from ProGov's proposal, but only SaiTech received a Significant Weakness. ECF No. 236 at 20-21. According to SaiTech, because it said it provided [ * * * ] it was substantively indistinguishable from ProGov's because that proposal said ProGov [ * * * ]. ECF No. 236 at 20 (citations omitted). Again, the Government and ProGov fault SaiTech for raising new arguments on reply. ECF No. 243 at 11 (ProGov arguing SaiTech waived its argument by failing to raise in its MJAR); ECF No. 254 at 167 (Government complaining that SaiTech raising new argument regarding ProGov). The Court considers this argument waived. *See supra* Section XII.A.1.

Even if the Court considers it, this argument misses the mark because SaiTech did not get a Significant Weakness for failing to address [ * * * ]. SaiTech got a Significant Weakness for failing to provide an approach and admits that it did not address all of the listed requirements. And SaiTech's argument proves too much. For example, ProGov provided an approach to [ * * * ] to ensure that no Agency information remained on hardware that was sent out for repair or disposal. ECF No. 127 at AR19234-35. SaiTech does not address this despite a PWS requirement for "sanitizing and disposing of equipment securely." ECF No. 147-1 at AR 29561. There was nothing arbitrary or capricious about SaiTech's Significant Weakness for PWS Section 3.4.10. The Court therefore holds the Agency's assignment to SaiTech of a Significant Weakness for PWS Section 3.4.10 was rational and supported by the record. Therefore, the Agency rationally assigned this Significant Weakness and the Court will not disturb it.

6.     Commerce rationally assigned the Significant Weakness for PWS Section 3.5B.2

Pursuant to PWS § 3.5B.2, offerors had to propose their solution to provide customer knowledge and content management. Here, the PWS advised offerors that the "[s]ervices should focus on end-user support to include tailoring front-end interfaces for DOC mission and business

applications, as well as web and portal presentation and content customization (i.e., portlets, digital authoring, and web publishing, tasking systems)." ECF No. 147-1 at AR 29569. And "[t]he contractor is expected to ensure that the content management system integrates effectively with existing enterprise systems and data stores with the goal of maintaining a well-connected, secured, and controlled enterprise of systems." *Id*.

The Agency assigned SaiTech a Significant Weakness for its proposal for PWS Section 3.5B.2 because its "approach is narrowly focused on [ * * * ] and does not address DOC mission and business applications." ECF No. 130 at AR 26795. According to SaiTech, its "proposal addresses [ * * * ]." ECF No. 169-1 at 23. And it argues "[t]he DOC mission and business applications are phrased as a focus of knowledge management, not as an independent requirement." ECF No. 236 at 21. To meet this requirement, SaiTech argues it "did present an approach that [ * * * ]." ECF No. 236 at 21 (citation omitted).

The Agency rationally concluded in its evaluation that SaiTech focused on [ * * * ] and does not address DOC mission and business applications. But this does not comport with the PWS, which states that "Services should focus on end-user support *to include tailoring front-end interfaces for DOC mission and business applications*, as well as web and portal presentation and content customization (i.e., portlets, digital authoring, and web publishing, tasking systems)." ECF No. 147-1 at AR 29569 (emphasis added). And the PWS continued that the "[s]ervices should enable customer use of supported DOC mission and business applications and their business processes in all IT environments." *Id*. Thus, any argument that tailoring interfaces for DOC mission and business applications is not the focus of the requirement is without merit. And a review of SaiTech's proposal confirms that it does not clearly address tailoring front-end interfaces to Commerce systems or enabling customers to use DOC mission and business applications in all IT environments as required.

Finally, SaiTech raises a disparate treatment argument regarding its proposal as compared to Centuria's proposal, arguing that SaiTech's approach is even more dynamic than Centuria's, yet only SaiTech received a Significant Weakness for its approach, while Centuria got a Strength. ECF No. 169-1 at 24; ECF No. 236 at 21-22. To support this argument, SaiTech raises several similarities between its proposal and Centuria's. But the comparison to Centuria's proposal does not show disparate treatment; rather, it confirms the Agency's evaluation of SaiTech's proposal is rational. Among other things, Centuria's proposal highlights that [ * * * ]. ECF No. 120 at AR 7023. SaiTech's proposal includes [ * * * ], meaning that its proposal and Centuria's are not substantively indistinguishable. Therefore, no matter how similar other parts of SaiTech's and Centuria's proposals may be, Commerce was under no obligation to assign these two proposals the same rating. *Office Design Grp*, 951 F.3d at 1372.

This Court will not second-guess the Agency's technical evaluation based on mere disagreement. Because the Agency clearly set forth its rationale for assessing this Significant Weakness in the contemporaneous evaluation. Therefore, the Agency rationally assigned the Significant Weakness for PWS Section 3.5B.2 and the Court will not disturb it.

       7.    Commerce rationally assigned the Significant Weakness for PWS Section 3.4.19

PWS Section 3.4.19 calls for a variety of services to support video and video teleconferencing technologies. *See* ECF No. 147-1 at AR 29564-65. The Agency assigned SaiTech a Significant Weakness for PWS Section 3.4.19 because SaiTech "provided [ * * * ], but it did not provide details to demonstrate capability. In addition, [SaiTech] did not provide the required approach to demonstrate capability to support integrating video, SVTC, and DVTC[24] capacities into other systems (e.g., VoIP teleconferencing, enterprise infrastructure services); standardizing protocol and interoperability proposal did not provide an approach to demonstrate capability to provide these services." ECF No. 130 at AR 26795.

SaiTech contends that although it "did not call out each and every one of the items mentioned in the PWS, [it] provid[ed] [ * * * ] that shows the capability SaiTech would use for this PWS." ECF No. 169-1 at 24-25. Once again, SaiTech argues that the Agency "ignored and misevaluated" SaiTech's proposal. *Id*. at 25. But the record shows clearly that the Agency recognized the [ * * * ] that SaiTech proposed to utilize when it concluded that SaiTech "provided [ * * * ]." ECF No. 130 at AR 26795. And the Court cannot find that the Agency "misevaluated" SaiTech's proposal. The TET also faulted SaiTech's proposal for "not provid[ing] the required approach to demonstrate capability to support integrating video, SVTC, and DVTC capacities into other systems (e.g., VoIP teleconferencing, enterprise infrastructure services); standardizing protocol and interoperability . . . ." *Id*. These were PWS requirements. ECF No. 147-1 at AR 29564-65. Indeed, SaiTech concedes that it did not call out each requirement but proposed an [ * * * ] solution. ECF No. 169-1 at 25. While SaiTech may have intended these services to be covered in what it proposed, it is not clear from its proposal that it would perform these integration and interoperability services as the PWS required.

SaiTech next argues disparate treatment because its proposal was substantially indistinguishable from VenTech's, yet only SaiTech received a significant weakness. ECF No. 169-1 at 25. According to SaiTech, [ * * * ]. ECF No. 169-1 at 25. [ * * * ]. ECF No. 130 at AR 24939-40; *see also* ECF No. 203 at 241.

Once again, SaiTech abandons its argument regarding VenTech in its reply and raises entirely new disparate treatment arguments regarding Reston. ECF No. 236 at 23 ("SaiTech's significant weakness assigned for PWS 3.4.19 was particularly unjustified when compared with Reston's proposal."). Once again, this Court does not approve. Once again, even if the Court considered SaiTech's argument, it fails on the merits. SaiTech argues that the only statement that Reston includes in its proposal to demonstrate its approach are "'[p]rovide experienced, skilled, and qualified personnel . . .'" ECF No. 236 at 23 (quoting ECF No. 128 at AR 20479) (alterations in original). Not so. As the Government contends, the Court cannot find it irrational to credit Reston's proposal when it provides that it will [ * * * ]. ECF No. 254 at 171; ECF No. 128 at AR 20479. And the TET also faulted SaiTech for failing to provide an approach to demonstrate its capability to support interoperability of systems (although it did list [ * * * ]). ECF No. 130 at AR 26795. And SaiTech complains that neither did Reston. But Reston did address interoperability, albeit in a different section, and explained it would "design systems with [ * * * ]" and that integration may require rewriting code, and how Reston proposed to

---

[24] According to the PWS, "SVTC" refers to "room-based Video Teleconferencing" and "DVTC" refers to "desktop video teleconferencing." ECF No. 147-1 at AR 29564.

synchronize systems.  ECF No. 254 at 171-72; ECF No. 128 at AR 20481.  Given these differences, even if SaiTech had not waived its argument regarding Reston, it fails to establish that its and Reston's proposals were substantively identical.  Therefore, the disparate treatment argument would fail.  *Office Design Grp*, 951 F.3d at 1372.

Therefore, the Agency rationally assigned the Significant Weakness for PWS Section 3.4.19 and the Court will not disturb it.

### B.  The Agency did not award contracts to non-compliant proposals.

Like JCS, SaiTech challenges certain awardees' use of tables to present their responses to the RFP.  As SaiTech argues "awarding contracts to non-compliant proposals would be a violation of the terms of the Solicitation, and result in 'improperly awarded contracts.'"  ECF No. 169-1 at 32 (quoting *WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 274 (2021)).  Like JCS and AttainX, SaiTech complains of the number of tables some awardees included in their proposals.  Because the Court detailed the RFP font and spacing requirements in response to AttainX's protest, it does not repeat the requirements here.

According to SaiTech, "[w]hile SaiTech utilized tables only when necessary and double spaced their proposal, it appears that multiple offerors pushed the limits or completely circumvented this requirement likely in an effort to provide more information in a small space.  The DOC should have rejected these proposals, or not awarded contracts to them."  ECF No. 169-1 at 32.  But this Court is not in a position to determine when table use is "necessary."  Again, there is nothing in the RFP differentiating what material could be in a table versus what had to be in regular text subject to the general font and spacing requirements.  And certainly nothing to guide when tables are "necessary."

To meet this issue, SaiTech argues that "taken together, the RFP clearly barred excessive use of tables, meaning that offerors could not exceed page limits and font requirements by putting information in tables.  When the limitations are read in whole, the RFP makes a clear requirement of judicious spacing, reasonable text size, and format.  The RFP, in limiting pages, text size, spacing and use of tables, wants quick, concise, efficient narratives and proposals, not proposals dominated by tables of inefficient jumbled complexities."  ECF No. 236 at 3.  But the RFP did not limit the use of tables, much less the "excessive use" of tables.  To illustrate the point, the Government and the Court count approximately [ * * * ] in SaiTech's proposal.  *See* ECF No. 263 at 275:17; *see also* ECF No. 147-1 at AR 29650-724.  Why is [ * * * ] okay, but more is not?  SaiTech fails to demonstrate that the Agency disparately enforced the RFP font and spacing requirements or awarded to noncompliant proposals.

### C.  Prejudice.

Because SaiTech does not prevail on any of its challenges to the Significant Weaknesses that Commerce assessed its technical proposal, the Court does not disturb the Unsatisfactory rating that resulted from those Significant Weaknesses.  Therefore, SaiTech's proposal remains excluded from award.  Therefore, the Court does not consider the arguments SaiTech raises about past performance, ECF No. 169-1 at 26-27, or various disparate treatment insofar as SaiTech got Weaknesses for elements of its proposal that other offerors did not, or other offerors

got Strengths and SaiTech did not, *id.* at 27-31.  No matter how strong any of these arguments are, SaiTech cannot prove prejudice from any of them because its technical proposal remains Unsatisfactory and excluded from consideration for award.  ECF No. 118 at AR 1512 (defining Unsatisfactory as "Proposal does not meet solicitation requirements and contains one or more Deficiencies and/or a combination of Significant Weaknesses that represents a material failure to meet requirements.  Represents a high or unacceptable risk of unsuccessful contract performance.").

Because SaiTech failed to establish error, it necessarily fails to establish prejudice.  Therefore, the Court denies SaiTech's MJAR and grants the Government's and Defendant-Intervernors' Cross-MJARs.

## XIII.   Injunctive Relief

Because certain plaintiffs have established prejudicial error, the Court turns to the appropriate relief.  When deciding whether to grant injunctive relief, the Court considers four factors, which are:

> (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (citation omitted).  The Court has discretion how to weigh the factors and "the weakness of the showing regarding one factor may be overborne by the strength of the others."  *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).  That said, the plaintiff must succeed on the merits.  *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 357 n.32 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003) ("Absent success on the merits, the other factors are irrelevant.").

### A.    Success on the merits.

As explained above, Ekagra, CAN Softtech, Syneren, and JCS Solutions have established prejudicial errors in Commerce's evaluations of their proposals, which satisfies the requirement to succeed on the merits.  Therefore, the first factor weighs in favor of injunction.

### B.    Irreparable harm.

"When analyzing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'"  *Hosp. Klean of Tex, Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005) (quoting *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 447 (1993)) (alteration in original) (additional citations omitted).  The prevailing plaintiffs make similar arguments to establish their irreparable harm.  They argue that the lack of ability to compete in a fair competition for the work, revenue, and potential profits under CATTS is irreparable harm because there is no adequate remedy absent the injunction.  ECF No. 173 at

35-36 (Ekagra); ECF No. 164-1 at 36-37 (JCS); ECF No. 179 at 38 (Syneren); ECF No. 237 at 18 (CSI).[25]

The Government is correct that generally something more than arguments of counsel is offered to establish irreparable harm. ECF No. 203 at 274-75. Indeed, in many cases plaintiffs submit declarations from corporate officials regarding harms such as losing talent to layoffs, lost revenue, etc. None have done so here. But there is no rule that they must. As Judge Horn laid out in *Caddell Construction*, the fight over the sufficiency of irreparable harm and the various lines of cases that have developed has been raging for a long time. 111 Fed. Cl. at 114-116. And she persuasively concludes that "the question of whether to grant equitable relief is in the discretion of the trial court and that 'general rules' unique to one category of cases are inappropriate." *Id.* at 116. Thus, while some form of declaration may be necessary to establish irreparable harm through imminent layoffs of highly skilled employees or similar harms, they may not be necessary to establish others.

Here, the Court finds that the "loss of profit, stemming from a lost opportunity to compete for a contract on a level playing field [is] found sufficient to constitute irreparable harm." *Hosp. Klean of Tex.*, 65 Fed. Cl. at 624; *see also Sierra Nevada Corp. v. United States*, 154 Fed. Cl. 424, 440-41 (2021) (collecting cases). As explained above, the prevailing plaintiffs have lost the opportunity to compete on a level playing field. And, as a result, have lost significant revenue. They do not need declarations to prove that in this case because Commerce itself calculated what it expected each offeror would earn over the life of the contract. As explained in more detail in Section I.B.3, Commerce's price evaluation consisted of multiplying each offeror's labor rates by the amount of expected work and divided it by 15 (to account for the expected 15 contract awards). And Commerce itself determined that had the prevailing plaintiffs won contracts, they would have earned between $65-89 million each in revenue over the life of the contract. Plaintiffs need not provide any further proof of loss in this case. Therefore, this factor weighs in favor of injunctive relief.

### C.     Balance of the hardships.

When considering the balance of the hardships, the Court considers the harm to the Government and to the awardees. *McAfee, Inc. v. United States*, 111 Fed. Cl. 696, 714 (2013). The contracting officer provided a declaration in which she explained that one of the key components of CATTS is to move to a shared services across the bureaus at Commerce's headquarters. ECF No. 203 at ¶ 4. Commerce's current contract vehicles are funded by the

---

[25] In CSI's MJAR, it seeks declaratory relief that the Agency's rating of its technical proposal is arbitrary and capricious, and directing the Agency to perform a new technical evaluation. ECF No. 174-1 at 36. Declaratory relief does not require the consideration of the injunctive relief factors. *E.g.*, *AT&T Corp. v. United States*, 133 Fed. Cl. 550, 557-58 (2017). But declaratory relief does not compel action or inaction. When plaintiffs seek to compel agency action—*e.g.*, re-evaluation of proposals—that "is tantamount to a request for injunctive relief." *PGBA*, 389 F.3d 1228 (citation omitted). Were CSI proceeding on its own, the Court would not grant injunctive relief because CSI did not address the injunctive relief factors in its MJAR. But given that other plaintiffs are prevailing on their motions for injunctive relief, the Court seeks no reason to exclude CSI from the relief the Court is already granting.

specific bureaus, meaning that contractors cannot provide work beyond the bureau funding the work. *Id*. ¶ 5. This siloed funding has resulted in redundancies and added costs. *Id*. CATTS will eliminate these issues by allowing all the bureaus to order services from the same contract. This will, according to the contracting officer, moving to CATTS will result in a $71.8 million dollar savings to the Government over the life of the contract. *Id*. There are also certain entities within Commerce that are mandatory users of the CATTS vehicle. *Id*. ¶¶ 6-7. The Court does not discount this harm.

But, as the contracting officer acknowledges, there are bridge contracts available. *Id*. ¶ 11. Thus, services remain available to Commerce, lessening the potential harm. *See Hosp. Klean*, 65 Fed. Cl. at 624 (finding no harm to the Government when there are "alternative contracting vehicles available"). While these alternative contracts may not provide all of the benefits of CATTS, they will allow services to continue for the limited time that will be required to re-evaluate Ekagra's, CSI's Syneren's, and JCS's proposals in accord with this opinion.

Finally, the contracting officer worries that re-evaluation may be disruptive if the Agency needs to assemble a new TET or contracting officer to perform the evaluation due to the limited number of specialized personnel available at the Agency to serve in those functions. ECF No. 203-1 at ¶ 13. But that is not something the Court believes will be an issue. In this very case, Commerce re-assembled or established a new TET and/or contracting officer to evaluate 2Aces' proposal that was not evaluated originally. According to 2Aces' Complaint, Commerce agreed to re-evaluate its proposal on February 10, 2023. ECF No. 261 at ¶ 4. That evaluation, which was for the entirety of 2Aces' proposal, concluded by March 14, 2023. ECF No. 261-8 (2-Aces Debriefing dated March 14, 2023). Clearly the Agency can re-evaluate proposals as needed.

Finally, the Court must consider that these harms the Government claims are of its own making. It conducted the procurement the way it did. *See Caddell*, 111 Fed. Cl. at 116. It also structured the existing contract vehicles the way it did. Riding them a little further does not appear too harmful.

Many Intervenors also urge the Court to consider the harm to them and at least narrow the focus of the relief granted. They often rely in this Court's opinion in *Blue Tech, Inc. v. United States*, 155 Fed. Cl. 229 (2021), because there the Court granted injunctive relief requiring the Government to re-evaluate plaintiff's proposal but did not enjoin performance or the issuance of new task orders. This would avoid harm to them. While the Court is still mindful of keeping injunctive relief as narrow as possible, *Blue Tech* presented somewhat different circumstances. First, there were national security issues that Congress required (rightfully so) this Court to weigh in deciding the proper remedy. *Id*. at 246. There are no similar concerns here. Second, Blue Tech did not seek an injunction to stop the award of task orders if the re-evaluation went promptly, which it did. *See id*. at 246-47. Here, the plaintiffs do not wish to forgo the opportunity to compete for task orders while the Agency re-evaluates their proposals.

And some Intervenors suggest that to avoid harm to them because they "played by the rules." ECF No. 263 at 299:18-301:8. The Court is cognizant of the potential for causing harm to the awardees. But the question is not whether they played by the rules, the question is whether the Agency played by the rules. The Court does not see harm to the awardees in this case by the

delay imposed by the limited re-evaluation of the prevailing plaintiffs' technical proposals that are the issue here.  The Agency need only re-evaluate the proposals in accordance with this Order, and prepare new evaluation and decision documents as necessary.  Then the Agency can award new contracts and move forward.

For these reasons, the Court finds the balance of the harm to favor, albeit a closer call, injunctive relief.

### D.    Public interest.

"Finally, when 'employing the extraordinary remedy of injunction,' a court 'should pay particular regard for the public consequences' of doing so." *Torres Advanced Enter. Sols., LLC v. United States*, 133 Fed. Cl. 496, 534, *redacted opinion issued*, 135 Fed. Cl. 1 (2017) (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)).  There are two main considerations that are often competing here.  On one hand, "it is well-settled that 'the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid.'" *Blue Tech*, 155 Fed. Cl. at 247 (quoting *Torres*, 133 Fed. Cl. at 534.  On the other hand, "'there is a countervailing public interest in minimizing disruption' to the Government." *Id*. (quoting *Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 321 (2009)).

Here, the public interest in ensuring the propriety of the procurement system wins out.  While there may be limited delay to the Government, that is the Agency's making.  Therefore, this factor weighs in favor of injunctive relief.

## XIV.   Conclusion

For the reasons stated above, the Court:

1.   Denies-in-Part all Motions for Judgment on the Administrative Record insofar as they seek dismissal for lack of standing.

2.   Denies Allicent's Motion for Judgment on the Administrative Record, ECF No. 168, and Grants the Defendant's, ECF No. 203, and Defendant-Intervenors' Cross-Motions for Judgment on the Administrative Record, ECF Nos. 193, 194, 195, 196, 197, 198, 199, 200, 201, 202 insofar as they relate to No. 22-1380.

3.   Grants-in-Part and Denies-in-Part Ekagra's Motion for Judgment on the Administrative Record, ECF No. 173, and Grants-in-Part and Denies-in-Part the Defendant's, ECF No. 203, and Defendant-Intervenors' Cross-Motions for Judgment on the Administrative Record, ECF Nos. 193, 194, 195, 196, 197, 198, 199, 200, 201, 202 insofar as they relate to No. 22-1425.

4.   Grants-in-Part and Denies-in-Part CAN Softtech's Motion for Judgment on the Administrative Record, ECF No. 174, and Grants-in-Part and Denies-in-Part the Defendant's, ECF No. 203, and Defendant-Intervenors' Cross-Motions for Judgment on the Administrative Record, ECF Nos. 193, 194, 195, 196, 197, 198, 199, 200, 201, 202 insofar as they relate to No. 22-1436.

5.  Grants-in-Part and Denies-in-Part Syneren's Motion for Judgment on the Administrative Record, ECF No. 179, and Grants-in-Part and Denies-in-Part the Defendant's, ECF No. 203, and Defendant-Intervenors' Cross-Motions for Judgment on the Administrative Record, ECF Nos. 193, 194, 195, 196, 197, 198, 199, 200, 201, 202 insofar as they relate to No. 22-1460.

6.  Denies GenceTek's Motion for Judgment on the Administrative Record, ECF No. 177, and Grants the Defendant's, ECF No. 203, and Defendant-Intervenors' Cross-Motions for Judgment on the Administrative Record, ECF Nos. 193, 194, 195, 196, 197, 198, 199, 200, 201, 202 insofar as they relate to No. 22-1462.

7.  Denies RarisRex's Motion for Judgment on the Administrative Record, ECF No. 172, and Grants the Defendant's, ECF No. 203, and Defendant-Intervenors' Cross-Motions for Judgment on the Administrative Record, ECF Nos. 193, 194, 195, 196, 197, 198, 199, 200, 201, 202 insofar as they relate to No. 22-1477.

8.  Denies AttainX's Motion for Judgment on the Administrative Record, ECF No. 170, and Grants the Defendant's, ECF No. 203, and Defendant-Intervenors' Cross-Motions for Judgment on the Administrative Record, ECF Nos. 193, 194, 195, 196, 197, 198, 199, 200, 201, 202 insofar as they relate to No. 22-1492.

9.  Grants-in-Part and Denies-in-Part JCS's Motion for Judgment on the Administrative Record, ECF No. 164, and Grants-in-Part and Denies-in-Part the Defendant's, ECF No. 203, and Defendant-Intervenors' Cross-Motions for Judgment on the Administrative Record, ECF Nos. 193, 194, 195, 196, 197, 198, 199, 200, 201, 202 insofar as they relate to No. 22-1519.

10. Denies SaiTech's Motion for Judgment on the Administrative Record, ECF No. 169, and Grants the Defendant's, ECF No. 203, and Defendant-Intervenors' Cross-Motions for Judgment on the Administrative Record, ECF Nos. 193, 194, 195, 196, 197, 198, 199, 200, 201, 202 insofar as they relate to No. 22-1549.

11. Grants Ekagra's, CAN Softtech's, Syneren's and JCS's requests for a declaratory judgment and for a Permanent Injunction as follows:

    a.  The Court hereby declares the Department of Commerce' selections of contract awardees under Request for Proposal No. 1131L5-21-R-13OS-0006 for the Commerce Acquisition for Transformational Technology Services to have been arbitrary and capricious.

    b.  The Court permanently enjoins the United States, acting by and through the Department of Commerce, from proceeding with any performance of a contract awarded under Request for Proposal No. 1131L5-21-R-13OS-0006 for the Commerce Acquisition for Transformational Technology Services.  If the Government wishes to proceed with this procurement, it shall, at a minimum, re-evaluate the technical proposals of Ekagra, CAN Softtech, Syneren, and JCS Solutions and issue new decision documents as necessary in a manner not inconsistent with this Opinion and Order.

The Government shall then make new contract award decisions and award new contracts as necessary.

12. Pursuant to RCFC 54(b), the Court finds that there is no just reason for delay and directs the Clerk's Office to enter judgment in Matter Nos. 22-1380, 22-1425, 22-1436, 22-1460, 22-1462, 22-1477, 22-1492, 22-1519, and 22-1549.  The Court will resolve Matter No. 23-441 pursuant to the schedule for that protest.

IT IS SO ORDERED.

<u>s/ Edward H. Meyers</u>
Edward H. Meyers
Judge